IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FEBIT HOLDING GMBH,<br><br>                    Plaintiff,<br><br>v.<br><br>CODON DEVICES, INC.,<br><br>                    Defendant. | Civil Action No.: 07-385 GMS<br><br>**PUBLIC VERSION** |

DECLARATION OF MARK FOX EVENS IN SUPPORT OF FEBIT HOLDING
GMBH'S OPPOSITION TO CODON DEVICES, INC.'S MOTION TO
DISMISS, OR IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT

P. Clarkson Collins, Jr. (#739)
Mary B. Matterer (#2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
302.888.6800
mmatterer@morrisjames.com

*Of Counsel*
Mark Fox Evens
Edward J. Kessler
W. Blake Coblentz
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, D.C.  20005-3934
(202) 371-2600

*Attorneys for Plaintiff*

Original Dated: October 26, 2007
Public Version:  November 9, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FEBIT HOLDING GMBH, | |
| Plaintiff, | |
| v. | Civil Action No.: 07-385 GMS |
| CODON DEVICES, INC., | |
| Defendant. | |

## DECLARATION OF MARK FOX EVENS IN SUPPORT OF FEBIT HOLDING GMBH'S OPPOSITION TO CODON DEVICES INC.'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT

I, Mark Fox Evens, declare:

1.      I am admitted *pro hac vice* to practice in the United States District Court for the District of Delaware in this action.  I am a director at Sterne, Kessler, Goldstein & Fox, P.L.L.C., and a member of the bars of the Commonwealth of Virginia and the District of Columbia.  I am attorney of record for febit holding GmbH ("febit").  The matters referred to in this document are based on my personal knowledge, and if called as a witness, I could, and would, testify to these matters.

2.      To my knowledge, attached hereto as Exhibit 1 is a true and correct copy of the Complaint filed by febit against Codon Devices, Inc. ("Codon") on June 15, 2007, in *febit biotech GmbH v. Codon Devices, Inc.*, Civil Action No. 07-385 GMS (D. Del.).

3.      To my knowledge, attached hereto as Exhibit 2 is a true and correct copy of U.S. Patent No. 6,586,211 B1 (the "'211 patent").

4.    To my knowledge, attached hereto as Exhibit 3 is a true and correct copy of the Report On The Filing Or Determination Of An Action Regarding A Patent Or Trademark filed on June 15, 2007, in *febit biotech GmbH v. Codon Devices, Inc.*, Civil Action No. 07-385 (D. Del.).

5.    To my knowledge, attached hereto as Exhibit 4 is a true and correct copy of a Complaint For Declaratory Judgment filed by Codon against febit on June 29, 2007, in *Codon Devices, Inc. v. febit biotech GmbH, febit ferrarius biotechnology GmbH, and febit, GmbH* , Civil Action 07-01177 RBW (D. D.C.).

6.    To my knowledge, attached hereto as Exhibit 5 is a true and correct copy of a letter dated July 2, 2007, from Edward Reines to Edward J. Kessler.

7.    In early to mid-July, 2007, I participated in a telephone conversation with attorneys from Weil, Gotshal & Manges, LLP ("Weil Gotshal").    During this telephone conversation, a Weil Gotshal attorney explained to me that Weil Gotshal had filed its Declaratory Judgment action out of concern as to which febit entity owned the '211 patent.  I discussed my desire to resolve any dispute or doubt as to the true ownership of the '211 patent informally so as not to waste either client's resources and not to needlessly involve this Court in a minor issue.  Specifically, I stated that I would attempt to obtain from my client febit documents showing the chain of title for the '211 patent without requiring Codon to submit a document request.  Due to the time necessary to obtain the documents and translations of the documents, I also agreed to extend the deadline for Codon to file a response to the Complaint.  It was my intent to resolve any doubt as to the ownership of the '211 patent without involving the District Court for the District of Delaware.

8.     To my knowledge, attached hereto as Exhibit 6 is a true and correct copy of an electronic mail ("e-mail") dated July 24, 2007, from Rip Finst to Mark Fox Evens.

9.     To my knowledge, attached hereto as Exhibit 7 is a true and correct copy of an e-mail dated July 27, 2007, from Mark Fox Evens to Rip Finst.

10.     To my knowledge, attached hereto as Exhibit 8 is a true and correct copy of an e-mail dated July 31, 2007, from Mark Fox Evens to Edward Reines.

11.     To my knowledge, attached hereto as Exhibit 9 is a true and correct copy of an accompanying letter to the e-mail dated July 31, 2007, from Mark Fox Evens to Edward Reines.

12.     To my knowledge, attached hereto as Exhibit 10 is a true and correct copy of an attachment to the letter dated July 31, 2007, from Mark Fox Evens to Edward Reines (Exhibit 9).   Specifically, Exhibit 10 is an English-language translation of a contract between TechnoStart Beratungsgesellschaft fur Beteiligungsfonds mbH ("TechnoStart"), the vendor, and Neckarburg 66. V V GmbH, which is to be known as febit biotech GmbH ("febit"), the purchaser.

13.     To my knowledge, attached hereto as Exhibit 11 is a true and correct copy of an attachment to the letter dated July 31, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 9).   Specifically, Exhibit 11 is an original German-language contract between TechnoStart, the vendor, and febit, the purchaser (an English-language translation of which is submitted herewith as Exhibit 10).

14.     To my knowledge, attached hereto as Exhibit 12 is a true and correct copy of an attachment to the letter dated July 31, 2007, from Mark Fox Evens to Edward Reines (submitted

-3-

herewith as Exhibit 9). Specifically, Exhibit 12 is an English-language translation of "ANNEX 4", identified at p. 7, line 7 of Exhibit 10, as an "Agreement canceling the memorandum of understanding" and identifying PCT/EP00/01356, and progeny therefrom, including the '211 patent, as being the subject of a purchase option to the contract between TechnoStart and febit.

15.    To my knowledge, attached hereto as Exhibit 13 is a true and correct copy of an attachment to the letter dated July 31, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 9). Specifically, Exhibit 13 is a copy of the original German-language "ANNEX 4" (an English-language translation of which is submitted herewith as Exhibit 12).

16.    To my knowledge, attached hereto as Exhibit 14 is a true and correct copy of an attachment to the letter dated July 31, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 9). Specifically, Exhibit 14 is an English-language translation of a letter dated February 14, 2005, from Wellensiek Grub & Partner, attorneys at law, Heidelberg, Germany, to Michael Mayer managing director, TechnoStart. Exhibit 14 states that by a contract of sale dated September 24, 2004, TechnoStart had acquired all "patents, trademarks, utility models, rights to use the name and industrial property rights as well as associated applications" of febit AG.

17.    To my knowledge, attached hereto as Exhibit 15 is a true and correct copy of an attachment to the letter dated July 31, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 9). Specifically, Exhibit 15 is a copy of a German-language letter dated February 14, 2005, from Wellensiek Grub & Partner, attorneys at law, Heidelberg, Germany, to Michael Mayer managing director, TechnoStart (an English-language translation of which is submitted herewith as Exhibit 14).

18.    To my knowledge, attached hereto as Exhibit 16 is a true and correct copy of an attachment to the letter dated July 31, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 9).  Specifically, Exhibit 16 is an English-language translation of a letter dated May 30, 2005, from TechnoStart to febit.  Exhibit 16 states that by a contract of sale dated September 24, 2004, and by way of retail sale on account on November 5, 2004 and December 16, 2004, TechnoStart acquired the "patents, trademarks, utility models, rights to use the name and industrial property rights as well as associated applications" of febit AG, and that as of April 18, 2005, febit acquired "the parts which are listed in the annex to the contract of sale of April 18, 2005."

19.    To my knowledge, attached hereto as Exhibit 17 is a true and correct copy of an attachment to the letter dated July 31, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 9).  Specifically, Exhibit 17 is a true and correct copy of a German-language letter dated May 30, 2005, from TechnoStart to febit (an English-language translation of which is submitted herewith as Exhibit 16).

20.    To my knowledge, attached hereto as Exhibit 18 is a true and correct copy of an attachment to the letter dated July 31, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 9).  Specifically, Exhibit 18 is a copy of a German-language letter dated July 17, 2001, from Freiwillige Gerichtsbarkeit to febit ferrarius biotechnology GmbH, which shows the name change from "febit ferrarius biotechnology GmbH" to "febit AG."

21.    To my knowledge, attached hereto as Exhibit 19 is a true and correct copy of an attachment to the letter dated July 31, 2007, from Mark Fox Evens to Edward Reines (submitted

herewith as Exhibit 9). Specifically, Exhibit 19 is a copy of a German-language letter dated July 20, 2001, from Freiwillige Gerichtsbarkeit to febit ferrarius biotechnology GmbH.

22.    To my knowledge, attached hereto as Exhibit 20 is a true and correct copy of a letter dated August 1, 2007, from Rip Finst to Mark Fox Evens.

23.    To my knowledge, attached hereto as Exhibit 21 is a true and correct copy of a letter dated August 8, 2007, from Rip Finst to Mark Fox Evens.

24.    To my knowledge, attached hereto as Exhibit 22 is a true and correct copy of an e-mail dated August 8, 2007, from Mark Fox Evens to Rip Finst.

25.    To my knowledge, attached hereto as Exhibit 23 is a true and correct copy of a letter dated August 15, 2007, from Rip Finst to Mark Fox Evens.

26.    Attached hereto as Exhibit 24 is a true and correct copy of an e-mail dated August 15, 2007, from Mark Fox Evens to Rip Finst.

27.    To my knowledge, attached hereto as Exhibit 25 is a true and correct copy of an e-mail dated August 17, 2007, from Rip Finst to Mark Fox Evens.

28.    To my knowledge, attached hereto as Exhibit 26 is a true and correct copy of an e-mail dated August 24, 2007, from Rip Finst to Mark Fox Evens.

29.    To my knowledge, attached hereto as Exhibit 27 is a true and correct copy of an e-mail dated August 27, 2007, from Mark Fox Evens to Rip Finst.

30.    Attached hereto as Exhibit 28 is a true and correct copy of an e-mail dated September 5, 2007, from Mark Fox Evens to Edward Reines.

31.    Unfortunately, in late July and early August, I had to attend to significant health issues involving my wife and daughter that prevented me from checking on the status of document collection and translation occurring in Germany.

32.    To my knowledge, attached hereto as Exhibit 29 is a true and correct copy of an e-mail dated September 18, 2007, from Mark Fox Evens to Rip Finst.

33.    To my knowledge, attached hereto as Exhibit 30 is a true and correct copy of an e-mail dated September 19, 2007, from Mark Fox Evens to Edward Reines.

34.    To my knowledge, attached hereto as Exhibit 31 is a true and correct copy of an accompanying letter to the e-mail dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 30).

35.    To my knowledge, attached hereto as Exhibit 32 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 32 is a Statement by Eisenlohr, LL.M., Mannheim, Germany, dated September 10, 2007, affirming that febit biotech GmbH is the proper owner of the '211 patent.

36.    To my knowledge, attached hereto as Exhibit 33 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 33 is a copy of "ANNEX 1" to the Statement by Eisenlohr, LL.M., which is a redacted copy of an English-language translation of an extract of the commercial register HRB 2476 W of the local court of Mannheim, Germany,

showing that febit ferrarius biotechnology GmbH was founded on November 10, 1998, and registered in the local court of Mannheim, Germany on January 26, 1999.

37.    To my knowledge, attached hereto as Exhibit 34 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 34 is a copy of "ANNEX 2" to the Statement by Eisehlohr, LL.M., which is a redacted copy of an English-language translation of an extract of the commercial register HRB 8373 of the local court of Mannheim, Germany, showing that on November 29, 1999, febit ferrarius biotechnology GmbH transferred its registered office from Weinheim, Germany to Mannheim, Germany.

38.    To my knowledge, attached hereto as Exhibit 35 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 35 is a copy of "ANNEX 3–part 1" to the Statement by Eisehlohr, LL.M., which is a redacted copy of an English-language translation of an extract of the commercial register HRB 8959 of the local court of Mannheim, Germany, showing that febit ferrarius biotechnology GmbH was transformed into a stock corporation and became registered as febit AG in the local court of Mannheim, Germany.

39.    To my knowledge, attached hereto as Exhibit 36 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 36 is a copy of "ANNEX 3–part 2" to the Statement by Eisehlohr, LL.M., which is a redacted copy of an English-language translation of an extract of the commercial register HRB 8959 of the local court of Mannheim, Germany,

showing that febit ferrarius biotechnology GmbH was transformed into a stock corporation and became registered as febit AG in the local court of Mannheim, Germany.

40.    To my knowledge, attached hereto as Exhibit 37 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 37 is a copy of "ANNEX 4" to the Statement by Eisenlohr, LL.M., which is a copy of a German-language court order of the local court of Mannheim, Germany, dated July 1, 2004, which shows that bankruptcy proceedings were instituted against febit AG on July 1, 2004.

41.    To my knowledge, attached hereto as Exhibit 38 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 38 is a copy of "ANNEX 5" to the Statement by Eisenlohr, LL.M., which is a redacted German-language purchase agreement dated September 24, 2004, between the insolvency administrator in the bankruptcy proceedings against febit AG and TechnoStart.

42.    To my knowledge, attached hereto as Exhibit 39 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 39 is a copy of "ANNEX 6" to the Statement by Eisenlohr, LL.M., which is an English-language translation of a letter dated December 17, 2004, from TechnoStart to Wellensiek Grub & Partner stating that TechnoStart exercises its purchase option of the patents and patent registrations listed in Appendix 4 (English- and German-language copies of which are submitted herewith as Exhibits 12 and 13, respectively, and which identifies the '211 patent).

43.     To my knowledge, attached hereto as Exhibit 40 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 40 is a copy of "ANNEX 7" to the Statement by Eisenlohr, LL.M., which is a an English-language translation of a letter dated January 17, 2005, from Wellensiek Grub & Partner to TechnoStart stating that the purchase option exercised on December 17, 2004, was valid and that transfer of title of the '211 patent to TechnoStart was completed. Also included in "ANNEX 7" to the Statement by Eisenlohr, LL.M. is a copy of Appendix 4, identifying the '211 patent.

44.     To my knowledge, attached hereto as Exhibit 41 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 41 is a copy of "ANNEX 8" to the Statement by Eisenlohr, LL.M., which is a redacted copy of a purchase agreement dated April 18, 2005, between TechnoStart and Neckarburg 66. VV GmbH.

45.     To my knowledge, attached hereto as Exhibit 42 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 42 is a copy of "ANNEX 9" to the Statement by Eisenlohr, LL.M., which is a redacted copy of an English-language translation of an extract of the commercial register HRB 25183 of the local court Stuttgart, Germany, showing that the company "Neckarburg 66. VV GmbH" was registered in the local court of Stuttgart, Germany on February 22, 2005.

46.     To my knowledge, attached hereto as Exhibit 43 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines

(submitted herewith as Exhibit 31). Specifically, Exhibit 43 is a copy of "ANNEX 10" to the Statement by Eisenlohr, LL.M., which is a redacted copy of an English-language translation of an extract of the commercial register HRB 337906 of the local court of Mannheim, Germany, showing that as of August 6, 2007, febit biotech GmbH changed its name to febit holding GmbH.

47. To my knowledge, attached hereto as Exhibit 44 is a true and correct copy of an attachment to the letter dated September 19, 2007, from Mark Fox Evens to Edward Reines (submitted herewith as Exhibit 31). Specifically, Exhibit 44 is a copy of "ANNEX 11" to the Statement by Eisenlohr, LL.M., which is an English-language translation of a letter dated May 30, 2005, from TechnoStart to febit biotech GmbH showing that as of April 18, 2005, febit biotech GmbH had acquired the patents, brands, utility models, name rights, intellectual property rights and other registrations in relation to these, which the insolvency administrator of febit AG had assigned to TechnoStart. Among the intellectual property assets purchased by febit biotech GmbH from TechnoStart was the '211 patent.

48. To my knowledge, attached hereto as Exhibit 45 is a true and correct copy of an e-mail dated September 23, 2007, from Rip Finst to Mark Fox Evens.

49. To my knowledge, attached hereto as Exhibit 46 is a true and correct copy of an e-mail dated September 26, 2007, from Mark Fox Evens to Rip Finst.

50. Attached hereto as Exhibit 47 is a true and correct copy of an e-mail dated September 26, 2007, from Rip Finst to Mark Fox Evens.

51.    To my knowledge, attached hereto as Exhibit 48 is a true and correct copy of an e-mail dated September 28, 2007, from Mark Fox Evens to Rip Finst.

52.    To my knowledge, attached hereto as Exhibit 49 is a true and correct copy of an attachment to the e-mail dated September 28, 2007, from Mark Fox Evens to Rip Finst (submitted herewith as Exhibit 48).  Specifically, Exhibit 49 is an English-language translation of "ANNEX 4" to the Statement by Eisenlohr, LL.M. (submitted herewith as Exhibits 32 and 37), and which shows that bankruptcy proceedings were instituted against febit AG on July 1, 2004.

53.    To my knowledge, attached hereto as Exhibit 50 is a true and correct copy of an attachment to the e-mail dated September 28, 2007, from Mark Fox Evens to Rip Finst (submitted herewith as Exhibit 48).  Specifically, Exhibit 50 is an English-language translation of "ANNEX 5" to the Statement by Eisenlohr, LL.M. (submitted herewith as Exhibits 32 and 38), and which is a redacted purchase agreement dated September 24, 2004, between the insolvency administrator in the bankruptcy proceedings against febit AG and TechnoStart.

54.    To my knowledge, attached hereto as Exhibit 51 is a true and correct copy of an attachment to the e-mail dated September 28, 2007, from Mark Fox Evens to Rip Finst (submitted herewith as Exhibit 48).  Specifically, Exhibit 51 is an English-language translation of "ANNEX 8" to the Statement by Eisenlohr, LL.M. (submitted herewith as Exhibits 32 and 41), and which is a redacted copy of a purchase agreement dated April 18, 2005, between TechnoStart and Neckarburg 66. VV GmbH.

55.    To my knowledge, attached hereto as Exhibit 52 is a true and correct copy of a Motion To Dismiss Complaint Of Plaintiff Febit Biotech GmbH Or, In The Alternative, For A

More Definite Statement, filed on October 1, 2007, in *febit biotech GmbH v. Codon Devices, Inc.*, Civil Action No. 07-385 (D. Del.).

56.    To my knowledge, attached hereto as Exhibit 53 is a true and correct copy of a Declaration of Rip Finst In Support Of Codon Device's, Inc.'s Motion To Dismiss febit biotech GmbH's Complaint Or, In The Alternative, For A More Definite Statement, filed on October 1, 2007, in *febit biotech GmbH v. Codon Devices, Inc.*, Civil Action No. 07-385 (D. Del.).

57.    To my knowledge, attached hereto as Exhibit 54 is a true and correct copy of a docket report for *Eckhart U. Alt, M.D. v. Medtronic, Inc.*, Civil Action No. 06-67 (E.D. Tex.), a patent infringement case filed by Eckhart U. Alt, M.D., alleging infringement of U.S. Patent No. 5,403,355 by Medtronic, Inc. The plaintiff, Eckhart U. Alt, M.D., is represented in the matter by attorneys from Weil Gotshal, which filed the complaint on his behalf.

58.    To my knowledge, attached hereto as Exhibit 55 is a true and correct copy of the complaint filed on February 15, 2006, by attorneys from Weil Gotshal on behalf of Eckhart U. Alt, M.D., in the District Court for the Eastern District of Texas and asserting against Medtronic, Inc., infringement of U.S. Patent No. 5,403,355 (the "'355 patent"). The complaint asserts that "Dr. Alt was assigned the '355 Patent, and he holds all rights, title, and interest in the '355 Patent."

59.    To my knowledge, attached hereto as Exhibit 56 is a true and correct copy of U.S. Patent No. 5,403,355, which is assigned on its face to "Intermedics, Inc."

60.    To my knowledge, attached hereto as Exhibit 57 is a true and correct copy of the "Patent Assignment Abstract of Title" for U.S. Patent No. 5,403,355, accessed electronically via

the United States Patent and Trademark Office website (http://www.uspto.gov) on October 22, 2007, and which shows that ownership of U.S. Patent No. 5,403,355 has been assigned to at least five different entities since 1994. Specifically, "Eckhard Alt" assigned his rights in the '355 patent to "Intermedics, Inc." by an assignment executed on June 23, 1994. Subsequently, "Intermedics, Inc." assigned its rights in the '355 patent to "Advanced Medical Devices, S.A." by an assignment executed November 10, 2003. "Advanced Medical Devices, S.A." then assigned its rights in the '355 patent to "Dr. Eckhard U. Alt", by an assignment that was executed on August 19, 2004. On September 15, 2006, an "Eckhard U. Alt, M.D.", who until this time had not been specifically named as an assignee of the '355 patent, executed an assignment of rights in the '355 patent to "Medtronic, Inc." Additionally, on September 15, 2006, "Advanced Medical Devices, S.A.," which had previously assigned its rights in the '355 patent to "Dr. Eckhard U. Alt", also executed an assignment of its rights in the '355 patent to "Medtronic, Inc." Finally, "Scicotec, Inc.", which had previously not been named as an assignee of the '355 patent, on September 15, 2006, executed an assignment of its rights in the '355 patent to "Medtronic, Inc." From the chain of title recorded at the United States Patent and Trademark Office the true owner of the '355 patent would appear to be "Medtronic, Inc."

61.    To my knowledge, attached hereto as Exhibit 58 is a true and correct copy of 37 C.F.R. § 3.54, accessed electronically via the United States Patent and Trademark Office website (http://www.uspto.gov) on October 22, 2007, and which identifies the effect of recording of a document pursuant to 37 C.F.R. § 3.11 at the United States Patent and Trademark Office.

62.    To my knowledge, attached hereto as Exhibit 59 is a true and correct copy of MPEP § 307, accessed electronically via the United States Patent and Trademark Office website (http://www.uspto.gov) on October 24, 2007, and which states that assignment information

-14-

printed on a patent is not updated after a patent is issued, and may not be reflective of the assignment recorded in the USPTO subsequent to the issuance of the patent.

63.    To my knowledge, attached hereto as Exhibit 60 is a true and correct copy of "ANNEX 1" to the Statement by Eisenlohr, LL.M., which is a redacted copy of a German-language extract of the commercial register HRB 2476 W of the local court of Mannheim, Germany, showing that febit ferrarius biotechnology GmbH was founded on November 10, 1998, and registered in the local court of Mannheim, Germany on January 26, 1999.

64.    To my knowledge, attached hereto as Exhibit 61 is a true and correct copy of "ANNEX 2" to the Statement by Eiselhohr, LL.M., which is a redacted copy of a German-language extract of the commercial register HRB 8373 of the local court of Mannheim, Germany, showing that on November 29, 1999, febit ferrarius biotechnology GmbH transferred its registered office from Weinheim, Germany to Mannheim, Germany.

65.    To my knowledge, attached hereto as Exhibit 62 is a true and correct copy of "ANNEX 3" to the Statement by Eisehlohr, LL.M., which is a redacted copy of a German-language extract of the commercial register HRB 8959 of the local court of Mannheim, Germany, showing that febit ferrarius biotechnology GmbH was transformed into a stock corporation and became registered as febit AG in the local court of Mannheim, Germany.

66.    To my knowledge, attached hereto as Exhibit 63 is a true and correct copy of "ANNEX 6" to the Statement by Eisenlohr, LL.M., which is a German-language letter dated December 17, 2004, from TechnoStart to Wellensiek Grub & Partner stating that TechnoStart exercises its purchase option of the patents and patent registrations listed in Appendix 4.

-15-

67.    To my knowledge, attached hereto as Exhibit 64 is a true and correct copy of "ANNEX 7" to the Statement by Eisenlohr, LL.M., which is a German-language letter dated January 17, 2005, from Wellensiek Grub & Partner to TechnoStart stating that the purchase option exercised on December 17, 2004, was valid and that transfer of title of the '211 patent to TechnoStart was completed.

68.    To my knowledge, attached hereto as Exhibit 65 is a true and correct copy of "ANNEX 9" to the Statement by Eisenlohr, LL.M., which is a redacted copy of a German-language extract of the commercial register HRB 25183 of the local court Stuttgart, Germany, showing that the company "Neckarburg 66. VV GmbH" was registered in the local court of Stuttgart, Germany on February 22, 2005.

69.    To my knowledge, attached hereto as Exhibit 66 is a true and correct copy of "ANNEX 10" to the Statement by Eisenlohr, LL.M., which is a redacted copy of a German-language extract of the commercial register HRB 337906 of the local court of Mannheim, Germany, showing that as of August 6, 2007, febit biotech GmbH changed its name to febit holding GmbH.

70.    To my knowledge, attached hereto as Exhibit 67 is a true and correct copy of "ANNEX 11" to the Statement by Eisenlohr, LL.M., which is a German-language letter dated May 30, 2005, from TechnoStart to febit biotech GmbH showing that as of April 18, 2005, febit biotech GmbH had acquired the patents, brands, utility models, name rights, intellectual property rights and other registrations in relation to these, which the insolvency administrator of febit AG had assigned to TechnoStart.  Among the intellectual property assets purchased by febit biotech GmbH from TechnoStart was the '211 patent.

-16-

71.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Mark Fox Evens

Executed on October 25 , 2007, in Washington, DC.

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FEBIT BIOTECH GMBH,
IM Neuenheimer Feld 519,
69120 Heidelberg, Germany

                           Plaintiff,

v.

CODON DEVICES, INC.,
One Kendall Square,
Building 300, Third Floor,
Cambridge, MA 02139

                          Defendant.

Civil Action No.:

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff febit biotech GmbH (hereinafter "febit"), through its undersigned attorneys, as and for its Complaint against Defendant Codon Devices, Inc. (hereinafter "Codon Devices"), alleges as follows:

## NATURE OF THE ACTION

1.     This is an action arising under the patent laws of the United States (35 U.S.C. §§ 271 et seq.) based upon Defendant Codon Devices' infringement of U.S. Patent No. 6,586,211 B1 entitled "Method for Producing Polymers."

## THE PARTIES

2.     Plaintiff febit is a German corporation having its principal place of business at IM Neuenheimer Feld 519, 69120 Heidelberg, Germany.

3.      Upon information and belief, Defendant Codon Devices, is a Delaware corporation, having its principal place of business at One Kendall Square, Building 300, Third Floor, Cambridge, MA 02139.

## JURISDICTION AND VENUE

4.      This action for patent infringement arises under the patent laws of the United States, United States Code, Title 35.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over Defendant Codon Devices because Codon Devices is incorporated in Delaware.

7.      Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400.

## THE PATENT-IN-SUIT

8.      febit is the owner of the entire right, title and interest in and to U.S. Patent No. 6,586,211 B1 (hereinafter "the '211 patent"), issued July 1, 2003, entitled "Method for Producing Polymers." The named inventors of this patent are Peer F. Stähler, Cord F. Stähler and Manfred Muller. A true and correct copy of the '211 patent is attached to this Complaint as Exhibit A.

9.      The independent claims of the '211 patent are:

Claim 1:

> Method for synthesizing polymers, wherein said method comprises synthesizing a plurality of oligomeric building blocks by parallel synthesis steps, wherein each oligomeric building block is synthesized on a different area of a common support, detaching the plurality of oligomeric building blocks from the support and bringing the oligomeric building blocks into contact with one another to synthesize the polymer, and wherein said different areas of said common support are at least partially in fluid communication during synthesis.

2

Claim 25:

> Method for synthesizing polymers that are greater than 10,000 bp in length, wherein said method comprises synthesizing a plurality of oligomeric building blocks by parallel synthesis steps, wherein each oligomeric building block is synthesized on a different area of a common support, detaching the plurality of oligomeric building blocks from the support and bringing the oligomeric building blocks into contact with one another to synthesize the polymer, and wherein said different areas of said common support are at least partially in fluid communication during synthesis.

## COUNT I

### (Infringement of the '211 Patent Pursuant to 35 U.S.C. § 271(g))

10.    The allegations of paragraphs 1-9 above are repeated and re-alleged as if set forth fully herein.

11.    Upon information and belief, Defendant Codon Devices manufactures and uses a gene synthesis platform called the BioFAB® platform.

12.    Upon information and belief, Defendant Codon Devices' BioFAB® platform, and the methods it performs, synthesizes molecular biology devices such as DNA and protein clones, variant libraries and operon and operon variant libraries. More specifically, Codon Devices' BioFAB® platform is used to synthesize oligonucleotides, hybridize oligonucleotides into duplexes and assemble genes from the duplexes. Codon Devices is currently scaling the platform to design and construct molecular biology devices hundreds of kilobases to megabases in length.

13.    Upon information and belief, in 2005, Defendant Codon Devices began offering for sale and selling in the United States molecular biology devices made using its BioFAB® platform.

14.    Upon information and belief, Defendant Codon Devices continues to offer for sale and sell in the United States molecular biology devices made using its BioFAB® platform.

3

15.    Upon information and belief, Defendant Codon Devices's manufacturing process to synthesize molecular biology devices using the BioFAB® platform, if practiced in the United States, infringes literally or under the doctrine of equivalents or will infringe literally or under the doctrine of equivalents one or more claims of the '211 patent pursuant to 35 U.S.C. § 271(g).

16.    Upon information and belief, Defendant Codon Devices' offer for sale, sale or use within the United States of its molecular biology devices made using its BioFAB® platform infringes literally or under the doctrine of equivalents, one or more claims of the '211 patent pursuant to 35 U.S.C. § 271(g).

17.    Upon information and belief, Defendant Codon Devices' infringement of the '211 patent has been knowing and willful.

18.    Defendant Codon Devices' infringement of the '211 patent has caused and continues to cause febit to suffer substantial money damages.

19.    Defendant Codon Devices' infringement of the '211 patent has caused and continues to cause febit to suffer irreparable harm for which there is no adequate remedy at law.

## COUNT II

### (Infringement of the '211 Patent Pursuant to 35 U.S.C. § 271(a))

20.    The allegations of paragraphs 1-19 above are repeated and re-alleged as if set forth fully herein.

21.    Upon information and belief, Defendant Codon Devices' offer for sale, sale or use within the United States of its molecular biology devices made using its BioFAB® platform infringes literally or under the doctrine of equivalents, one or more claims of the '211 patent pursuant to 35 U.S.C. § 271(a).

4

22.    On information and belief, Defendant Codon Devices' infringement of the '211 patent has been knowing and willful.

23.    Defendant Codon Devices' infringement of the '211 patent has caused and continues to cause febit to suffer substantial money damages.

24.    Defendant Codon Devices' infringement of the '211 patent has caused and continues to cause febit to suffer irreparable harm for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, febit prays for a judgment:

A.    Entering judgment that Defendant Codon Devices has infringed the '211 patent;

B.    Entering a preliminary and permanent injunction enjoining Codon Devices and their affiliates, subsidiaries, officers, directors, employees, agents, representatives, licensees, successors, assigns and all those acting for them or on their behalf, or acting in concert or privity with them, from committing further infringement of the '211 patent;

C.    Awarding febit compensatory damages under 35 U.S.C. § 284;

D.    Awarding febit treble damages for Codon Devices' willful infringement;

E.    Awarding costs and reasonable attorney's fees in favor of febit; and

F.    Awarding febit any further relief that this Court may deem appropriate.

5

**JURY DEMAND**

febit demands a jury trial as to all issues that are triable by a jury in this action.

FEBIT BIOTECH GMBH

Date:   June 15, 2007

By: _____
P. Clarkson Collins, Jr. (#739)
Mary B. Matterer (#2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
302.888.6800
mmatterer@morrisjames.com

Mark Fox Evens
Edward J. Kessler
W. Blake Coblentz
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, D.C.  20005-3934
(202) 371-2600

*Attorneys for Plaintiff*

6

# EXHIBIT 2

US006586211B1

(12) **United States Patent**    (10) Patent No.: **US 6,586,211 B1**
Stähler et al.                    (45) Date of Patent:        **Jul. 1, 2003**

(54) **METHOD FOR PRODUCING POLYMERS**

(75) Inventors: **Peer F. Stähler**, Mannheim (DE); **Cord F. Stähler**, Weinheim (DE); **Manfred Müller**, Schriesheim (DE)

(73) Assignee: **FeBit Ferrarius Biotechnology GmbH** (DE)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/869,332**

(22) PCT Filed: **Feb. 18, 2000**

(86) PCT No.: **PCT/EP00/01356**

§ 371 (c)(1),
(2), (4) Date: **Aug. 26, 2001**

(87) PCT Pub. No.: **WO00/49142**

PCT Pub. Date: **Aug. 24, 2000**

(30) **Foreign Application Priority Data**

| | | |
|---|---|---|
| Feb. 19, 1999 | (DE) | 199 07 080 |
| Jun. 24, 1999 | (DE) | 199 28 843 |
| Aug. 27, 1999 | (DE) | 199 40 752 |
| Aug. 27, 1999 | (WO) | PCT/EP99/06316 |
| Nov. 26, 1999 | (DE) | 199 57 116 |

(51) Int. Cl.⁷ .......................... **C12P 19/34; C12Q 1/68; C07H 21/02; C07H 21/04; G06F 19/00**

(52) U.S. Cl. .......................... **435/91.1; 435/6; 536/23.1; 536/24.3; 702/19; 702/20**

(58) Field of Search .................. 435/91.1, 6; 536/23.1, 536/24.3; 702/19, 20

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,510,270 A | * | 4/1996 | Fodor et al. | 436/518 |
| 6,020,481 A | * | 2/2000 | Benson et al. | 536/26.6 |
| 6,238,884 B1 | * | 5/2001 | Short et al. | 435/69.1 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0022242 | 1/1981 |
| EP | 0130166 | 1/1985 |
| EP | 0316018 | 5/1989 |
| EP | 0385410 | 9/1999 |
| WO | WO 90 00626 | 1/1990 |
| WO | WO 94 12632 | 6/1994 |
| WO | WO 95 17413 | 6/1995 |
| WO | WO 99 14318 | 3/1999 |
| WO | WO 00 13017 | 3/2000 |

OTHER PUBLICATIONS

Stemmer W. P. C. et al., "Single–step assembly of a gene and entire plasmid from large numbers of oligodeoxyribonucle-otides", Gene, vol. 164, pp. 49–53 (1995).*

S. Rayner et al.: "MerMade: An oligodeoxyribonucleotide synthesizer for high throughput oligonucleotide production in dual 96–well plates" PCR Methods and Applications, US, Cold Spring Harbor, NY vol. 8, No. 7 Jul. 1, 1998 pp. 741–747.

L E Sindelar and J M Jaklevic: High–throughput DNA synthesis in a multichannel format Nucleic Acids Research, GB, Oxford University Press, Surrey, vol. 23, No. 6, Jan. 1, 1995, pp. 982–987.

Lashkari D A et al.: "An Automated Multiplex Oligonucle-otide Synthesizer: Development of High–Throughput, Low–Cost DNA Synthesis" Proceedings of the National Academy of Sciences of USA, US, National Academy of Science. Washington, vol. 92, No. 17, Aug. 15, 1995 pp. 7912–7915.

* cited by examiner

*Primary Examiner*—Kenneth R. Horlick
*Assistant Examiner*—Teresa Strzelecka
(74) *Attorney, Agent, or Firm*—Rothwell, Figg, Ernst & Manbeck, PC

(57) **ABSTRACT**

The invention relates to a method for producing polymers, in particular synthetic nucleic acid double strands of optional sequence, comprising the steps:

(a) provision of a support having a surface area which contains a plurality of individual reaction areas,

(b) location-resolved synthesis of nucleic acid fragments having in each case different base sequences in several of the individual reaction areas, and

(c) detachment of the nucleic acid fragments from indi- vidual reaction areas.

**26 Claims, 7 Drawing Sheets**

# Fig.1



# Fig.2

## Fig.3



## Fig.4





Fig.5



Fig.6



Fig.7



Fig.8

64 (NUCLEIC ACID HYBRID 85)

US 6,586,211 B1

1

# METHOD FOR PRODUCING POLYMERS

## DESCRIPTION

The invention relates to a method for producing polymers, in particular synthetic nucleic acid double strands of optional sequence.

### 1. Technical Background of the Invention

Manipulation and construction of genetic elements such as, for example, gene fragments, whole genes or regulatory regions through the development of DNA recombination technology, which is often also referred to as genetic engineering, led to a particular need for genetic engineering methods and further development thereof in the areas of gene therapy, molecular medicine (basic research, vector development, vaccines, regeneration, etc.). Important areas of application are also the development of active substances, production of active substances in the context of the development of pharmaceuticals, combinatorial biosynthesis (antibodies, effectors such as growth factors, neural transmitters, etc.), biotechnology (e.g. enzyme design, pharming, biological production methods, bioreactors, etc.), diagnostics (BioChips, receptors/antibodies, enzyme design, etc.) and environmental technology (specialized or custom microorganisms, production processes, cleaning-up, sensors, etc.).

### 2. Prior Art

Numerous methods, first and foremost enzyme-based methods, allow specific manipulation of DNA for different purposes.

All of said methods have to use available genetic material. Said material is, on the one hand, well-defined to a large extent but allows, on the other hand, in a kind of "construction kit system" only a limited amount of possible combinations of the particular available and slightly modified elements.

In this connection, completely synthetic DNA has so far played only a minor part in the form of one of these combinatorial elements, with the aid of which specific modifications of the available genetic material are possible.

The known methods share the large amount of work required, combined with a certain duration of appropriate operations, since the stages of molecular biological and in particular genetic experiments such as DNA isolation, manipulation, transfer into suitable target cells, propagation, renewed isolation, etc. usually have to be repeated several times. Many of the operations which come up can only insufficiently be automated and accelerated so that the corresponding work remains time-consuming and labor-intensive. For the isolation of genes, which must precede functional study and characterization of the gene product, the flow of information is in most cases from isolated RNA (mRNA) via cDNA and appropriate gene libraries via complicated screening methods to a single clone. The desired DNA which has been cloned in said clone is frequently incomplete, so that further screening processes follow.

Finally, the above-described recombination of DNA fragments has only limited flexibility and allows, together with the described amount of work required, only few opportunities for optimization. In view of the variety and complexity in genetics, functional genomics and proteomics, i.e. the study of gene product actions, such optimizations in particular are a bottleneck for the further development of modern biology.

A common method is recombination by enzymatic methods (in vitro): here, DNA elements (isolated genomic DNA,

2

plasmids, amplicons, viral or bacterial genomes, vectors) are first cut into fragments with defined ends by appropriate restriction enzymes. Depending on the composition of these ends, it is possible to recombine the fragments formed and to link them to form larger DNA elements (likewise enzymatically). For DNA propagation purposes, this is frequently carried out in a plasmid acting as cloning vector.

The recombinant DNA normally has to be propagated clonally in suitable organisms (cloning) and, after this time-consuming step and isolation by appropriate methods, is again available for manipulations such as, for example, recombinations. However, the restriction enzyme cleavage sites are a limiting factor in this method: each enzyme recognizes a specific sequence on the (double-stranded) DNA, which is between three and twelve nucleotide bases in length, depending on the particular enzyme, and therefore, according to statistical distribution, a particular number of cleavage sites at which the DNA strand is cut is present on each DNA element. Cutting the treated DNA into defined fragments, which can subsequently be combined to give the desired sequence, is important for recombination. Sufficiently different and specific enzymes are available for recombination technology up to a limit of 10–30 kilo base pairs (kbp) of the DNA to be cut. In addition, preliminary work and commercial suppliers provide corresponding vectors which take up the recombinant DNA and allow cloning (and thus propagation and selection). Such vectors contain suitable cleavage sites for efficient recombination and integration.

With increasing length of the manipulated DNA, however, the rules of statistics give rise to the problem of multiple and unwanted cleavage sites. The statistical average for an enzyme recognition sequence of 6 nucleotide bases is one cleavage site per 4000 base pairs ($4^6$) and for 8 nucleotide bases it is one cleavage site per 65,000 ($4^8$). Recombination using restriction enzymes therefore is not particularly suitable for manipulating relatively large DNA elements (e.g. viral genomes, chromosomes, etc.).

Recombination by homologous recombination in cells is known, too. Here, if identical sequence sections are present on the elements to be recombined, it is possible to newly assemble and manipulate relatively large DNA elements by way of the natural process of homologous recombination. These recombination events are substantially more indirect than in the case of the restriction enzyme method and, moreover, more difficult to control. They often give distinctly poorer yields than the above-described recombination using restriction enzymes.

A second substantial disadvantage is restriction to the identical sequence sections mentioned which, on the one hand, have to be present in the first place and, on the other hand, are very specific for the particular system. The specific introduction of appropriate sequences itself then causes considerable difficulties.

An additional well-known method is the polymerase chain reaction (PCR) which allows enzymatic DNA synthesis (including high multiplication) due to the bordering regions of the section to be multiplied indicating a DNA replication start by means of short, completely synthetic DNA oligomers ("primers"). For this purpose, however, these flanking regions must be known and be specific for the region lying in between. When replicating the strand, however, polymerases also incorporate wrong nucleotides, with a frequency depending on the particular enzyme, so that there is always the danger of a certain distortion of the starting sequence. For some applications, this gradual dis-

US 6,586,211 B1

3

4

tortion can be very disturbing. During chemical synthesis, sequences such as, for example, the above-described restriction cleavage sites can be incorporated into the primers. This allows (limited) manipulation of the complete sequence. The multiplied region can now be in the region of approx. 30 kbp, but most of this DNA molecule is the copy of a DNA already present.

The primers are prepared using automated solid phase synthesis and are widely available, but the configuration of all automatic synthesizers known to date leads to the production of amounts of primer DNA (μmol-range reaction mixtures) which are too large and not required for PCR, while the variety in variants remains limited.

Synthetic DNA Elements

Since the pioneering work of Khorana (inter alia in: Shabarova: Advanced organic Chemistry of Nucleic Acids, VCH Weinheim;) in the 1960s, approaches in order to assemble double-stranded DNA with genetic or coding sequences from chemically synthesized DNA molecules have repeatedly been described. State of the art here is genetic elements of up to approx. 2 kbp in length which are synthesized from nucleic acids. Chemical solid phase synthesis of nucleic acids and peptides has been automated. Appropriate methods and devices have been described, for example, in U.S. Pat. Nos. 4,353,989 and 5,112,575.

Double-stranded DNA is synthesized from short oligonucleotides according to two methods (see Holowachuk et al., PCR Methods and Applications, Cold Spring Harbor Laboratory Press): on the one hand, the complete double strand is synthesized by synthesizing single-stranded nucleic acids (with suitable sequence), attaching complementary regions by hybridization and linking the molecular backbone by, for example, ligase. On the other hand, there is also the possibility of synthesizing regions overlapping at the edges as single-stranded nucleic acids, attachment by hybridization, filling in the single-stranded regions via enzymes (polymerases) and linking the backbone.

In both methods, the total length of the genetic element is restricted to only a few thousand nucleotide bases due to, on the one hand, the expenditure and production costs of nucleic acids in macroscopic column synthesis and, on the other hand, the logistics of nucleic acids being prepared separately in macroscopic column synthesis and then combined. Thus, the same size range as in DNA recombination technology is covered.

To summarize, the prior art can be described as a procedure in which, in analogy to logical operations, the available matter (in this case genetic material in the form of nucleic acids) is studied and combined (recombination). The result of recombination experiments of this kind is then studied and allows conclusions, inter alia about the elements employed and their combined effect. The procedure may therefore be described as (selectively) analytical and combinatorial.

The prior art thus does not allow any systematic studies of any combinations whatsoever. The modification of the combined elements is almost impossible. Systematic testing of modifications is impossible.

SUBJECT OF THE INVENTION AND OBJECT ACHIEVED THEREWITH

It is intended to provide a method for directly converting digital genetic information (target sequence, databases, etc.) into biochemical genetic information (nucleic acids) without making use of nucleic acid fragments already present.

The invention therefore relates to a method for producing polymers, in which a plurality of oligomeric building blocks

is synthesized on a support by parallel synthesis steps, is detached from the support and is brought into contact with one another to synthesize the polymer. Preference is given to synthesizing double-stranded nucleic acid polymers of at least 300 bp, in particular at least 1000 bp in length. The nucleic acid polymers are preferably selected from genes, gene clusters, chromosomes, viral and bacterial genomes or sections thereof. The oligomeric building blocks used for synthesizing the polymer are preferably 5–150, particularly preferably 5–30, monomer units in length. In successive steps, it is possible to detach in each case partially complementary oligonucleotide building blocks from the support and to bring them into contact with one another or with the polymer intermediate under hybridization conditions. Further examples of suitable polymers are nucleic acid analogs and proteins.

In a particularly preferred embodiment, the invention relates to a method for producing synthetic DNA of any optional sequence and thus any known or novel functional genetic elements which are contained in said sequence. This method comprises the steps

(a) provision of a support having a surface area which contains a plurality of individual reaction areas,

(b) location-resolved synthesis of nucleic acid fragments having in each case different base sequences in several of the individual reaction areas, and

(c) detachment of the nucleic acid fragments from individual reaction areas.

The base sequences of the nucleic acid fragments synthesized in individual reaction areas are preferably chosen such that they can assemble to form a nucleic acid double strand hybrid. The nucleic acid fragments can then be detached in step (c) in one or more steps under conditions such that a plurality, i.e. at least some of the detached nucleic acid fragments assemble to form a nucleic acid double strand hybrid. Subsequently, the nucleic acid fragments forming one strand of the nucleic acid double strand hybrid can at least partially be linked covalently to one another. This may be carried out by enzymatic treatment, for example using ligase, or/and filling in gaps in the strands using. DNA polymerase.

The method comprises within the framework of a modular system the synthesis of very many individual nucleic acid strands which serve as building blocks and, as a result, a double-stranded nucleic acid sequence which can be more than 100,000 base pairs in length is generated, for example in a microfluidic reaction support.

The highly complex synthetic nucleic acid which preferably consists of DNA is produced according to the method and according to the following principle: first, relatively short DNA strands are synthesized in a multiplicity of reaction areas on a reaction support by. in situ synthesis. This may take place, for example, using the supports described in the patent applications DE 199 24 327.1, DE 199 40 749.5, PCT/EP99/06316 and PCT/EP99/06317. In this connection, each reaction area is suitable for the individual and specific synthesis of an individual given DNA sequence of approx. 10–100 nucleotides in length. These DNA strands form the building blocks for the specific synthesis of very long DNA molecules. The fluidic microprocessor used here may carry reaction spaces specially designed for the application.

The DNA synthesis itself is thus carried out by following the automated solid phase synthesis but with some novel aspects: the "solid phase" in this case is an individual reaction area on the surface of the support, for example the wall of the reaction space, i.e. it is not particles introduced

US 6,586,211 B1

5

into the reaction space as is the case in a conventional synthesizer. Integration of the synthesis in a microfluidic reaction support (e.g. a structure with optionally branched channels and reaction spaces) makes it possible to introduce the reagents and other components such as enzymes.

After synthesis, the synthesized building blocks are detached from said reaction areas. This detachment process may be carried out location- or/and time-specifically for individual, several or all DNA strands.

In a preferred variant of the method it is provided for a plurality of reaction areas to be established and utilized within a fluidic space or compartment so that the DNA strands synthesized therein can be detached in one operation step and taken away from the compartment which fluidically connects the reaction areas.

Subsequently, suitable combinations of the detached DNA strands are formed. Single-stranded or/and double-stranded building blocks are then assembled, for example, within a reaction space which may comprise one or more reaction areas for the synthesis. Expediently, the sequence of the individual building blocks is chosen such that, when bringing the individual building blocks into contact with one another, regions complementary to one another are available at the two ends brought together, in order to make possible specific attachment of further DNA strands by hybridizing said regions. As a result, longer DNA hybrids are formed. The phosphorus diester backbone of these DNA hybrids may be covalently closed, for example by ligases, and possible gaps in the double strand may be filled in in a known manner enzymatically by means of polymerases. Single-stranded regions which may be present may be filled in by enzymes (e.g. Klenow fragment) with the addition of suitable nucleotides. Thus longer DNA molecules are formed. By bringing together clusters of DNA strands synthesized in this way within reaction spaces it is in turn possible to generate longer part sequences of the final DNA molecule. This may be done in stages, and the part sequences are put together to give ever longer DNA molecules. In this way it is possible to generate very long DNA sequences as completely synthetic molecules of more than 100,000 base pairs in length.

The amount of individual building blocks which is required for a long synthetic DNA molecule is dealt with in the reaction support by parallel synthesis of the building blocks in a location- or/and time-resolved synthesis process. In the preferred embodiment, this parallel synthesis is carried out by light-dependent location- or/and time-resolved DNA synthesis in a fluidic microprocessor which is also described in the patent applications DE 199 24 327.1, DE 199 40 749.5, PCT/EP99/06316 and PCT/EP99/06317.

The miniaturized reaction support here causes a reduction in the amount of starting substances by at least a factor of 1000 compared with a conventional DNA synthesizer. At the same time, an extremely high number of nucleic acid-double strands of defined sequence is produced. Only in this way is it possible to generate a very large variety of individual building blocks, which is required for the synthesis of long DNA molecules, by using an economically sensible amount of resources. The synthesis of a sequence of 100,000 base pairs, composed of overlapping building blocks of 20 nucleotides in length, requires 10,000 individual building blocks. This can be achieved using appropriately miniaturized equipment in a highly parallel synthesis process.

For efficient processing of genetic molecules and systematic inclusion of all possible variants it is necessary to produce the individual building block sequences in a flexible and economic way. This is achieved by the method preferably by using a programmable light source matrix for the

6

light-dependent location- or/and time-resolved in situ synthesis of the DNA strands, which in turn can be used as building blocks for the synthesis of longer DNA strands. This flexible synthesis allows free programming of the individual building block sequences and thus also generation of any variants of the part sequences or the final sequence, without the need for substantial modifications of system components (hardware). This programmed synthesis of the building blocks and thus the final synthesis products makes it possible to systematically process the variety of genetic elements. At the same time, the use of computer-controlled programmable synthesis allows automation of the entire process including communication with appropriate databases.

With a given target sequence, the sequence of the individual building blocks can be selected efficiently, taking into account biochemical and functional parameters. After putting in the target sequence (e.g. from a database), an algorithm makes out suitable overlapping regions. Depending on the task, different amounts of target sequences can be produced, either within one reaction support or spread over a plurality of reaction supports. The hybridization conditions for formation of the hybrids, such as, for example, temperature, salt concentrations, etc., are adjusted to the available overlap regions by an appropriate algorithm. Thus, maximum attachment specificity is ensured. In a fully automatic version, it is also possible to take target sequence data directly from public or private databases and convert them into appropriate target sequences. The products generated may in turn be introduced optionally into appropriately automated processes, for example into cloning in suitable target cells.

Synthesis in stages by synthesizing the individual DNA strands in reaction areas within enclosed reaction spaces also allows the synthesis of difficult sequences, for example those with internal repeats of sequence sections, which occur, for example, in retroviruses and corresponding retroviral vectors. The controlled detachment of building blocks within the fluidic reaction spaces makes a synthesis of any sequence possible, without problems being generated by assigning the overlapping regions on the individual building blocks.

The high quality requirements necessary for synthesizing very long DNA molecules can be met inter alia by using real-time quality control. This comprises monitoring the location-resolved building block synthesis, likewise detachment and assembly up to production of the final sequence. Then all processes take place, in a transparent reaction support. In addition, the possibility to follow reactions and fluidic processes in transmitted light mode, for example by CCD detection, is created.

The miniaturized reaction support is preferably designed such that a detachment process is possible in the individual reaction spaces and thus the DNA strands synthesized on the reaction areas located within these reaction spaces are detached individually or in clusters. In a suitable embodiment of the reaction support it is possible to assemble the building blocks in reaction spaces in a process in stages and also to remove building blocks, part sequences or the final product or else to sort or fractionate the molecules.

The target sequence, after its completion, may be introduced as integrated genetic element into cells by transfer and thereby be cloned and studied in functional studies. Another possibility is to firstly further purify or analyze the synthesis product, a possible example of said analysis being sequencing. The sequencing process may also be initiated by direct coupling using an appropriate apparatus, for example using

US 6,586,211 B1

7

a device described in the patent applications DE 199 24 327.1, DE 199 40 749.5, PCT/EP99/06316 and PCT/EP99/06317 (corresponding 35 U.S.C. §371 application is U.S. patent application Ser. No. 09/763,914) for the integrated synthesis and analysis of polymers It is likewise conceivable to isolate and analyze the generated target sequences after cloning.

The method of the invention provides via the integrated genetic elements generated therewith a tool which, for the further development of molecular biology, includes biological variety in a systematic process. The generation of DNA molecules with desired genetic information is thus no longer the bottleneck of molecular biological work, since all molecules, from small plasmids via complex vectors to mini chromosomes, can be generated synthetically and are available for further work.

The production method allows generation of numerous different nucleic acids and thus a systematic approach for questions concerning regulatory elements, DNA binding sites for regulators, signal cascades, receptors, effect and interactions of growth factors, etc.

The integration of genetic elements into a fully synthetic complete nucleic acid makes it possible to further utilize known genetic tools such as plasmids and vectors and thus to build on the relevant experience. On the other hand, this experience will change rapidly as a result of the intended optimization of available vectors, etc. The mechanisms which, for example, make a plasmid suitable for propagation in a particular cell type can be studied efficiently for the first time on the basis of the method of the invention.

This efficient study of large numbers of variants makes it possible to detect the entire combination space of genetic elements. Thus, in addition to the at the moment rapidly developing highly parallel analysis (inter alia on DNA arrays or DNA chips), the programmed synthesis of integrated genetic elements is created as a second important element. Only both elements together can form the foundation of an efficient molecular biology.

The programmed synthesis of appropriate DNA molecules makes possible not only random composition of the coding sequences and functional elements but also adaptation of the intermediate regions. This may rapidly lead to minimal vectors and minimal genomes, whose small size in turn generates advantages. As a result, transfer vehicles such as, for example, retroviral vectors can be made more efficient, for example when using retroviral or adenoviral vectors.

In addition to the combination of known genetic sequences, it is possible to develop novel genetic elements which can build on the function of available elements. Especially for such developmental work, the flexibility of the system is of enormous value.

The synthetic DNA molecules are in each stage of the development of the method described here fully compatible with the available recombination technology. For "traditional" molecular biological applications it is also possible to provide integrated genetic elements, for example by appropriate vectors. Incorporation of appropriate cleavage sites even of enzymes little used so far is not a limiting factor for integrated genetic elements.

## IMPROVEMENTS IN COMPARISON WITH PRIOR ART

This method makes it possible to integrate all desired functional elements as "genetic modules" such as, for example, genes, parts of genes, regulatory elements, viral packaging signals, etc. into the synthesized nucleic acid molecule as carrier of genetic information. This integration leads to inter alia the following advantages:

8

It is possible to develop therewith extremely functionally integrated DNA molecules, unnecessary DNA regions being removed (minimal genes, minimal genomes).

The free combination of the genetic elements and also modifications of the sequence such as, for example, for adaptation to the expressing organism or cell type (codon usage) are made possible as well as modifications of the sequence for optimizing functional genetic parameters such as, for example, gene regulation.

Modifications of the sequence for optimizing functional parameters of the transcript, for example splicing, regulation at the mRNA level, regulation at the translation level, and, moreover, the optimization of functional parameters of the gene product, such as, for example, the amino acid sequence (e.g. antibodies, growth factors, receptors, channels, pores, transporters, etc.) are likewise made possible.

On the whole, the system created by the method is extremely flexible and allows in a manner previously not available the programmed production of genetic material under greatly reduced amounts of time, materials and work needed.

Using the available methods, it has been almost impossible to specifically manipulate relatively large DNA molecules of several hundred kbp, such as chromosomes for example. Even more complex (i.e. larger) viral genomes of more than 30 kbp (e.g. adenoviruses) are difficult to handle and to manipulate using the classical methods of gene technology.

The method of the invention leads to a considerable shortening up to the last stage of cloning a gene: the gene or the genes are synthesized as DNA molecule and then (after suitable preparation such as purification, etc.) introduced directly into target cells and the result is studied. The multi-stage cloning process which is mostly carried out in microorganisms such as *E. coli* (e.g. DNA isolation, purification, analysis, recombination, cloning in bacteria, isolation, analysis, etc.) is thus reduced to the last transfer of the DNA molecule into the final effector cells. For synthetically produced genes or gene fragments clonal propagation in an intermediate host (usually *E. coli*) is no longer required. This avoids the danger of the gene product destined for the target cell exerting a toxic action on the intermediate host. This is distinctly different from the toxicity of some gene products, which, when using classical plasmid vectors, frequently leads to considerable problems for cloning of the appropriate nucleic acid fragments.

Another considerable improvement is the reduction in time and the reduction in operational steps to after the sequencing of genetic material, with potential genes found being verified as such and cloned. Normally, after finding interesting patterns, which are possible open reading frames (ORF), probes are used (e.g. by means of PCR) to search in cDNA libraries for appropriate clones which, however, need not contain the whole sequence of the mRNA originally used in their production. In other methods, an expression gene library is searched by means of an antibody (screening). Both methods can be shortened very substantially using the method of the invention: if a gene sequence determined "in silico" is present (i.e. after detection of an appropriate pattern in a DNA sequence by the computer) or after decoding a protein sequence, an appropriate vector with the sequence or variants thereof can be generated directly via programmed synthesis of an integrated genetic element and introduced into suitable target cells.

The synthesis taking place in this way of DNA molecules of up to several 100 kbp allows the direct complete synthesis

US 6,586,211 B1

9

of viral genomes, for example adenoviruses. These are an important tool in basic research (inter alia gene therapy) but, due to the size of their genome (approx. 40 kbp), are difficult to handle using classical genetic engineering methods. As a result, the rapid and economic generation of variants for optimization in particular is greatly limited. This limitation is removed by the method of the invention.

The method leads to integration of the synthesis, detachment of synthesis products and assembly to a DNA molecule being carried out in one system. Using production methods of microsystem technology, it is possible to integrate all necessary functions and process steps up to the purification of the final product in a miniaturized reaction support. These may be synthesis areas, detachment areas (clusters), reaction spaces, feeding channels, valves, pumps, concentrators, fractionation areas, etc.

Plasmids and expression vectors may be prepared directly for sequenced proteins or corresponding part sequences and the products may be analyzed biochemically and functionally, for example by using suitable regulatory elements. This omits the search for clones in a gene library. Correspondingly, ORFs from sequencing work (e.g. Human Genome Project) can be programmed directly into appropriate vectors and be combined with desired genetic elements. An identification of clones, for example by complicated screening of cDNA libraries, is removed. Thus, the flow of information from sequence analysis to function analysis has been greatly reduced, because on the same day on which an ORF is present in the computer due to analysis of primary data, an appropriate vector including the putative gene can be synthesized and made available.

Compared with conventional solid-phase synthesis for obtaining synthetic DNA, the method according to the invention is distinguished by a small amount of material needed. In order to produce thousands of different building blocks for generating a complex integrated genetic element of several 100,000 kbp in length, in an appropriately parallelized format and with appropriate miniaturization (see exemplary embodiments), a microfluidic system needs markedly fewer starting substances for an individual DNA oligomer than a conventional solid-phase synthesis apparatus (when using a single column). Here, microliters compare with the consumption of milliliters, i.e. a factor of 1000.

Taking into account the newest findings in immunology, the presented method allows an extremely efficient and rapid vaccine design (DNA vaccines).

EXEMPLARY EMBODIMENTS

To carry out the method, the present invention requires the provision of a large number of nucleic acid molecules, usually DNA, whose sequence can be freely determined. These building blocks must have virtually 100% identical sequences within one building block species (analogously to the synthesis performance of conventional synthesizers). Only highly parallel synthesis methods are suitable for generating the required variance. In order for the system to be able to work flexibly and, despite the necessary multiplicity of different building blocks to be synthesized, to require as little space and as few reagents as possible, the method is preferably carried out in a microfluidic system within which the individual sequences are produced in a determinable form. Two types of programmed synthesis are suitable for systems of this kind, which are also described in the patent applications DE 199 24 327.1, DE 199 40 749.5, PCT/EP99/06316 and PCT/EP99/06317: these are first the synthesis by programmable fluidic individualization of the

10

reaction areas and, secondly, the synthesis by programmable light-dependent individualization of the reaction areas.

In both variants, synthesis is carried out in a microfluidic reaction support. The design of this reaction support may provide in the system for the bringing together in stages the detached synthesis products, i.e. building blocks, by collecting the nucleic acid strands, after detaching them, in appropriate reaction areas and the assembly taking place there. Groups of such assembly areas may then for their part be brought into contact again with one another so that during the course of a more or less long cascade the final synthesis products are produced: genetic information carriers in the form of DNA molecules. The following variants are suitable here: Either synthesis, detachment and assembly are carried out chronologically but spatially integrated in a microfluidic reaction support or synthesis, detachment and assembly are carried out partially in parallel in one or more microfluidic reaction supports. It is furthermore possible that the microfluidic reaction support contains only reaction areas for the programmed synthesis and that subsequently detachment and elution into a reaction vessel for the assembly are carried out.

In the case of very large DNA molecules, synthesis, detachment and assembly can be supplemented by condensation strategies which prevent break-up of the molecules. This includes, for example, the use of histones (nuclear proteins which make condensation of the chromosomes in the nucleus possible in eukaryotes), the use of topoisomerases (enzymes for twisting DNA in eukaryotes and prokaryotes) or the addition of other DNA-binding, stabilizing and condensing agents or proteins. Depending on the design of the reaction support, this may take place by integrating the condensation reaction in another reaction chamber provided therefor or by addition during the combination and assembly in stages of the building blocks.

The free choice of sequence is of essential importance for the controlled and efficient building block assembly in stages to the final product. For the choice of overlapping complementary ends influences the specificity of the assembly and the overall biochemical conditions (salt concentration, temperature, etc.). When providing a sequence for the gene of interest and after automatic or manual selection of the other genetic elements (regulatory regions, resistance genes for cloning, propagation signals, etc.) for determination of the final product (e.g. a plasmid vector), the provided sequence is fragmented into suitable building blocks which are then synthesized in the required number of reaction supports. The fragments or their overlap regions to be hybridized are chosen such that the conditions for hybridizing are as similar as possible (inter alia GC : AT ratio, melting points, etc.).

Further extension of the system provides for elements for purification and isolation of the product forming, which are likewise designed by microfluidics or microsystem technology. Said elements may be, for example, methods in which the final double-stranded DNA after its synthesis using fluorescent synthons must have a particular total fluorescence. When using proteins with condensing action, these proteins, where appropriate, may also carry a fluorescent label which is preferably detectable separately (reference signal). It is then possible to sort the mixture of final reaction product in the reaction support structures according to fluorescence (see Chou et al., Proceedings of the National Academy of Science PNAS 96:11–13, 1999). Thus a sufficient quality is achieved in order to directly provide a product for further work.

Information from sequencing projects, which is present in databases, may be studied for genes fully automatically

US 6,586,211 B1

11

(computer-assisted). Identified or putative genes (ORFs) are converted into completely synthetic DNA which may contain, where appropriate, regulatory and other genetic elements which seem suitable, so that, for example, one or more vectors are generated. The product is either made available (e.g. as pure DNA) or directly introduced to functional studies, inter alia by transfer into suitable target cells. The information may come from public databases, from work of decentralized users or from other sources, for example the method described in the patent applications DE 199 24 327.1 and DE 199 40 749.5.

It may be of interest that a variance of randomized sequence occurs at a particular site or sites of the target sequence. An example is the testing of variants of a binding site into which, for example over an area of 20 amino acids, i.e. 60 nucleotides, random variations of nucleotides were incorporated. This may take place in an embodiment in that during the synthesis process, after activating a reaction area, a mixture of synthons is added so that all added synthons can hybridize in a statistically distributed manner. A modification of this process may provide for DNA building blocks of different length to be used at a particular position of the target sequence, for example by producing different building blocks on different reaction areas, which show the same sequence for overlapping and hybridization.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a vertical section of a reaction support **30** which is orthogonal to the microchannels **33** present thereon, which are separated from one another by walls **32**. The bottom **31** of the reaction support is transparent. Furthermore, a single-stranded nucleic acid **10** with the designation of the 5' and 3' ends according to convention is depicted diagrammatically. These are depicted as **10a** with the 3' end covalently bound to the reaction support **30** by solid-phase synthesis. A light source matrix **20** with a light source and a controllable illumination exit facing the reaction support **30** is likewise depicted.

FIG. 2 shows a top view of reaction support **30** with reaction areas **12** and the walls **32** between the microchannels **33**. The arrows indicate the direction of flow.

FIG. 3 shows, similar to FIG. 1, a vertical section through the reaction support **30**, with the single-stranded nucleic acids in the microchannel **33** being detached.

FIG. 4 again depicts a top view of the reaction support **30**, with the single-stranded nucleic acids in the microchannel **33** being detached.

FIG. 5 shows a top view of the arrangement of microchannels with fluidic reaction spaces **50**, which contain the individual reaction areas, and reaction chambers, where a part sequence is assembled. In the reaction space **54** all microchannels within a reaction support are brought together. The final synthesis product is assembled there, too, and is removed through exit **55**. The reference numbers **51a** and **51b** indicate the representations of a reaction chamber which are shown in enlarged form in FIG. 6 and FIG. 7 and FIG. 8. The arrows again signal the direction of flow.

FIG. 6 shows an enlarged representation of a reaction chamber **51a** after a microchannel with detached single-stranded nucleic acids.

FIG. 7 shows an enlarged representation of a reaction chamber **51a** after a microchannel with a double-stranded hybrid **60** composed of two attached complementary nucleic acid single strands.

FIG. 8 shows an enlarged representation of a reaction chamber **51b** after bringing together two microchannels with

12

an assembled double-stranded nucleic acid hybrid **62**, enzyme **63** (e.g. ligases) for the covalent linkage of the building blocks of the nucleic acid hybrid **85**, a linear covalently linked nucleic acid double strand **65** and a circular closed nucleic acid double strand **66** (e.g. vector).

The reference number **64** represents a reaction of the enzymes with the nucleic acid hybrid.

What is claimed is:

1. Method for synthesizing polymers, wherein said method comprises synthesizing a plurality of oligomeric building blocks by parallel synthesis steps, wherein each oligomeric building block is synthesized on a different area of a common support, detaching the plurality of oligomeric building blocks from the support and bringing the oligomeric building blocks into contact with one another to synthesize the polymer, and wherein said different areas of said common support are at least partially in fluid communication during synthesis.

2. Method according to claim 1, wherein double-stranded nucleic acid polymers of at least 300 bp in length are synthesized.

3. A method according to claim 1, wherein the polymers are nucleic acid polymers which are selected from the group consisting of genes or sections thereof, gene clusters or sections thereof, chromosomes or sections thereof, and viral and bacterial genomes or sections thereof.

4. Method according to claim 1, wherein the oligomeric building blocks are from 5 to 150 monomer units in length.

5. Method according to claim 1, wherein partially complimentary oligonucleotide building blocks are detached from the support and are brought into contact with one another or with a polymer intermediate under hybridization conditions in successive steps.

6. Method according to claim 1 for producing synthetic nucleic acid double strands, wherein said method comprises the steps:
   (a) providing a support having a surface area which contains a plurality of individual reaction areas,
   (b) synthesizing nucleic acid fragments in a location-resolved manner, wherein said nucleic acid fragments comprise different base sequences, as compared to other nucleic acid fragments, in several of the individual reaction areas, and
   (c) detaching the nucleic acid fragments from the individual reaction areas.

7. Method according to claim 6, wherein the base sequences of the nucleic acid fragments synthesized in individual reaction areas are chosen such that they can assemble to form a nucleic acid double strand hybrid.

8. Method according to claim 6, wherein the nucleic acid fragments according to step (c) are detached in one or more steps under conditions such that a plurality of the detached nucleic acid fragments assemble to form a nucleic acid double strand hybrid.

9. Method according to claim 8, wherein several nucleic acid fragments which form one strand of the nucleic acid double strand hybrid are linked covalently to one another.

10. Method according to claim 9, wherein the covalent linking includes treatment with ligase or/and filling in gaps in the strands using DNA polymerase.

11. Method according to claim 6, wherein the sequence comprises at one or more position recognition sequences for specific interaction with other molecules.

12. Method according to claim 6, wherein the sequence of the nucleic acid double strands is a naturally occurring sequence, a not naturally occurring sequence or a combination of these two.

US 6,586,211 B1

13

14

13. Method according to claim 6, wherein the sequence is taken from a database, a sequencing experiment or a device for the integrated synthesis and analysis of polymers.

14. Method according to claim 1, wherein the oligomeric building blocks are synthesized by location- or/and time-resolved illumination by means of a programmable light source matrix.

15. Method according to claim 1, wherein the synthesizing step is a location- or/and time-resolved synthesis of the oligomeric building blocks in a microfluidic reaction support having one or more fluidic reaction compartments and one or more reaction areas within a fluidic reaction compartment.

16. Method according to claim 1, wherein the oligomeric building blocks contain nucleotides occurring in nature, modified nucleotides or mixtures thereof.

17. Method according to claim 1, wherein said oligomeric building blocks contain synthesis building blocks carrying labeling groups for subsequent detection of the polymer.

18. Method according to claim 17, wherein the labeling groups are detectable in a light-dependent manner.

19. The method of claim 1, wherein said method further comprises stabilizing, condensing and/or topologically manipulating a nucleic acid double strand or nucleic acid double strand precursor during or following the assembly of the nucleic acid double strand.

20. A method according to claim 19, where the stabilization, condensation or/and topological manipulation is carried out by functional molecules selected from the group consisting of histones, topoisomerases, DNA-binding agents, DNA-binding proteins, DNA-stabilizing agents, DNA-stabilizing proteins, DNA-condensing agents and DNA-condensing proteins.

21. Method according to claim 1, wherein double-stranded nucleic acid polymers of at least 1000 bp in length are synthesized.

22. Method according to claim 1, wherein partially complimentary oligonucleotide building blocks are detached from the support and are brought into contact with (1) one another or with second partially complimentary oligonucleotide building blocks to form a polymer intermediate or (2) with a polymer intermediate under hybridization conditions, to form an advanced polymer intermediate, and thereafter third partially complimentary oligonucleotide building blocks are detached and brought into contact with (1) fourth partially complimentary oligonucleotide building blocks or with third partially complimentary oligonucleotide building blocks to form a polymer intermediate or (2) with a polymer intermediate under hybridization conditions, to form an advanced polymer intermediate, and these steps are repeated.

23. Method according to claim 11, wherein the other molecules are selected from the group consisting of proteins, nucleic acids, peptides, pharmaceuticals, saccharides, lipids, hormones, and organic compounds.

24. Method according to claim 20, wherein the other functional molecules are selected from the group consisting of histones or topoisomerases.

25. Method for synthesizing polymers that are greater than 10,000 bp in length, wherein said method comprises synthesizing a plurality of oligomeric building blocks by parallel synthesis steps, wherein each oligomeric building block is synthesized on a different area of a common support, detaching the plurality of the oligomeric building blocks from the support and bringing the oligomeric building blocks into contact with one another to synthesize the polymer, and wherein said different areas of said common support are at least partially in fluid communication during synthesis.

26. Method according to claim 1, wherein the oligomeric building blocks are from 5 to 30 monomer units in length.

*  *  *  *  *

# EXHIBIT 3

✎ AO 120 (Rev. 3/04)

| TO: | Mail Stop 8<br>Director of the U.S. Patent and Trademark Office<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 | REPORT ON THE<br>FILING OR DETERMINATION OF AN<br>ACTION REGARDING A PATENT OR<br>TRADEMARK |
|---|---|---|

In Compliance with 35 U.S.C. § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been

filed in the U.S. District Court _____ Delaware _____ on the following  X Patents or  ☐ Trademarks:

| DOCKET NO.<br>07-385 | DATE FILED<br>6/15/07 | U.S. DISTRICT COURT<br>DISTRICT OF DELAWARE |
|---|---|---|
| PLAINTIFF<br><br>febit biotech GmbH | | DEFENDANT<br><br>Codon Devices Inc. |

| | PATENT OR | DATE OF PATENT | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|---|
| 1 | 6,586,211 B1 | 7/1/2003 | FeBit Ferrarius Biotechnology GmbH |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above—entitled case, the following patent(s)/ trademark(s) have been included:

| DATE INCLUDED | INCLUDED BY | |
|---|---|---|
| | ☐ Amendment    ☐ Answer    ☐ Cross Bill    ☐ Other Pleading | |
| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| <br><br><br> |

| CLERK<br>PETER T. DALLEO, CLERK OF COURT | (BY) DEPUTY CLERK | DATE<br>6/15/07 |
|---|---|---|

**Copy 1—Upon initiation of action, mail this copy to Director    Copy 3—Upon termination of action, mail this copy to Director**
**Copy 2—Upon filing document adding patent(s), mail this copy to Director    Copy 4—Case file copy**

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CODON DEVICES, INC.
One Kendall Square
Building 300, 3rd Flr.
Cambridge, MA 02139,

        Plaintiff,

    v.

FEBIT BIOTECH GMBH
Im Neuenheimer Feld 519
D-69120 Heidelberg, Germany,

FEBIT FERRARIUS BIOTECHNOLOGY
GMBH
Kafertaler Strasse 190
D-68167 Mannheim, Germany,

    and

FEBIT, GMBH
c/o Sterne, Kessler, Goldstein and Fox
1100 New York Avenue, N.W.
Washington, DC 20005,

        Defendants.

Case: 1:07-cv-01177
Assigned To : Walton, Reggie B.
Assign. Date : 6/29/2007
Description: General Civil

JURY TRIAL DEMANDED

## COMPLAINT FOR DECLARATORY JUDGMENT

    Plaintiff, Codon Devices, Inc. ("Codon"), by and through its attorneys, alleges as

follows:

## NATURE OF ACTION

1.    This action is for a declaratory judgment that United States Patent No. 6,586,211

(the "'211 Patent") is invalid, unenforceable and not infringed by Codon.

1

## PARTIES

2.     Codon is a Delaware corporation having its principal place of business at One Kendall Square, Building 300, Cambridge, Massachusetts.

3.     Upon information and belief, Defendant febit biotech GmbH ("febit biotech") is a German corporation having its principal place of business at IM Neuenheimer Feld 519, Heidelberg, Germany, D-69120.

4.     Upon information and belief, Defendant Febit Ferrarius Biotechnology GmbH ("Febit Ferrarius") is a German company having its principal place of business at Kafertaler Strasse 190, Mannheim, Germany, D-68167.

5.     Upon information and belief, Defendant febit, GmbH ("febit, GmbH") is a foreign company having its last known address through its counsel and agent at Sterne, Kessler, Goldstein and Fox, 1100 New York Avenue, N.W., Washington, DC, 20005.

## JURISDICTION AND VENUE

6.     This is an action arising under the patent laws of the United States, Title 35 of the United States Code, and the laws authorizing actions for declaratory judgment in the courts of the United States, 28 U.S.C. §§ 2201 and 2202. Based on the allegations set forth in paragraphs 10 through 43, there is a conflict of asserted rights between the parties and an actual controversy exists between Codon and Defendants with respect to the ownership, infringement, validity, scope and enforceability of the '211 Patent.

7.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

8.     Upon information and belief, no Defendant has designated with the United States Patent and Trademark Office ("PTO") a person residing in the United States on whom process or

2

notice of proceedings affecting the '211 Patent or rights thereunder may be served. Defendants are thus subject to personal jurisdiction in the District of Columbia under 35 U.S.C. § 293.

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(c) and (d).

## BACKGROUND

10.    Codon repeats and realleges each and every allegation contained in paragraphs 1 through 9 hereof with the same force and effect as if fully set forth herein.

11.    On December 6, 2006, an attorney from a law firm in Washington, D.C., proclaiming to represent febit, GmbH sent Codon a letter alleging that febit, GmbH owned the '211 Patent and "[i]t appears that it is difficult, if not impossible, for Codon Devices to operate as it does in the area of synthetic gene manufacturing without practicing one or more claims of febit's '211 patent." In that letter, febit, GmbH demanded that Codon immediately discontinue using the allegedly infringing methods.

12.    On June 15, 2007, febit biotech filed suit against Codon in the U.S. District Court for the District of Delaware for infringement of the '211 Patent: *febit biotech GmbH v. Codon Devices, Inc.*, C.A. No. 07-385 (D. Del.) (the "Delaware Action").

13.    Febit Ferrarius and febit, GmbH are not named as parties to the Complaint in the Delaware Action.

14.    On June 18, 2007, the Chairman of the Board of febit biotech sent to a member of Codon's Board of Directors a letter alleging that Codon infringed "febit's intellectual property rights" and, thus, "febit" had commenced "legal action." The letter further stated that the Complaint in the Delaware Action had not been served and that the company "ha[d] 120 days for doing so." The letter demanded a "pre-emptive settlement."

3

15.     On information and belief, febit biotech has not served on Codon the Complaint in the Delaware Action.

16.     On information and belief, febit, GmbH, Febit Ferrarius and febit biotech are alter egos and/or agents of one another.

17.     On information and belief, febit, GmbH may be a fictitious entity or an alias for Febit Ferrarius, febit biotech and/or another company.

## CONFLICTING CLAIMS OF OWNERSHIP

18.     Codon repeats and realleges each and every allegation contained in paragraphs 1 through 17 hereof with the same force and effect as if fully set forth herein.

19.     Febit Ferrarius is the sole named assignee on the face of the '211 Patent.

20.     On information and belief, Febit Ferrarius is also identified as the sole assignee of the '211 Patent on the assignment Abstract of Title for the '211 Patent ("Abstract of Title") on file with the PTO.

21.     In its Complaint in the Delaware Action, febit biotech alleged that it, not Febit Ferrarius, "is the owner of the entire right, title and interest in and to U.S. Patent No. 6,586,211 B1."

22.     On June 15, 2007, the same day febit biotech filed its Complaint, a "Report On The Filing Or Determination Of An Action Regarding A Patent Or Trademark" ("Report") was filed in the Delaware Action that identified Febit Ferrarius, not febit biotech, as the sole "Holder of Patent."

23.     By letter dated December 6, 2006, counsel and agent for febit, GmbH alleged that febit, GmbH is "the owner" of the '211 Patent.

4

24.    Thus, each Defendant has independently alleged that it is the sole owner of the '211 Patent. Accordingly, an apparent controversy exists among Defendants regarding which, if any, of febit biotech, Febit Ferrarius and/or febit, GmbH is the legal assignee and owner of the '211 Patent.

25.    Codon wishes to be free from claims of infringement of the '211 Patent brought by any and all Defendants, regardless of which Defendant may be the legal assignee and owner of the '211 Patent. Based on the allegations set forth in paragraphs 26 through 43, any Defendant that may be the legal assignee and owner of the '211 Patent holds an invalid, unenforceable patent that Codon does not presently infringe and has not in the past infringed.

## FIRST CLAIM FOR RELIEF

### Declaratory Judgment of Noninfringement of the '211 Patent

26.    Codon repeats and realleges each and every allegation contained in paragraphs 1 through 25 hereof with the same force and effect as if fully set forth herein.

27.    In the Complaint in the Delaware Action, febit biotech claims that Codon infringes the '211 Patent.

28.    In a letter dated December 6, 2006, febit, GmbH alleged that Codon infringes the '211 Patent.

29.    Codon contends that it does not infringe the '211 Patent, regardless which Defendant, if any, is the assignee and owner of the '211 Patent.

30.    Accordingly, an actual controversy exists between Codon and Defendants as to the infringement of the '211 Patent. Codon desires a judicial determination and declaration of the respective rights and duties of the parties herein. Such a determination and declaration is

5

necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

## SECOND CLAIM FOR RELIEF

### Declaratory Judgment of Invalidity of the '211 Patent

31.　Codon repeats and realleges each and every allegation contained in paragraphs 1 through 25 hereof with the same force and effect as if fully set forth herein.

32.　febit biotech claims that the '211 Patent is valid.

33.　febit, GmbH alleges that the '211 Patent is valid.

34.　Codon contends that the '211 Patent is invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112, regardless which Defendant, if any, is the assignee and owner of the '211 Patent.

35.　Accordingly, an actual controversy exists between Codon and Defendants as to the validity of the '211 Patent.  Codon desires a judicial determination and declaration of the respective rights and duties of the parties herein.  Such a determination and declaration is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

## THIRD CLAIM FOR RELIEF

### Declaratory Judgment of Unenforceability of the '211 Patent

36.　Codon repeats and realleges each and every allegation contained in paragraphs 1 through 25 hereof with the same force and effect as if fully set forth herein.

37.　febit biotech claims that the '211 Patent is enforceable.

38.　febit, GmbH alleges that the '211 Patent is enforceable.

39.　Codon contends that the '211 Patent is unenforceable by reason of inequitable conduct committed by Defendants, the named inventors of the '211 Patent, and/or their attorneys

6

(collectively and individually, the "Applicants") during prosecution of the '211 Patent before the PTO.

40.    In particular, the Applicants failed to disclose to the PTO certain prior art and information material to the application for the '211 Patent, including United States Patent No. 5,755,942 (the "'942 Patent") and United States Patent No. 5,723,320 (the "'320 Patent"). The '942 Patent and '320 Patent are highly material to the subject matter claimed in the '211 Patent because, *inter alia*, each reference describes a system and method for parallel synthesis of a plurality of polymers using a microelectronic and fluidic array.

41.    Upon information and belief, the Applicants had knowledge of the '942 Patent and '320 Patent prior to and during prosecution of the application for the '211 Patent and, upon information and belief, the Applicants failed to disclose these references with intent to deceive. The Applicants learned of the '942 Patent and '320 Patent from an International Search Report, dated May 11, 2000, for WO 00/13018, a foreign counterpart to United States Patent No. 7,097,974 to the same named inventors of the '211 Patent.

42.    Despite the materiality of the '942 Patent and '320 Patent and the Applicants' knowledge of such reference prior to and during prosecution of the application for the '211 Patent, the Applicants did not disclose the '942 Patent and '320 Patent to the PTO. The '211 Patent is, therefore, unenforceable by reason of the Applicants' inequitable conduct.

43.    By reason of the facts set forth in paragraphs 36 through 42, an actual controversy exists between Codon and Defendants as to the enforceability of the '211 Patent. Codon desires a judicial determination and declaration of the respective rights and duties of the parties herein. Such a determination and declaration is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

## PRAYER FOR RELIEF

WHEREFORE, Codon prays for judgment as follows:

A.    Declaring that Codon has not, and does not, infringe, directly or indirectly, any valid and enforceable claim of the '211 Patent;

B.    Declaring that the claims of the '211 Patent are invalid;

C.    Declaring that the '211 Patent is unenforceable;

D.    Declaring the true ownership of the '211 Patent;

E.    Declaring that all Defendants and each of their officers, employees, agents, alter egos, attorneys, and any persons in active concert or participation with them be restrained and enjoined from further prosecuting or instituting any action against Codon claiming that the '211 patent is valid, enforceable, or infringed, or from representing that Codon's products or services infringe the '211 patent;

F.    Declaring this an exceptional case pursuant to 35 U.S.C. § 285, and awarding Codon its attorney fees, costs, and expenses; and

G.    Awarding Codon such other and further relief as the Court may deem just and appropriate.

## JURY DEMAND

Codon demands a trial by jury, pursuant to Fed. R. Civ. P. 38(b), on all disputed issues.

Respectfully submitted,

Dated: June 29, 2007

_Adam P. Strochak (D.C. Bar No. 439308)_
WEIL, GOTSHAL & MANGES LLP
1300 Eye St. NW, Suite 900
Washington, DC 20005
Telephone: (202) 682-7000

Of Counsel:

Edward R. Reines (Cal. Bar No. 135960)
Nicholas A. Brown (Cal. Bar No. 198210)
Rip Finst (Cal. Bar No. 234478)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: 650-802-3000
Fax: 650-802-3100

*Counsel For Plaintiff*
*Codon Devices, Inc.*

9

# EXHIBIT 5

# WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE
201 REDWOOD SHORES PARKWAY
REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000
FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SINGAPORE
WARSAW
WASHINGTON, D.C.

EDWARD R. REINES
DIRECT LINE (650) 802-3022
E-MAIL: edward.reines@weil.com

July 2, 2007



RECEIVED
JUL 0 2 2007

Sterne, Kessler, Goldstein & Fox
*BLW P.L.L.C BLW 7/9/07*
*ESK*

Edward J. Kessler
Stern, Kessler, Goldstein & Fox PLLC
1100 New York Ave. NW
Washington, DC 20005-3934

Re:   ***Codon Devices, Inc. v. Febit Biotech GmbH, et al.,***
      **District of Columbia Case No. 07-1177 rbw**

Dear Mr. Kessler:

We represent Codon Devices, Inc. ("Codon"). We understand you are counsel to febit biotech, GmbH in a lawsuit pending against Codon in the United States District Court for the District of Delaware (*febit biotech GmbH v. Codon Devices, Inc.*, No. 07-385). Similarly, you stated in a letter (dated December 6, 2006) to Codon that your firm "represents febit, GmbH." Accordingly, as an agent and counsel for both febit biotech, GmbH and febit, GmbH, attached please find courtesy copies of a summons and complaint for declaratory judgment filed by Codon against, *inter alia*, febit biotech, GmbH and febit, GmbH in the United States District Court for the District of Columbia. The lawsuit also names Febit Ferrarius Biotechnology GmbH as a defendant.

Please let us know whether you are authorized to and will accept service of the summons and complaint on behalf of any, or all, defendants. Alternatively, pursuant to Fed. R. Civ. Proc. 4(d), please let us know whether your firm, on behalf of any, or all, defendants, will waive service of the summons and complaint. Form waivers for each defendant are attached for your reference, as well as a postage-paid return envelope. If you do not accept or waive service, Codon will serve the defendants by alternative means, with attendant costs and fees borne by defendants pursuant to Fed. R. Civ. Proc. 4(d)(5).

WEIL, GOTSHAL & MANGES LLP

Edward J. Kessler
Re: Codon v. Febit, et al.
July 2, 2007
Page 2


       The courtesy of a prompt response to this letter would be appreciated, and we look forward to speaking with you further on this matter.

                   Best regards,

                   Edward Reines

Enclosures

# EXHIBIT 6

·Rip Finst/SV/WGM/US

07/24/2007 12:36 PM

To    mevens@skgf.com

cc    jblumenfeld@mnat.com, mmatterer@morrisjames.com,
edward.reines@weil.com

bcc

Subject    febit v. Codon

Dear Mark -

Thanks for returning my call and for agreeing to a 30-day extension for Codon to respond to febit biotech's complaint.  Per our discussion, I'll ask our local counsel Jack Blumenfeld (cc'd on this email) to work with your local counsel (who I understand is Mary Matterer) to prepare and file a stipulation extending the deadline for Codon to answer or otherwise respond to the complaint from July 30 to August 30.

We look forward to receiving your letter regarding ownership of the patent-in-suit this Friday, July 27.

Best regards,

Rip Finst
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3220 office
650-802-3100 fax

< END >

# EXHIBIT 7



"Mark F. Evens"
<MEVENS@skgf.com>
07/27/2007 01:43 PM

To  Rip.Finst@weil.com

cc  jblumenfeld@mnat.com, mmatterer@morrisjames.com,
    edward.reines@weil.com, "Ed Kessler"
    <EKESSLER@skgf.com>, "Blake Coblentz"

bcc

Subject  RE: febit v. Codon

Rip,

          I did not receive the translation. I should get it Monday and
will then forward it to you for review.

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)

-----Original Message-----
From: Rip.Finst@weil.com [mailto:Rip.Finst@weil.com]
Sent: Tuesday, July 24, 2007 3:37 PM
To: Mark F. Evens
Cc: jblumenfeld@mnat.com; mmatterer@morrisjames.com;
edward.reines@weil.com
Subject: febit v. Codon

Dear Mark -

Thanks for returning my call and for agreeing to a 30-day extension for
Codon to respond to febit biotech's complaint.  Per our discussion, I'll
ask our local counsel Jack Blumenfeld (cc'd on this email) to work with
your local counsel (who I understand is Mary Matterer) to prepare and
file a stipulation extending the deadline for Codon to answer or
otherwise respond to the complaint from July 30 to August 30.

We look forward to receiving your letter regarding ownership of the
patent-in-suit this Friday, July 27.

Best regards,

Rip Finst
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3220 office
650-802-3100 fax

< END >

------------------------------------------

# EXHIBIT 8



**"Mark F. Evens"**
**<MEVENS@skgf.com>**
07/31/2007 04:02 PM

To  edward.reines@weil.com, Rip.Finst@weil.com

cc  "Blake Coblentz" <BCOBLENT@skgf.com>

Subject  FW: [draft]Name change documents

Ed and Rip,
   I didn't want to delay and felt it better to send you the materials we have in hand now. I will send the last certified translation when we receive it.
I am providing these documents "attorneys eyes only" until we figure out a more appropriate designation.

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)


**From:** Blake Coblentz
**Sent:** Tuesday, July 31, 2007 6:58 PM
**To:** Mark F. Evens
**Subject:** [draft]Name change documents

Dear Ed,

Please see the attached letter regarding the name change documents for febit biotech GmbH.  The name change documents are also attached for your reference.

With best regards,

Mark



**W. Blake Coblentz, Esq.**
Associate
Sterne, Kessler, Goldstein & Fox P.L.L.C.
1100 New York Avenue, NW
Washington, DC 20005
Direct: 202.772.8782
Fax: 202.371.2540
Main: 202.371.2600
Email: bcoblent@skgf.com
www.skgf.com

Administrative Assistant: Carol Phillip Nouchet
Direct: 202.772.8549

Notice: The information in this electronic transmission
(including any attachments) may
contain confidential or legally privileged information and is
intended solely for the
individual(s) or entity(ies) named above.  If you are not an
intended recipient or an
authorized agent, you are hereby notified that reading,
distributing, or otherwise
disseminating or copying, or taking any action based on the
contents of this
transmission is strictly prohibited.  Any unauthorized
interception of this
transmission is illegal under the law.  If you have received this
transmission
in error, please immediately notify the sender by return email
and then destroy all
copies of the transmission.

LETTER.pdf  DOCUMENT1.pdf  DOCUMENT2.pdf  DOCUMENT3.pdf  DOCUMENT4.pdf  DOCUMENT5.pdf

# EXHIBIT 9



**Sterne Kessler Goldstein Fox**
ATTORNEYS AT LAW

Robert Greene Sterne
Jorge A. Goldstein
David K.S. Cornwell
Robert W. Esmond
Tracy-Gene G. Durkin
Michele A. Cimbala
Michael B. Ray
Robert E. Sokohl
Eric K. Steffe
Michael Q. Lee
John M. Covert
Robert C. Millonig
Donald J. Featherstone
Timothy J. Shea, Jr
Michael V. Messinger
Judith U. Kim
Jeffrey T. Helvey
Eldora L. Ellison
Donald R. Banowit

Peter A. Jackman
Brian J. Del Buono
Mark Fox Evens
Vincent L. Capuano
Elizabeth J. Haanes
Michael D. Specht
Kevin W. McCabe
Glenn J. Perry
Edward W. Yee
Grant E. Reed
Virgil Lee Beaston
Theodore A. Wood
Joseph S. Ostroff
Jason D. Eisenberg
Tracy L. Muller
Jon E. Wright
LuAnne M. DeSantis
Ann E. Summerfield
Helene C. Carlson

Cynthia M. Bouchez
Timothy A. Doyle
Gaby L. Longsworth
Lori A. Gordon
Laura A. Vogel
Bryan S. Waite
Basile M.S. Ali
Shannon A. Carroll
Anbar E. Khal
Michelle K. Holoubek
Marsha A. Rose
Scott A. Schaller
Lei Zhou
Young Tang
Christopher J. Walsh
W. Blake Coblentz
James J. Pohl
John T. Haran
Mark W. Rygiel

Michael R. Malek*
Carla Ji-Eun Kim
Doyle A. Siever*
Ulrika Winkler
Bryan L. Stalton*
Paul A. Calvo
Robert A. Schwartzman
C. Matthew Rozier
Alexandra K. Pechhold

**Registered Patent Agents***
Karen R. Markowicz
Matthew J. Dowd
Katrina Yoljan Pel Quach
Julie A. Heider
Mita Mukherjee

Scott M. Woolhouse
Peter A. Socarras
Jeffrey K. Mills
Danielle L. Letting
Lori Braedes
Steven C. Oppenheimer
Aaron S. Lukas
Gaurav Asthana

*Of Counsel*
Edward J. Kessler
Kenneth C. Bass III
Marvin C. Guthrie
Christopher P. Wrist

*Admitted only in Maryland
+ Admitted only in Virginia
•Practice Limited to
Federal Agencies

July 31, 2007

WRITER'S DIRECT NUMBER:
(202) 772-8550
(202) 772-8888
INTERNET ADDRESS:
BKESSLER@SKGF.COM
MEVENS@SKGF.COM

Edward R. Reines, Esq.
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway
Redwood Shores, California 94065

*Via Email*

Re:    febit biotech GmbH v. Codon Devices Inc.,
U.S. District Court for the District of Delaware, Case No. 1:2007cv00385

Dear Ed:

Following up on our phone call and Rip Finst's email of July 24, I am transmitting the promised information that, hopefully, will facilitate our ability to move this case forward expeditiously. We are providing you with these documents with the understanding that you will treat them as "Attorneys Eyes Only" until we work out a Protective Order in this case.

We have checked the "proper party" issue with our client. Based on the attached documents, febit biotech GmbH is the current owner of U.S. Patent No. 6,586,211. We enclose a certified English translation of the name change documents for your reference. Additionally, we also enclose the German language name change document demonstrating the name change from FeBit Ferrarius Biotechnology GmbH to febit ag. We are in the process of obtaining a certified English translation of this document. In the meantime, we had one of our associates fluent in German provide the following summary of this document:

> The document indicates that the company founders requested a change in the status of the company in May 2001. The company transformed from a limited liability company (Gesellschaft mit beschrankter Haftung; GmbH) into a stock corporation (Aktiengesellschaft; AG).
>
> FeBiT Ferrarius Biotechnology GmbH, Mannheim
>
> Hier: Umwandlung in die FeBiT Aktiengesellschaft, Mannheim

Edward R. Reines
July 31, 2007
Page 2

                [here:    the    transformation    into    FeBiT    Aktiengesellschaft,
Mannheim]

       As soon as we receive the certified English translation, we will forward a copy to you.
Please let us know if you have any further questions regarding this matter.

                     Very truly yours,

                     STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

                     Mark Fox Evens

MFE/WBC:cpn
Enclosures
699304_1.DOC

# EXHIBIT 10

# EXHIBIT FILED UNDER SEAL

Exhibit 10 - English-language translation of a contract.

# EXHIBIT 11

# EXHIBIT FILED
# UNDER SEAL

Exhibit 11 - original German-language contract between TechnoStart, the vendor, and febit, the purchaser.

# EXHIBIT 12

# EXHIBIT FILED UNDER SEAL

Exhibit 12 - English-language translation of "ANNEX 4".

# EXHIBIT 13

# EXHIBIT FILED
# UNDER SEAL

Exhibit 13 - copy of the original German-language "ANNEX 4".

# EXHIBIT 14

# EXHIBIT FILED
# UNDER SEAL

Exhibit 14 - English-language translation of a letter dated February 14, 2005.

# EXHIBIT 15

# EXHIBIT FILED
# UNDER SEAL

Exhibit 15 - copy of a German-language letter dated February 14, 2005.

# EXHIBIT 16

# EXHIBIT FILED
# UNDER SEAL

Exhibit 16 - English-language translation of a letter dated May 30, 2005.

# EXHIBIT 17

# EXHIBIT FILED
# UNDER SEAL

Exhibit 17 - true and correct copy of a German-language letter dated May 30, 2005.

# EXHIBIT 18

# EXHIBIT FILED
# UNDER SEAL

Exhibit 18 - copy of a German-language letter dated July 17, 2001.

# EXHIBIT 19

# EXHIBIT FILED UNDER SEAL

Exhibit 19 - copy of a German-language letter dated July 20, 2001.

# EXHIBIT 20

# DOCUMENT FILED UNDER SEAL

Exhibit 20 – Letter to Mark Fox Evans dated August 1, 2007

# EXHIBIT 21

# WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE

201 REDWOOD SHORES PARKWAY

REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000

FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE
650-802-3220
rip.finst@weil.com

August 8, 2007

**Via Email**

Mark Fox Evens
Stern, Kessler, Goldstein & Fox PLLC
1100 New York Ave. NW
Washington, DC 20005-3934

> Re: ***Febit Biotech GmbH, et al. v. Codon Devices, Inc.***
> **District of Delaware Case No. 07-385 GMS**

Dear Mark:

We have received no response to our letter of August 1, 2007 regarding the patent ownership issue. Please provide us with your response as soon as possible.

Best regards,

*Rip*

Rip Finst

# EXHIBIT 22

 **"Mark F. Evens"**
**<MEVENS@skgf.com>**
08/08/2007 09:55 AM

To  Rip.Finst@weil.com
cc
bcc
Subject  Re: febit biotech - Codon Devices correspondence

Rip,
Am out the next few days. This is hospital week in the Evens household.
My wife undergoes a procedure otday, and I drive my daughter to a specialist at UNC tonight for a 3 day stay.
We talked to the client about your concerns yesterday morning.
We should have the resposive docs in a week or so, hopefully sooner.

-----Original Message-----
From: Rip.Finst@weil.com <Rip.Finst@weil.com>
To: Mark F. Evens
CC: edward.reines@weil.com <edward.reines@weil.com>
Sent: Wed Aug 08 12:30:52 2007
Subject: febit biotech - Codon Devices correspondence

Mark -

Please see the attached correspondence concerning the febit biotech v.
Codon Devices matter.

Best regards,

Rip First
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3220 office
650-802-3100 fax

(See attached file: letter.PDF)

< END >

------------------------------------
The information contained in this email message is intended only
for use of the individual or entity named above. If the reader of
this message is not the intended recipient, or the employee or
agent responsible to deliver it to the intended recipient, you are
hereby notified that any dissemination, distribution or copying of
this communication is strictly prohibited. If you have received
this communication in error, please immediately notify us by email
(postmaster@weil.com), and destroy the original message. Thank you

Notice: The information in this electronic transmission
(including any attachments) may
contain confidential or legally privileged information and is

# EXHIBIT 23

# WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE

201 REDWOOD SHORES PARKWAY

REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000

FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE
650-802-3220
rlp.finst@weil.com

August 15, 2007

<u>**Via Email**</u>

Mark Fox Evens
Stern, Kessler, Goldstein & Fox PLLC
1100 New York Ave. NW
Washington, DC 20005-3934

Re:     *Febit Biotech GmbH v. Codon Devices, Inc.*
        District of Delaware Case No. 07-385 GMS

Dear Mark:

I write to follow up on a number of open issues stemming from the ownership questions related to the patent-in-suit. In the lawsuit pending in the District of Delaware, febit biotech, GmbH alleged in its complaint that it was the sole owner of the '211 patent; however, the patent identifies Febit Ferrarius Biotechnology, GmbH as the assignee. In a letter to Codon Devices, dated December 6, 2006, your colleague, Mr. Kessler, stated that a third entity – "febit, GmbH" – was the sole owner of the patent. Codon Devices detailed these conflicting claims of ownership in its complaint for declaratory relief in the District of Columbia, a courtesy copy of which was hand-delivered to your firm on July 2. Shortly thereafter, you and Ed Reines discussed this conflicting ownership issue and you agreed to send us a letter and information establishing that febit biotech, GmbH was the true owner of the '211 patent. You and I revisited the matter on July 24, and you renewed your agreement to send us relevant materials. We received a small set of materials on July 31, and informed you on August 1 that those materials did not resolve the ownership issue and, in fact, raised more questions concerning the past and current ownership of the '211 patent.

SV1:\277727\01\5XY50!!.DOC\36441.0004

WEIL, GOTSHAL & MANGES LLP

Mark Fox Evens
August 1, 2007
Page 2

Concerning the District of Delaware lawsuit, we have not yet received responses to the issues raised in my letter, dated August 1. Further, we understood from your e-mail of August 8 that we would receive within one week additional documents supporting febit biotech, GmbH's allegation that it is the sole owner of the patent, but we have not yet received any documents. Codon's response to febit biotech's complaint in the District of Delaware litigation is due August 30. If we have to file motion papers due to the ownership issues, we reserve all our rights. We have been attempting to work with you on this cooperatively for some time and hold out hope we can resolve it as soon as possible.

Regarding the District of Columbia action, we have not received a response to Ed Reines' letter to Mr. Kessler, dated July 2, 2007. Given the lack of progress on the ownership issues, we are in a position where we need your position on the service of these complaints.

Best regards,

*Rip*

Rip Finst

# EXHIBIT 24

 **"Mark F. Evens"**
<MEVENS@skgf.com>

08/15/2007 12:11 PM

To  ·Rip.Finst@weil.com

cc  "Ed Kessler" <EKESSLER@skgf.com>, "Blake Coblentz"
<BCOBLENT@skgf.com>

bcc

Subject  RE: febit biotech - Codon Devices correspondence

```
Rip,
          I don't think it productive to engage in disputing your
characterization of whether the information already provided is or is
not sufficient to address your stated concerns about ownership. To keep
this matter from becoming an issue, we advised you that we would provide
additional information. As I indicated to you last week, the client is
putting together materials that should resolve this question about
ownership. We checked this morning and hope the materials will arrive
soon. If not, we have no problem agreeing to extending your need to
respond to the Delaware action. I suggest we agree to a tolling of the
DC case pending resolution, although frankly, if our client agrees to
accept service in Delaware, that should resolve that issue.
          I do not understand your reference to information that I owe you
on the Delaware case. The information discussed above should resolve the
ownership issue, which I thought was the basis for your questions. If
you have ownership questions after that, they should be addressed
through the discovery process.
Best,

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)


-----Original Message-----
From: Rip.Finst@weil.com [mailto:Rip.Finst@weil.com]
Sent: Wednesday, August 15, 2007 2:25 PM
To: Mark F. Evens
Cc: edward.reines@weil.com
Subject: febit biotech - Codon Devices correspondence

Mark -

Please see the attached correspondence concerning the febit biotech /
Codon Devices matters.

Best regards,

Rip Finst
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3220 office
```

650-802-3100 fax

(See attached file: evens ltr 8-15-07.pdf)

< END >

------------------------------------------
The information contained in this email message is intended only for use
of the individual or entity named above. If the reader of this message
is not the intended recipient, or the employee or agent responsible to
deliver it to the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please
immediately notify us by email (postmaster@weil.com), and destroy the
original message. Thank you

Notice: The information in this electronic transmission (including any
attachments) may
contain confidential or legally privileged information and is intended solely
for the
individual(s) or entity(ies) named above.  If you are not an intended
recipient or an
authorized agent, you are hereby notified that reading, distributing, or
otherwise
disseminating or copying, or taking any action based on the contents of this
transmission is strictly prohibited.  Any unauthorized interception of this
transmission is illegal under the law.  If you have received this transmission
in error, please immediately notify the sender by return email and then
destroy all
copies of the transmission.

# EXHIBIT 25

·Rip Finst/SV/WGM/US      **To**   MEVENS@skgf.com
08/17/2007 09:00 AM        **cc**   edward.reines@weil.com

                            **bcc**   nicholas.brown@weil.com

                       **Subject**   RE: febit biotech - Codon Devices correspondence

Mark -

Thanks for the update. With your representation that your client is continuing to collect additional materials and that we should receive those soon, we think an extension is the sensible approach and appreciate your offer. Please let us know if the following language for a stipulation is OK and whether we have permission to file on your behalf (I'll ask our local counsel to work with Mary to get this filed).

IT IS HEREBY STIPULATED by the parties, subject to the approval of the Court, that the time in which the defendant may move, answer or otherwise plead in response to the complaint is extended until September 30, 2007. The parties are continuing to discuss a threshold patent ownership issue, and plaintiff has agreed to provide defendant with materials concerning ownership of the patent-in-suit. An extension of the deadline for Codon's response will permit the parties additional time to attempt to informally resolve this issue, thereby potentially obviating the need for judicial resolution of that issue.

Thanks,

Rip Finst
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3220 office
650-802-3100 fax
"Mark F. Evens" <MEVENS@skgf.com>



"Mark F. Evens"
<MEVENS@skgf.com>       **To**   Rip.Finst@weil.com
08/15/2007 12:11 PM        **cc**   "Ed Kessler" <EKESSLER@skgf.com>, "Blake Coblentz"
                                <BCOBLENT@skgf.com>
                 **Subject**   RE: febit biotech - Codon Devices correspondence

```
Rip,
          I don't think it productive to engage in disputing your
characterization of whether the information already provided is or is
not sufficient to address your stated concerns about ownership. To keep
this matter from becoming an issue, we advised you that we would provide
additional information. As I indicated to you last week, the client is
putting together materials that should resolve this question about
ownership. We checked this morning and hope the materials will arrive
soon. If not, we have no problem agreeing to extending your need to
respond to the Delaware action. I suggest we agree to a tolling of the
DC case pending resolution, although frankly, if our client agrees to
accept service in Delaware, that should resolve that issue.
          I do not understand your reference to information that I owe you
on the Delaware case. The information discussed above should resolve the
ownership issue, which I thought was the basis for your questions. If
```

you have ownership questions after that, they should be addressed
through the discovery process.
Best,

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)


-----Original Message-----
From: Rip.Finst@weil.com [mailto:Rip.Finst@weil.com]
Sent: Wednesday, August 15, 2007 2:25 PM
To: Mark F. Evens
Cc: edward.reines@weil.com
Subject: febit biotech - Codon Devices correspondence

Mark -

Please see the attached correspondence concerning the febit biotech /
Codon Devices matters.

Best regards,

Rip Finst
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3220 office
650-802-3100 fax

(See attached file: evens ltr 8-15-07.pdf)

< END >

-----------------------------------------
The information contained in this email message is intended only for use
of the individual or entity named above. If the reader of this message
is not the intended recipient, or the employee or agent responsible to
deliver it to the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please
immediately notify us by email (postmaster@weil.com), and destroy the
original message. Thank you


Notice: The information in this electronic transmission (including any
attachments) may
contain confidential or legally privileged information and is intended solely
for the
individual(s) or entity(ies) named above.  If you are not an intended
recipient or an
authorized agent, you are hereby notified that reading, distributing, or
otherwise
disseminating or copying, or taking any action based on the contents of this
transmission is strictly prohibited.  Any unauthorized interception of this

transmission is illegal under the law.  If you have received this transmission
in error, please immediately notify the sender by return email and then destroy all
copies of the transmission.


< END >

# EXHIBIT 26

·Rip Finst/SV/WGM/US
08/24/2007 01:31 PM

To  MEVENS@skgf.com

cc  edward.reines@weil.com

bcc

Subject  febit biotech - Codon Devices

Dear Mark -

Just checking in on the patent ownership issue.  Do you have a sense if/when we can expect to receive
any additional materials from your client?

Best regards,

Rip Finst
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3220 office
650-802-3100 fax

< END >

# EXHIBIT 27

"Mark F. Evens"
&lt;MEVENS@skgf.com&gt;
08/27/2007 05:05 AM

To  Rip.Finst@weil.com

cc

bcc

Subject  RE: febit biotech - Codon Devices

Rip,

　　　　Sorry for my failure to respond. I was out Monday.
This weekend, I moved my daughter into college, and Sunday, I thought I
was going to die.
I don't know if you have kids, but moving boys is a relative piece of
cake.

I am checking where we stand this morning. I know Blake emailed our
client on Thursday to check status.

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)

-----Original Message-----
From: Rip.Finst@weil.com [mailto:Rip.Finst@weil.com]
Sent: Friday, August 24, 2007 4:32 PM
To: Mark F. Evens
Cc: edward.reines@weil.com
Subject: febit biotech - Codon Devices

Dear Mark -

Just checking in on the patent ownership issue.  Do you have a sense
if/when we can expect to receive any additional materials from your
client?

Best regards,

Rip Finst
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3220 office
650-802-3100 fax

< END >

------------------------------------------
The information contained in this email message is intended only for use

of the individual or entity named above. If the reader of this message
is not the intended recipient, or the employee or agent responsible to
deliver it to the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please
immediately notify us by email (postmaster@weil.com), and destroy the
original message. Thank you


Notice: The information in this electronic transmission (including any
attachments) may
contain confidential or legally privileged information and is intended solely
for the
individual(s) or entity(ies) named above.  If you are not an intended
recipient or an
authorized agent, you are hereby notified that reading, distributing, or
otherwise
disseminating or copying, or taking any action based on the contents of this
transmission is strictly prohibited.  Any unauthorized interception of this
transmission is illegal under the law.  If you have received this transmission
in error, please immediately notify the sender by return email and then
destroy all
copies of the transmission.

# EXHIBIT 28



**"Mark F. Evens"**
**<MEVENS@skgf.com>**
09/05/2007 09:46 AM

To   edward.reines@weil.com

cc   ·Rip.Finst@weil.com, "Blake Coblentz"
     <BCOBLENT@skgf.com>

bcc

Subject   Response to your letter

Ed,

   I received your hand-delivered September 4, 2007 letter. I am requesting authorization from the client to accept service of your DC Complaint and will advise you when I receive a response.
We still hope to see this case tried in Delaware and hope to receive satisfactory documentation shortly. Summer and other matters have delayed our response.

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)

Notice: The information in this electronic transmission
(including any attachments) may
contain confidential or legally privileged information and is
intended solely for the
individual(s) or entity(ies) named above.  If you are not an
intended recipient or an
authorized agent, you are hereby notified that reading,
distributing, or otherwise
disseminating or copying, or taking any action based on the
contents of this
transmission is strictly prohibited.  Any unauthorized
interception of this
transmission is illegal under the law.  If you have received this
transmission
in error, please immediately notify the sender by return email
and then destroy all
copies of the transmission.

# EXHIBIT 29



"Mark F. Evens"
<MEVENS@skgf.com>
09/18/2007 07:08 AM

To ·Rip.Finst@weil.com

cc "Blake Coblentz" <BCOBLENT@skgf.com>

bcc

Subject German

Rip,
    Sorry for the delay. We had received supporting docs in German, but hope to receive the English translations today or tomorrow. Will then send out. I hope our package will address your issues. If not, we will work out a service procedure and move forward.

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)

Notice: The information in this electronic transmission (including any attachments) may
contain confidential or legally privileged information and is intended solely for the
individual(s) or entity(ies) named above.  If you are not an intended recipient or an
authorized agent, you are hereby notified that reading, distributing, or otherwise
disseminating or copying, or taking any action based on the contents of this
transmission is strictly prohibited.  Any unauthorized interception of this
transmission is illegal under the law.  If you have received this transmission
in error, please immediately notify the sender by return email and then destroy all
copies of the transmission.

# EXHIBIT 30



"Mark F. Evens"
<MEVENS@skgf.com>
09/19/2007 10:48 AM

To    edward.reines@weil.com

cc    Rip.Finst@weil.com, "Ed Kessler"
      <EKESSLER@skgf.com>, "Blake Coblentz"
      <BCOBLENT@skgf.com>

bcc

Subject    FW: Name change documents


Dear Ed,

Please see the attached letter regarding the name change documents for febit biotech GmbH.  The name change documents are also attached for your reference.

With best regards,

Mark


Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)


Notice: The information in this electronic transmission
(including any attachments) may
contain confidential or legally privileged information and is
intended solely for the
individual(s) or entity(ies) named above.  If you are not an
intended recipient or an
authorized agent, you are hereby notified that reading,
distributing, or otherwise
disseminating or copying, or taking any action based on the
contents of this
transmission is strictly prohibited.  Any unauthorized
interception of this
transmission is illegal under the law.  If you have received this
transmission
in error, please immediately notify the sender by return email
and then destroy all
copies of the transmission.



Letter.pdf  Statement.pdf  A1.pdf  A2.pdf  A3.pdf  A3 Part 2.pdf  A4.pdf  A5.pdf  A6.pdf  A7.pdf  A8.pdf  A9.pdf  A10.pdf  A11.pdf

# EXHIBIT 31



**Sterne Kessler Goldstein Fox**
ATTORNEYS AT LAW

Robert Greene Sterne
Jorge A. Goldstein
David K.S. Cornwell
Robert W. Esmond
Tracy-Gene G. Durkin
Michele A. Cimbala
Michael B. Ray
Robert C. Scheifl
Eric K. Steffe
Michael Q. Lee
John M. Covert
Robert C. Millonig
Donald J. Featherstone
Timothy J. Shea, Jr
Michael V. Messinger
Judith U. Kim
Jeffrey T. Helvey
Eldora J. Ellison
Donald R. Banowit

Peter A. Jackman
Brian J. Del Buono
Mark Fox Evens
Vincent L. Capuano
Elizabeth J. Haanes
Michael D. Specht
Kevin W. McCabe
Glenn J. Perry
Edward W. Yee
Grant E. Reed
Virgil Lee Beaston
Theodore A. Wood
Joseph S. Ostroff
Jason D. Eisenberg
Tracy L. Muller
Jon E. Wright
LuAnne M. DeSantis
Ann E. Summerfield
Helena C. Carlson

Cynthia M. Bouchez
Timothy A. Doyle
Gaby L. Longsworth
Lori A. Gordon
Laura A. Vogel
Bryan S. Hilda
Bashir M.S. Ali
Shannon A. Carroll
Anbar Z. Khal
Michelle K. Holoubek
Marsha A. Rose
Scott A. Schaller
Lei Zhou
Young Tang
Christopher J. Walsh
W. Blake Coblentz*
James J. Pohl
John T. Haran
Mark W. Rygiel

Michael R. Malek*
Carla Ji-Eun Kim
Doyle A. Siever*
Ulrika Winkler
Bryan L. Skelton*
Paul A. Calvo
Robert A. Schwartzman
C. Matthew Rozier
Alexandra K. Pechhold

Registered Patent Agents:
Karen R. Markowicz
Matthew J. Dowd
Katrina Yujian Pei Quach
Julie A. Heider
Mita Mukherjee

Scott M. Woodhouse
Peter A. Socarras
Jeffrey K. Mills
Danielle L. Letting
Lori Brandes
Steven C. Oppenhelmar
Aaron S. Lukas
Gaurav Asthana

Of Counsel
Edward J. Kessler
Kenneth C. Bass III
Marvin C. Guthrie
Christopher P. Witsi

*Admitted only in Maryland
*Admitted only in Virginia
+Practice Limited to
   Federal Agencies

September 19, 2007

*WRITER'S DIRECT NUMBER:*
(202) 772-8550*
(202) 772-8888
*INTERNET ADDRESS:*
EKESSLER@SKGF.COM
MEVENS@SKGF.COM

Edward R. Reines, Esq.
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway
Redwood Shores, California 94065

*Via Email*

Re:    febit biotech GmbH v. Codon Devices Inc.,
       U.S. District Court for the District of Delaware, Case No. 1:2007cv00385

Dear Ed:

Following up on our previous correspondence, enclosed herewith is the requested information that should answer your questions regarding ownership of the patent in suit so that we can move this case forward expeditiously. We are providing these documents with the understanding that you will treat them as "Attorneys Eyes Only" until we work out a Protective Order in this case and that by providing these documents we are not waiving any privileges or work product doctrine.

Our client's German counsel reviewed the relevant corporate documentation and prepared the attached Statement. The German documents relied upon in the attached Statement are also attached. We have provided English translations for some of the documents, and we will send the rest of the English translations when we receive them. In summary, the documents show that febit biotech GmbH is the current owner of U.S. Patent No. 6,586,211 ("the '211 patent"). As explained in the attached Statement, our client has recently undergone a name change from "febit biotech GmbH" to "febit holding GmbH" (hereinafter, "febit"). This name change was instituted after both febit's and Codon Devices' complaints were filed. Thus, we will take the proper steps to have febit's complaint in the U.S. District Court for the District of Delaware amended to reflect this change. Finally, we have redacted some financial information regarding corporate assets, but we have not redacted any information regarding the ownership of the '211 patent or the appropriate corporate name.

Edward R. Reines
September 19, 2007
Page 2

Please let us know if you have any further questions regarding this matter.

Very truly yours,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Mark Fox Evens

MFE/WBC:cpn
Enclosures
699304_1.DOC

# EXHIBIT 32

**RITTERSHAUS**
Rechtsanwälte Notar
MANNHEIM · FRANKFURT a. M.

**Statement regarding**

**the Ownership of U.S. Patent No. 6,586,211 B1**

The law suit of febit biotech GmbH against Condon Devices, Inc. is based on the assertion that febit biotech GmbH is the owner of the U.S. Patent No. 6,586,211 B1 entitled Method for Producing Polymers, issued on July 1, 2003 (hereinafter referred to as "Patent"). The following statement shall demonstrate that febit biotech GmbH is the owner of the Patent.

The registered owner of the Patent is the German company FeBit Ferrarius Biotechnology GmbH. This company was founded on November 10, 1998 and was registered in the commercial register of the local court of Mannheim, Germany on January 26, 1999 under the registration number "HRB 2476 W" (see Annex 1 – extract of the commercial register HRB 2476 W). By this registration the company became a limited liability company (*Gesellschaft mit beschränkter Haftung – GmbH*) under German Law.

Pursuant to a shareholders' resolution dated November 29, 1999 FeBit Ferrarius Biotechnology GmbH transferred its registered office from Weinheim to Mannheim. Due to this change of registered office the company was then registered in the commercial register of the local court of Mannheim under HRB 8373 on April 12, 2000 (see Annex 2 – extract of the commercial register HRB 8373).

On May 4, 2001 the shareholders of FeBit Ferrarius Biotechnology GmbH resolved that the legal form of the company shall be transformed into a stock corporation (*Aktiengesellschaft*) with the name "febit AG" according to §§ 190 seq. of the German Law Regulating Transformation of Companies (*Umwandlungsgesetz*). This change of legal form became valid by registration in the commercial register on October 11, 2001 (see Annex 2 – extract of the commercial register HRB 8373). The newly formed febit AG was then registered in the commercial register of the local court of Mannheim under HRB 8959 (see Annex 3 – extract of the commercial register HRB 8959).

Regardless of the transformation of FeBit Ferrarius Biotechnology GmbH into febit AG the legal entity of the company remained the same, only the form of organization had changed. Therefore, febit AG was the owner of the same assets as FeBit Ferrarius Biotechnology GmbH. When the Patent was issued for FeBit Ferrarius Biotechnology

**RITTERSHAUS**
Rechtsanwälte Notar
MANNHEIM · FRANKFURT a. M.

GmbH on July 1, 2003, the name of the Patent's owner was already febit AG, the legal successor company of FeBit Ferrarius Biotechnology GmbH.

On July 1, 2004 bankruptcy proceedings were instituted against the assets of febit AG and Mr. Christopher Seagon was appointed as insolvency administrator (see Annex 3 – extract of the commercial register 8959; see Annex 4 order of the local court of Mannheim dated July 1, 2004). As insolvency administrator Mr. Seagon was entitled to sell and transfer the title of febit AG's assets in order to liquidate the company.

On September 24, 2004 the insolvency administrator and TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH entered into a purchase agreement by which assets of febit AG were sold and transferred to TechnoStart Beratungsgesellschaft für Beteiligungs fonds mbH. Pursuant to § 7 of this purchase agreement TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH was also granted the option to buy and acquire patents and patent applications listed in Annex 4 to this purchase agreement. In this Annex 4 the Patent is listed in the first line (see Annex 5 – purchase agreement between the insolvency administrator and TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH dated September 24, 2004). The option had to be exercised by Friday, December 12, 2004, 12 a.m. With letter dated December 17, 2004 TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH exercised the option pursuant to § 7 of the said purchase agreement (see Annex 6 – letter of TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH dated December 17, 2004). The exercise of the option in due time was confirmed by the insolvency administrator with letter dated January 17, 2005. He furthermore confirmed the payment of the purchase price which was a condition precedent for transfer of title regarding the sold patents and patent applications (see Annex 7 – letter of Mr. Seagon dated January 17, 2005). TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH therefore became owner of the Patent.

On April 18, 2005 TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH sold and transferred the former assets of febit AG including the Patent to a limited liability company under the then present name "Neckarburg 66. VV GmbH" and the future name „febit biotech GmbH" (see Annex 8 – purchase agreement between TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH and Neckarburg 66. VV GmbH dated April 18, 2005).

**RITTERSHAUS**
Rechtsanwälte Notar
MANNHEIM · FRANKFURT a. M.

The company „Neckarburg 66. VV GmbH" was founded as a shelf company on February 16, 2005 and became registered in the commercial register of the local court of Stuttgart on February 22, 2005 under the number HRB 25183 (see Annex 9 – extract of the commercial register HRB 25183). After acquiring the shares of this shelf company the new shareholders resolved on April 18, 2005 that the company shall be named "febit biotech GmbH" and the registered office shall be moved to Heidelberg. The company became registered under the name "febit biotech GmbH" in the commercial register of the local court Mannheim under the number HRB 337906 (see Annex 10 – extract of the commercial register 337906).

As febit biotech GmbH paid the agreed purchase price which was a condition precedent to the transfer of title regarding the sold assets, febit biotech GmbH became owner of the Patent. This was confirmed by TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH to febit biotech GmbH with letter dated May 30, 2005. In this letter TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH confirmed that febit biotech GmbH, formerly named Neckarburg 66 VV GmbH, acquired the patents, trade marks, utility patents, name rights and intellectual properties and the respective applications hereto which the insolvency administrator of febit AG had transferred to TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH by purchase agreements dated September 24, 2004, November 5, 2004 and December 16, 2004 (see Annex 11 – letter of TechnoStart Beratungsgesellschaft für Beteiligungsfonds mbH dated May 30, 2005).

Meanwhile febit biotech GmbH has changed its name into "febit holding GmbH" due to a shareholders' resolution dated August 6, 2007 (see Annex 10 – extract of the commercial register HRB 337906).

This statement is based on the assumption that FeBit Ferrarius Biotechnology GmbH was originally the owner of the Patent, that the title of the Patent was only transferred by the purchase agreements mentioned above and that the respective sellers had not transferred the Patent to a third party prior to the aforementioned purchase agreements.

Mannheim, September 10, 2007

Eisenlohr, LL.M.
Rechtsanwältin

3

# EXHIBIT 33

# EXHIBIT FILED UNDER SEAL

Exhibit 33 - copy of "ANNEX 1".

# EXHIBIT 34

# EXHIBIT FILED
# UNDER SEAL

Exhibit 34 - copy of "ANNEX 2".

# EXHIBIT 35

# EXHIBIT FILED UNDER SEAL

Exhibit 35 - copy of "ANNEX 3–part 1".

# EXHIBIT 36

# EXHIBIT FILED UNDER SEAL

Exhibit 36 - copy of "ANNEX 3–part 2.

# EXHIBIT 37

# EXHIBIT FILED UNDER SEAL

Exhibit 37 - copy of "ANNEX 4".

# EXHIBIT 38

# EXHIBIT FILED UNDER SEAL

Exhibit 38 - copy of "ANNEX 5".

# EXHIBIT 39

# EXHIBIT FILED UNDER SEAL

Exhibit 39 - copy of "ANNEX 6".

# EXHIBIT 40

# EXHIBIT FILED
# UNDER SEAL

Exhibit 40 - copy of "ANNEX 7".

# EXHIBIT 41

# EXHIBIT FILED UNDER SEAL

Exhibit 41 - copy of "ANNEX 8".

# EXHIBIT 42

# EXHIBIT FILED UNDER SEAL

Exhibit 42 - copy of "ANNEX 9".

# EXHIBIT 43

# EXHIBIT FILED
# UNDER SEAL

Exhibit 43 - copy of "ANNEX 10".

# EXHIBIT 44

# EXHIBIT FILED UNDER SEAL

Exhibit 44 - copy of "ANNEX 11".

# EXHIBIT 45

**From:** Rip.Finst@weil.com [mailto:Rip.Finst@weil.com]
**Sent:** Sunday, September 23, 2007 1:03 AM
**To:** Mark F. Evens
**Cc:** Mr. Edward Reines
**Subject:** Re: Name change documents

Dear Mark -

Thanks for the additional materials concerning the patent ownership issue.  Please let us know when you expect to receive the balance of the English translations and whether you anticipate receiving any additional documentation from your client.

We have begun to review the materials, but note that potentially relevant sections have been redacted in their entirety.  For example, an appendix entitled "Anlage 2  IP Portfolio [Auswahl aus Bestand der febit AG]" to the April 18, 2005 TechnoStart-Neckarburg 66 agreement (document "A8..pdf" to your email) is fully redacted.  Likewise, for an appendix entitled "Anlage 2: Schultzrechte febit ag" to the September 24, 2004 Seagon-TechnoStart agreement (also document "A8.pdf" to your email).  These appendices are referenced in the context of "Patente" (patents) in section 1 of each agreement and, thus, their redacted content appears to be germane to the ownership issue.  Please let me know if/when we can expect to receive unredacted documents.

Best regards,
Rip

---

----- Original Message -----
**From:** "Mark F. Evens" [MEVENS@skgf.com]
**Sent:** 09/19/2007 01:48 PM AST
**To:** Edward Reines
**Cc:** Rip Finst; "Ed Kessler" <EKESSLER@skgf.com>; "Blake Coblentz" <BCOBLENT@skgf.com>
**Subject:** FW: Name change documents


Dear Ed,

Please see the attached letter regarding the name change documents for febit biotech GmbH.  The name change documents are also attached for your reference.

With best regards,

Mark


Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)

```
Notice: The information in this electronic transmission (including any
attachments) may
contain confidential or legally privileged information and is intended solely
for the
individual(s) or entity(ies) named above.  If you are not an intended
recipient or an
authorized agent, you are hereby notified that reading, distributing, or
otherwise
disseminating or copying, or taking any action based on the contents of this
transmission is strictly prohibited.  Any unauthorized interception of this
transmission is illegal under the law.  If you have received this
transmission
in error, please immediately notify the sender by return email and then
destroy all
copies of the transmission.
```

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you

# EXHIBIT 46

**From:**        Mark F. Evens
**Sent:**        Wednesday, September 26, 2007 5:30 PM
**To:**          'Rip.Finst@weil.com'
**Cc:**          Blake Coblentz
**Subject:**     Re: Name change documents

Rip,
I wanted to give you an update.
We received the rest of the German translations.
I will be back in DC on Friday and plan to transmit them to you.

-----Original Message-----
From: Rip.Finst@weil.com <Rip.Finst@weil.com>
To: Mark F. Evens
CC: Mr. Edward Reines <edward.reines@weil.com>
Sent: Sun Sep 23 01:03:07 2007
Subject: Re: Name change documents


Dear Mark -

Thanks for the additional materials concerning the patent ownership issue.  Please let us
know when you expect to receive the balance of the English translations and whether you
anticipate receiving any additional documentation from your client.

We have begun to review the materials, but note that potentially relevant sections have
been redacted in their entirety.  For example, an appendix entitled "Anlage 2  IP
Portfolio [Auswahl aus Bestand der febit AG]" to the April 18, 2005 TechnoStart-Neckarburg
66 agreement (document "A8..pdf" to your email) is fully redacted.  Likewise, for an
appendix entitled "Anlage 2: Schultzrechte febit ag" to the September 24, 2004 Seagon-
TechnoStart agreement (also document "A8.pdf" to your email).  These appendices are
referenced in the context of "Patente" (patents) in section 1 of each agreement and, thus,
their redacted content appears to be germane to the ownership issue.  Please let me know
if/when we can expect to receive unredacted documents.

Best regards,
Rip


------------------------------------

----- Original Message -----
From: "Mark F. Evens" [MEVENS@skgf.com]
Sent: 09/19/2007 01:48 PM AST
To: Edward Reines
Cc: Rip Finst; "Ed Kessler" <EKESSLER@skgf.com>; "Blake Coblentz" <BCOBLENT@skgf.com>
Subject: FW: Name change documents



Dear Ed,

Please see the attached letter regarding the name change documents for febit biotech GmbH.
The name change documents are also attached for your reference.

With best regards,

Mark

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)

Notice: The information in this electronic transmission (including any attachments) may
contain confidential or legally privileged information and is intended solely for the
individual(s) or entity(ies) named above.  If you are not an intended recipient or an
authorized agent, you are hereby notified that reading, distributing, or otherwise
disseminating or copying, or taking any action based on the contents of this
transmission is strictly prohibited.  Any unauthorized interception of this
transmission is illegal under the law.  If you have received this transmission
in error, please immediately notify the sender by return email and then destroy all
copies of the transmission.

---

The information contained in this email message is intended only for use of the individual
or entity named above. If the reader of this message is not the intended recipient, or the
employee or agent responsible to deliver it to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please immediately notify us
by email (postmaster@weil.com), and destroy the original message. Thank you

# EXHIBIT 47

| From: | Rip.Finst@weil.com |
|---|---|
| Sent: | Wednesday, September 26, 2007 5:33 PM |
| To: | Mark F. Evens |
| Cc: | Blake Coblentz; edward.reines@weil.com |
| Subject: | Re: Name change documents |

Thanks for the update.


Rip Finst
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3220 office
650-802-3100 fax



```
          "Mark F. Evens"
          <MEVENS@skgf.com>
                                                                To
          09/26/2007 02:29        Rip.Finst@weil.com
          PM                                                    cc
                                  "Blake Coblentz"
                                  <BCOBLENT@skgf.com>
                                                            Subject
                                  Re: Name change documents
```




Rip,
I wanted to give you an update.
We received the rest of the German translations.
I will be back in DC on Friday and plan to transmit them to you.

-----Original Message-----
From: Rip.Finst@weil.com <Rip.Finst@weil.com>
To: Mark F. Evens
CC: Mr. Edward Reines <edward.reines@weil.com>
Sent: Sun Sep 23 01:03:07 2007
Subject: Re: Name change documents

Dear Mark -

Thanks for the additional materials concerning the patent ownership issue.
Please let us know when you expect to receive the balance of the English translations and
whether you anticipate receiving any additional documentation from your client.

We have begun to review the materials, but note that potentially relevant sections have
been redacted in their entirety.  For example, an appendix entitled "Anlage 2  IP
Portfolio [Auswahl aus Bestand der febit AG]" to the April 18, 2005 TechnoStart-Neckarburg
66 agreement (document "A8..pdf" to your email) is fully redacted.  Likewise, for an
appendix entitled "Anlage
2: Schultzrechte febit ag" to the September 24, 2004 Seagon-TechnoStart agreement (also

1

document "A8.pdf" to your email).  These appendices are referenced in the context of "Patente" (patents) in section 1 of each agreement and, thus, their redacted content appears to be germane to the ownership issue.  Please let me know if/when we can expect to receive unredacted documents.

Best regards,
Rip

---

----- Original Message -----
  From: "Mark F. Evens" [MEVENS@skgf.com]
  Sent: 09/19/2007 01:48 PM AST
  To: Edward Reines
  Cc: Rip Finst; "Ed Kessler" <EKESSLER@skgf.com>; "Blake Coblentz"
<BCOBLENT@skgf.com>
  Subject: FW: Name change documents

Dear Ed,

Please see the attached letter regarding the name change documents for febit biotech GmbH. The name change documents are also attached for your reference.

With best regards,

Mark

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)

Notice: The information in this electronic transmission (including any attachments) may
contain confidential or legally privileged information and is intended solely for the individual(s) or entity(ies) named above.  If you are not an intended recipient or an authorized agent, you are hereby notified that reading, distributing, or otherwise disseminating or copying, or taking any action based on the contents of this transmission is strictly prohibited.  Any unauthorized interception of this transmission is illegal under the law.  If you have received this transmission in error, please immediately notify the sender by return email and then destroy all copies of the transmission.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us

by email (postmaster@weil.com), and destroy the original message. Thank you


< END >


-------------------------------------------
The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you

# EXHIBIT 48



"Mark F. Evens"
&lt;MEVENS@skgf.com&gt;
09/28/2007 03:26 PM

To  edward.reines@weil.com
cc  ·Rip.Finst@weil.com
bcc
Subject  FW: Name change documents

Here are the remaining documents, translated into English.

Mark Fox Evens
Director
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., NW
Washington, DC 20005

202-772-8888 (direct)
202-371-2540 (fax)
202-371-2600 (reception)

**From:** Blake Coblentz
**Sent:** Friday, September 28, 2007 5:58 PM
**To:** Mark F. Evens
**Subject:** Name change documents

Mark,

Here are the remaining english translated name change documents.

Thanks,
Blake

Notice: The information in this electronic transmission
(including any attachments) may
contain confidential or legally privileged information and is
intended solely for the
individual(s) or entity(ies) named above.  If you are not an
intended recipient or an
authorized agent, you are hereby notified that reading,
distributing, or otherwise
disseminating or copying, or taking any action based on the
contents of this
transmission is strictly prohibited.  Any unauthorized
interception of this
transmission is illegal under the law.  If you have received this
transmission
in error, please immediately notify the sender by return email
and then destroy all

copies of the transmission.

  

A4 english translation.pdf   A5 english translation.pdf   A8englishtranslation.pdf

# EXHIBIT 49

# EXHIBIT FILED UNDER SEAL

Exhibit 49 - English-language translation of "ANNEX 4" to the Statement by Eisenlohr, LL.M.

# EXHIBIT 50

# EXHIBIT FILED
# UNDER SEAL

Exhibit 50 - English-language translation of "ANNEX 5" to the Statement by Eisenlohr, LL.M.

# EXHIBIT 51

# EXHIBIT FILED UNDER SEAL

Exhibit 51 - English-language translation of "ANNEX 8" to the Statement by Eisenlohr, LL.M.

# EXHIBIT 52

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FEBIT HOLDING GMBH,                    )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )    C.A. No. 07-385 (GMS)
                                       )
CODON DEVICES, INC.,                   )
                                       )
                    Defendant.         )

**DEFENDANT CODON DEVICES, INC.'S
MOTION TO DISMISS COMPLAINT OF PLAINTIFF FEBIT BIOTECH GMBH
OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT**

**NATURE AND STAGE OF THE PROCEEDINGS**

febit biotech GmbH ("febit biotech") filed this patent infringement lawsuit against

Codon Devices, Inc. ("Codon") on June 15, 2007.  The parties have twice stipulated to extend

Codon's time to file a responsive pleading so febit biotech could collect documentation to

attempt to address outstanding questions concerning the ownership of the patent-in-suit.  The

parties prioritized this issue because such questions must be resolved to establish standing to sue

and subject matter jurisdiction.

**INTRODUCTION**

febit biotech sued Codon for infringement of United States Patent No. 6,586,211

(the "'211 Patent").  Finst Decl., Exh. 1 [Complaint (D.I. 1) at ¶ 1.[1]  In its Complaint, febit

biotech baldly asserts that it has standing to bring suit because it allegedly "is the owner of the

entire right, title and interest in and to" the '211 Patent.  *Id.* at ¶ 8.  This allegation is inconsistent

with the face of the '211 Patent.  The '211 Patent identifies a third party, FeBit Ferrarius

---

[1]    References to the "Finst Decl." and "Exh." are to the Declaration of Rip Finst and
Exhibits thereto concurrently filed in support of this Motion.

Biotechnology, GmbH (hereafter, "Febit Ferrarius") as the assignee. Exh. A ['211 Patent] to Exh. 1 [Complaint] at 1. This inconsistency calls into question whether febit biotech has standing in this case. With conflicting claims of ownership obvious from the Complaint and the patent appended to it, febit biotech's conclusory assertion of ownership does not meet its statutory obligation to plead sufficient facts to show that it "is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007). If febit biotech cannot in response to this motion allege facts establishing its ownership of the '211 Patent, its complaint should be dismissed for lack of standing. *Ortho Pharm. Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995) (affirming district court's dismissal of plaintiff-patent licensee's suit on ground that licensee lacked standing to sue).

Because there is a serious question as to whether the plaintiff has standing to bring this action at all, Codon has diligently sought clarifying documentation establishing that the plaintiff indeed owns the patent-in-suit. As detailed below, as a result of Codon's efforts to investigate this issue, it has received 19 German documents from febit biotech's counsel. These documents, however, do not themselves establish ownership, but instead reflect that as many as seven different entities have now or have had in the past ownership claims to the patent-in-suit. Separately, an eighth entity, febit, GmbH, has also claimed ownership of the '211 Patent. Codon respectfully submits that, before this case proceeds further, it and this Court are entitled to a clear statement in the Complaint of how febit biotech contends it owns the patent and thus has standing to sue. Such a statement will provide the reasonable and legally required allegation of standing for Codon to evaluate and challenge as warranted.

2

## STATEMENT OF FACTS

In its Complaint, febit biotech's entire proffer in support of standing is a single-sentence: "febit is the owner of the entire right, title and interest in and to" the '211 Patent. *See* Finst Decl., Exh. 1 [Complaint (D.I. 1)] at ¶ 8.   That conclusory claim conflicts with the assignee identified on the face of the '211 Patent, Febit Ferrarius.   Exh. A ['211 Patent] to Exh. 1 [Complaint] at 1.   A report prepared by the Clerk of this Court and filed with the Complaint also lists Febit Ferrarius – not febit biotech – as the "Holder of Patent."   See Finst Decl., Exh. 2 [Report On The Filing Or Determination Of An Action Regarding A Patent Or Trademark (D.I. 4)].   The Complaint does not address this glaring inconsistency between febit biotech's claim of ownership and the identification of a different entity as the owner-of-record.

For more than two months, Codon has attempted to resolve informally this standing issue without Court intervention.   Counsel for the parties conferred during the week of July 16 and again on July 24 to discuss the ownership conflict and means for resolution.   *See* Finst Decl., Exh. 3 [July 24, 2007 email from R. Finst to M. Evens].   febit biotech's counsel agreed to submit by July 27 a letter and materials evidencing a legal transfer of ownership in the '211 Patent to febit biotech.   *See id.*; Exh. 4 [July 27, 2007 email from M. Evens to R. Finst].   To allow febit biotech time to prepare its submission, the parties submitted a stipulation extending the deadline for Codon to answer or otherwise respond to the Complaint by 30 days.   *See id.*; D.I. 6 (stipulation as-entered July 26, 2007).

On July 31, 2007, febit biotech submitted five documents, including an untranslated German-language document, in an attempt to establish that it is the current owner of the '211 Patent.   First Decl., Exh. 5 [July 31, 2007 email and letter from M. Evens to E. Reines].   These documents failed to show that febit biotech was the owner of the '211 Patent and, in fact,

3

suggested that at least four other German entities may have owned part or all of the patent: (1) febit AG, (2) Christopher Seagon (a German insolvency administrator presiding over distribution and sale of assets in connection with dissolution of febit AG), (3) Technostart Beratungsgesellschaft fur Beteiligungsfonds mbH, and (4) Neckarburg 66, VV GmbH. Accordingly, one day later, Codon notified febit biotech's counsel that the documents do not resolve the patent ownership issue and instead paint an ambiguous record concerning the past and current ownership of the '211 patent. Finst Decl., Exh. 6 [August 1, 2007 letter from R. Finst to M. Evens] at 1. Indeed, the only document that expressly references the '211 patent is a vague, one-page "Annex." *Id.*

As a result of the inconclusive July 31 documentation, which raised more patent ownership questions than it answered, Codon promptly requested additional documentation, including agreements referenced in the July 31 documents. *Id.* For the next seven weeks, Codon repeatedly renewed its request for curative or clarifying ownership documentation and febit biotech's counsel agreed to, but was not able to, provide such documents. *See* Finst Decl., Exhs. 7 [August 8, 2007 letter from R. Finst to M. Evens], 8 [August 8, 2007 email from M. Evens to R. Finst], 9 [August 15, 2007 letter from R. Finst to M. Evens]; 10 [August 15, 2007 email from M. Evens to R. Finst]; 11 [August 17, 2007 email from R. Finst to M. Evens]; 12 [August 24, 2007 email from R. Finst to M. Evens]; 13 [August 27, 2007 email from M. Evens to R. Finst]; 14 [September 5, 2007 email from M. Evens to E. Reines]; 15 [September 18, 2007 email from M. Evens to R. Finst].[2]

---

[2]     To provide febit biotech additional time to collect documents concerning transfer of ownership, the parties stipulated to a second 30-day extension of the deadline for Codon to respond to the Complaint. D.I. 9 (stipulation as-entered August 20, 2007).

On September 19 and 28, Codon finally received fourteen additional documents, including redacted and German-language documents and translations, that allegedly support febit biotech's ownership claim. *See* Finst Decl., Exh. 16 [September 19, 2007 email and letter from M. Evens to E. Reines]; Exh. 17 [September 28, 2007 email from M. Evens to E. Reines]. This documentation also included a report prepared by febit biotech's German counsel summarizing numerous purported transfers of ownership of the '211 Patent. *See* Exh. 16 at 1. Like the July 31 documents, these materials do not resolve – and, instead, further cloud – the ownership picture for the patent-in-suit. In addition to febit biotech, Febit Ferrarius and the four German entities identified above, an additional entity, febit holding GmbH, apparently has an interest in the patent. Indeed, on September 28, plaintiff's counsel filed a Notice of Name Change (D.I. 10) suggesting that febit holding GmbH is now the real party in interest.

Separately, Codon filed suit against febit biotech, Febit Ferrarius (the record owner of the '211 Patent) and febit, GmbH (yet another entity proclaiming sole ownership of the '211 Patent) in the United States District Court for the District of Columbia (Case No. 07-01177 RBW; the "D.C. Action").[3] *See* Finst Decl., Exh. 18 [D.D.C. Complaint]. In the D.C. Action, Codon seeks a judicial determination of the true and correct owner of the '211 Patent and a declaratory judgment of non-infringement and patent invalidity and unenforceability. Codon has no issue with litigating all the pending issues before this Court, but selected the D.C. Court for its declaratory judgment action because that is where additional entities claiming ownership of the patent-in-suit were clearly subject to jurisdiction.

---

[3]    The D.C. Action was filed on June 29, 2007, before febit biotech served Codon with its Complaint.

**ARGUMENT**

I.   **FEBIT BIOTECH HAS NOT SHOWN AN ENTITLEMENT TO RELIEF OR THAT THE COURT HAS SUBJECT MATTER JURISDICTION**

   A.   **An Inadequately Pled Complaint Should Be Dismissed**

   febit biotech's Complaint should be dismissed because febit biotech has failed to plead allegations sufficient to establish standing and, thus, has no claim upon which relief can be granted or over which the Court has subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b). In *UD Tech. Corp. v. Phenomenex, Inc.*, C.A. No. 05-842-GMS, 2007 WL 28295 (D. Del. Jan. 4, 2007) (Finst Decl., Exh. 21), this Court addressed standing defects similar to but less egregious than those at-issue in the Complaint here. Although the complaint in *UD Tech* alleged assignments of patent rights to the plaintiff, the Court concluded that the allegations had not shown that the plaintiff was granted the right to sue for infringement. *Id.* at *4. Here, febit biotech's allegations are even more poorly plead: febit biotech identifies no instrument transferring an ownership right or a right to sue.

   Setting forth the framework for evaluating a motion to dismiss, the Court noted that a Rule 12(b)(1) attack on the pleadings may be either facial or factual. *Id.* at *2. When reviewing a Rule 12(b)(1) facial attack, the Court is limited to the pleadings. *Id.* In reviewing a factual attack, the Court weighs evidence outside the pleadings and accords no weight to the plaintiff's allegations. *Id.*

   In *UD Tech*, the Court's evaluation was based on the dismissal standard set forth by the Supreme Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). *Id.* Recently, however, the Supreme Court rejected the *Conley* standard and adopted a pleading standard that demands even more from the plaintiff's allegations than this Court required in *UD Tech. See Bell Atl.*

6

*Corp. v. Twombly*, 127 S. Ct. 1955 (2007).[4]

In *Bell Atlantic*, the Supreme Court emphasized that the complaint must provide "fair notice" of what the claim is and the grounds upon which it rests. *Bell Atl. Corp.*, 127 S. Ct. at 1964; *see* Fed. R. Civ. P. 8(a)(2) (a complaint requires "a short and plain statement of the claim showing that the pleader is entitled to relief"). The alleged facts must "**possess enough heft**" to show that the pleader is entitled to relief. *Id.* at 1966 (emphasis added). Although a complaint "does not need detailed factual allegations," the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (citations omitted). Thus, a complaint should be dismissed pursuant to Rule 12(b) if it does not allege "enough facts to state a claim to relief that is plausible." *Id.* at 1974.

Of course, the Court need not take each allegation at "face value." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 (3rd Cir. 1998) (rejecting plaintiff's assertion that "the [district] court should have taken the allegations of its complaint at face value"). The Court has "an obligation … to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable." *Id.* Further, the Court need not accept legal conclusions framed as factual allegations. *Bell Atlantic Corp.*, 127 S.Ct. at 1965. Nor must the Court accept bald assertions, unwarranted inferences or strained interpretations of fact offered by the Complaint. *City of Pittsburgh*, 147 F.3d at 263, n. 13; *see* 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1286 (3d ed. 2004) (Finst Decl., Exh. 19).

---

[4]    In *Bell Atlantic*, the Supreme Court abandoned *Conley*'s previously "accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp.*, 127 S. Ct. at 1968-69 (quoting *Conley*, 355 U.S. at 45-46).

**B.**     **febit biotech's Allegations Fall Far Short Of Establishing Standing**

Standing is a threshold issue in every case. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *City of Pittsburgh*, 147 F.3d at 269.  In a patent infringement action, only the patentee or successors-in-title have a protectable interest in the patent sufficient to confer standing to sue for infringement. *See* 35 U.S.C. § 281 (A "patentee shall have remedy by civil action for infringement of his patent."); 35 U.S.C. § 100(d) (defining "patentee" as the party to whom the patent issued or any successors in title to the patent); *Ortho Pharm. Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995) (affirming district court's dismissal on ground that plaintiff-patent licensee lacked standing to sue).  febit biotech has not, however, pled allegations sufficient to establish ownership of the '211 Patent. *See Ortho Pharm. Corp.*, 52 F.3d at 1032-33 (stating that "[t]he burden of demonstrating standing falls to" the party asserting a claim of infringement).

febit biotech's claim of ownership is contradicted by the '211 Patent referenced in and attached to the Complaint.  In that circumstance, the attached exhibit trumps the allegations. *See City of Pittsburgh*, 147 F.3d at 266-67; 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1363 (3d ed. 2004) ("The district court will not accept as true pleading allegations that are contradicted by … exhibits attached to or incorporated in the pleading.") (Finst Decl., Exh. 20).

Further, ownership of a patent is a matter of law (*Kahn v. General Motors Corp.*, 77 F.3d 457, 459 (Fed. Cir. 1996)), and the Court need not accept febit biotech's legal conclusion that it is the patent owner. *See Bell Atlantic Corp.*, 127 S.Ct. at 1965 (noting that the Court need not accept legal conclusions set forth as factual allegations).

8

Finally, a written assignment is required for a change of ownership. *See* 35 U.S.C. § 261; *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000) (stating that plaintiff "must produce a written instrument documenting the transfer of proprietary rights in the patents" to establish it had standing to sue).  febit biotech neither plead or referenced a legal instrument evidencing a transfer of ownership to it from the named assignee, Febit Ferrarius.[5] Consequently, the Court need not accept febit biotech's unsupported claim of being "the owner of the entire right, title and interest" to the '211 Patent. *See City of Pittsburgh*, 147 F.3d at 263, n. 13.

In summary, even reviewing the allegations of the Complaint in the light most favorable to febit biotech, febit biotech has not plead facts sufficient to show standing nor alleged "enough facts to state a claim to relief that is plausible." *See Bell Atl. Corp.*, 127 S. Ct. at 1974.  The Complaint should, therefore, be dismissed.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD REQUIRE FEBIT BIOTECH TO PROVIDE A MORE DEFINITE STATEMENT

Codon moves in the alternative for a more definite statement in the Complaint establishing standing. *See* Fed. R. Civ. P. 12(e).  For the reasons set forth above, febit biotech's Complaint is "so vague or ambiguous" that Codon cannot reasonably respond. *See id.*  A more definite statement of ownership should include sufficiently detailed descriptions of all transfers of ownership of the patent-in-suit and records filed with the Patent Office so that Codon and the Court can "trace the chain of title" of the patent. *See Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1092 (Fed. Cir. 1998) (concluding that plaintiff lacked standing to assert patent infringement claim where no written assignment of patent rights to plaintiff had been made at

---

[5]    Indeed, febit biotech's failure to allege facts establishing standing appears to be more than a simple oversight.  As described in the Statement of Facts, a tortured record of transactions involving the '211 Patent suggests that numerous entities apparently have had or currently have an interest in that patent.

9

time claims were brought); *see Waterman v. Mackenzie*, 138 U.S. 252 (1891) (suit dismissed because not brought by record owner); *Speedplay, Inc.*, 211 F.3d at 1250.

## CONCLUSION

For the reasons set forth above, Codon's motion to dismiss should be granted and febit biotech's Complaint dismissed with prejudice.

MORRIS, NICHOLS, ARSHT & TUNNEL LLP

*/s/ Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com

*Attorneys for Defendant,*
*Codon Devices, Inc.*

OF COUNSEL:

Edward R. Reines
Nicholas A. Brown
Rip Finst
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

October 1, 2007
1251200

# EXHIBIT 53

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FEBIT HOLDING GMBH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-385 (GMS) |
| | ) | |
| CODON DEVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF RIP FINST IN SUPPORT OF CODON DEVICES, INC.'S
MOTION TO DISMISS FEBIT BIOTECH GMBH'S COMPLAINT
OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT**

I, Rip Finst, declare:

1.        I am an attorney admitted *pro hac vice* to practice in the United States
District Court for the District of Delaware, and am an associate at Weil, Gotshal & Manges
L.L.P., attorneys of record for Defendant Codon Devices, Inc. ("Codon").    The matters referred
to in this declaration are based on my personal knowledge and if called as a witness I could, and
would, testify competently to those matters.

2.        Attached hereto as Exhibit 1 is a true and correct copy of the Complaint
(D.I. 1) and Exhibit A (United States Patent No. 6,586,211) thereto filed by febit biotech GmbH
against Codon on June 15, 2007 in *febit biotech GmbH v. Codon Devices, Inc.,* Civil Action No.
07-385 (D. Del.).

3.        Attached hereto as Exhibit 2 is a true and correct copy of the Report On
The Filing Or Determination Of An Action Regarding A Patent Or Trademark (D.I. 4) filed on
June 15, 2007, in *febit biotech GmbH v. Codon Devices, Inc.*, Civil Action No. 07-385 (D. Del.).

4.        Attached hereto as Exhibit 3 is a true and correct copy of an email dated
July 24, 2007 from Rip Finst to Mark Evens.

5.        Attached hereto as Exhibit 4 is a true and correct copy of an email dated
July 27, 2007 from Rip Finst to Mark Evens.

6.     Attached hereto as Exhibit 5 is a true and correct copy of an email and accompanying letter, without attachments, dated July 31, 2007 from Mark Evens to Edward Reines.

7.     Attached hereto as Exhibit 6 is a true and correct copy of a letter dated August 1, 2007 from Rip Finst to Mark Evens.

8.     Attached hereto as Exhibit 7 is a true and correct copy of a letter dated August 8, 2007 from Rip Finst to Mark Evens.

9.     Attached hereto as Exhibit 8 is a true and correct copy of an email dated August 8, 2007 from Mark Evens to Rip Finst.

10.     Attached hereto as Exhibit 9 is a true and correct copy of a letter dated August 15, 2007 from Rip Finst to Mark Evens.

11.     Attached hereto as Exhibit 10 is a true and correct copy of an email dated August 15, 2007 from Mark Evens to Rip Finst.

12.     Attached hereto as Exhibit 11 is a true and correct copy of an email dated August 17, 2007 from Rip Finst to Mark Evens.

13.     Attached hereto as Exhibit 12 is a true and correct copy of an email dated August 24, 2007 from Rip Finst to Mark Evens.

14.     Attached hereto as Exhibit 13 is a true and correct copy of an email dated August 27, 2007 from Mark Evens to Rip Finst.

15.     Attached hereto as Exhibit 14 is a true and correct copy of an email dated September 5, 2007 from Mark Evens to Edward Reines.

16.     Attached hereto as Exhibit 15 is a true and correct copy of an email dated September 18, 2007 from Mark Evens to Rip Finst.

17.     Attached hereto as Exhibit 16 is a true and correct copy of an email and accompanying letter, without attachments, dated September 19, 2007 from Mark Evens to Edward Reines.

2

18.    Attached hereto as Exhibit 17 is a true and correct copy of an email, without attachments, dated September 28, 2007 from Mark Evens to E. Reines.

19.    Attached hereto as Exhibit 18 is a true and correct copy of Codon's Complaint for Declaratory Judgment filed in the United States District Court in the District of Columbia against febit biotech GmbH, Febit Ferrarius Biotechnology GmbH and febit, GmbH filed on June 29, 2007, *Codon Devices, Inc. v. febit biotech GmbH, Febit Ferrarius Biotechnology, GmbH, and Febit, Inc.*, Case No. 1:07-cv-01177 RBW.

20.    Attached hereto as Exhibit 19 is a true and correct copy of 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004).

21.    Attached hereto as Exhibit 20 is a true and correct copy of 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1363 (3d ed. 2004).

22.    Attached hereto as Exhibit 21 is a true and correct copy of *UD Tech. Corp. v. Phenomenex, Inc.*, C.A. No. 05-842-GMS, 2007 WL 28295 (D. Del. Jan. 4, 2007).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 1, 2007 at Redwood Shores, California.


*/s/ Rip Finst*
Rip Finst

3

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on October 1, 2007, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Mary Matterer, Esquire
> MORRIS JAMES

I also certify that copies were caused to be served on October 1, 2007 upon the following in the manner indicated:

**BY ELECTRONIC MAIL
and HAND DELIVERY**

Mary Matterer, Esquire
MORRIS JAMES
500 Delaware Avenue
Suite 1500
Wilmington, DE    19801

**BY ELECTRONIC MAIL
and FIRST CLASS MAIL**

Mark Fox Evens, Esquire
Edward J. Kessler, Esquire
W. Blake Coblentz, Esquire
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, DC    20005-3934

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)

# EXHIBIT 54

CLOSED, PATENT

# U.S. District Court [LIVE]
## Eastern District of TEXAS LIVE (Tyler)
## CIVIL DOCKET FOR CASE #: 6:06-cv-00067-LED

Alt v. Medtronic Inc
Assigned to: Judge Leonard Davis
Cause: 35:145 Patent Infringement

Date Filed: 02/15/2006
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**MD Eckhard U Alt**

represented by **Ana Elena Kadala**
Weil Gotshal & Manges
700 Louisiana
Suite 1600
Houston, TX 77002-2784
713/546-5000
Fax: 17132249511
Email: anita.kadala@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David J Healey**
Weil Gotshal & Manges- Houston
700 Louisiana
Suite 1600
Houston, TX 77002-2784
713/546-5000
Fax: 17132249511
Email: david.healey@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Deborah J Race**
Ireland Carroll & Kelley
6101 S Broadway
Suite 500
Tyler, TX 75703
903/561-1600
Email: drace@icklaw.com
*ATTORNEY TO BE NOTICED*

**Franklin Jones, Jr**
Jones & Jones - Marshall
201 W Houston St

PO Drawer 1249
Marshall, TX 75670
903/938-4395
Fax: 9039383360
Email: maizieh@millerfirm.com
*ATTORNEY TO BE NOTICED*

**Otis W Carroll, Jr**
Ireland Carroll & Kelley
6101 S Broadway
Suite 500
Tyler, TX 75703
903/561-1600
Fax: 9035811071
Email: Fedserv@icklaw.com
*ATTORNEY TO BE NOTICED*

**Robert Christopher Bunt**
Parker, Bunt & Ainsworth, P.C.
100 East Ferguson, Ste. 1114
Tyler, TX 75702
903/531-3535
Fax: 903/533-9687
Email: rcbunt@pbatyler.com
*ATTORNEY TO BE NOTICED*

**Robert M Parker**
Parker, Bunt & Ainsworth, P.C.
100 E Ferguson
Suite 1114
Tyler, TX 75702
903/531-3535
Fax: 9035339687
Email: rmparker@pbatyler.com
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
McKool Smith - Marshall
P O Box O
Marshall, TX 75671
US
903/923-9000
Fax: 903-923-9099
Email: sbaxter@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Sidney Calvin Capshaw, III**
Brown McCarroll - Longview

1127 Judson Rd - Ste 220
PO Box 3999
Longview, TX 75606-3999
903/236-9800
Fax: 19032368787
Email: ccapshaw@mailbmc.com
*ATTORNEY TO BE NOTICED*

**V.**

**Defendant**

**Medtronic Inc**                    represented by    **Samuel Franklin Baxter**
*A Minnesota Corporation*                              (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Medtronic Inc**
*A Minnesota Corporation*

**V.**

**Counter Defendant**

**MD Eckhard U Alt**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/15/2006 | 1 | COMPLAINT against Medtronic Inc , filed by Eckhard U Alt. (Attachments: # 1 Exhibits # 2 Civil Cover Sheet)(mll, ) (Entered: 02/16/2006) |
| 02/15/2006 |  | Filing fee: $ 250.00, receipt number 6-4057 (mll, ) (Entered: 02/16/2006) |
| 02/15/2006 |  | Summons Issued as to Medtronic Inc. (mll, ) (Entered: 02/16/2006) |
| 02/15/2006 | 2 | NOTICE OF CASE ASSIGNMENT cc:pltf 2-16-06 (mll, ) (Entered: 02/16/2006) |
| 02/15/2006 | 3 | Form mailed to Commissioner of Patents and Trademarks. (mll, ) (Entered: 02/16/2006) |
| 02/16/2006 | 4 | Case assigned to Judge Leonard Davis. Judge William M. Steger no longer assigned to the case. (per General Order 06-05) (mll, ) (Entered: 02/21/2006) |
| 02/23/2006 | 5 | NOTICE of Attorney Appearance by Sidney Calvin Capshaw, III on behalf of Eckhard U Alt (Capshaw, Sidney) (Entered: 02/23/2006) |
| 02/27/2006 | 6 | NOTICE of Attorney Appearance by Robert Christopher Bunt on behalf of Eckhard U Alt (Bunt, Robert) (Entered: 02/27/2006) |
|  |  |  |

| 03/01/2006 | 7 | NOTICE of Attorney Appearance by Franklin Jones, Jr on behalf of Eckhard U Alt (Jones, Franklin) (Entered: 03/01/2006) |
| 03/01/2006 | | Case Reassigned to Judge William M. Steger. Judge Leonard Davis no longer assigned to the case. (rvw, ) (Entered: 03/03/2006) |
| 03/06/2006 | 8 | ORDER OF RECUSAL. Judge William M. Steger recused. Case reassigned to Judge Leonard Davis for all further proceedings. Signed by Judge William M. Steger on 03/06/06. cc:attys 3-6-06(mll, ) (Entered: 03/06/2006) |
| 03/22/2006 | 9 | Consent MOTION for Extension of Time to File Answer re 1 Complaint *MEDTRONIC INC.'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE ITS ANSWER OR OTHER RESPONSIVE PLEADING TO PLAINTIFF'S ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT* by Medtronic Inc. (Attachments: # 1 Text of Proposed Order)(Baxter, Samuel) (Entered: 03/22/2006) |
| 03/22/2006 | 11 | SUMMONS Returned Executed by Eckhard U Alt. Medtronic Inc served on 3/3/2006, answer due 3/23/2006. (fnt, ) (Entered: 03/24/2006) |
| 03/23/2006 | 10 | ORDER granting 9 Motion for Extension of Time to Answer re 1 Complaint. The deadline for Defendant to file its answer or other responsive pleading is extended to April 23, 2006 . Signed by Judge Leonard Davis on 3/23/06. (fnt, ) (Entered: 03/24/2006) |
| 03/23/2006 | | Answer Due Deadline Updated for Medtronic Inc to 4/23/2006. (fnt, ) (Entered: 03/24/2006) |
| 03/23/2006 | | Answer Due Deadline Updated for Medtronic Inc to 4/23/2006. (fnt, ) (Entered: 03/24/2006) |
| 04/21/2006 | 12 | ANSWER to Complaint with Jury Demand, COUNTERCLAIM against Eckhard U Alt by Medtronic Inc.(Baxter, Samuel) (Entered: 04/21/2006) |
| 05/04/2006 | 13 | NOTICE of Attorney Appearance by Deborah J Race on behalf of Eckhard U Alt (Race, Deborah) (Entered: 05/04/2006) |
| 09/29/2006 | 14 | Joint MOTION to Dismiss *JOINT STIPULATION OF DISMISSAL WITH PREJUDICE* by Eckhard U Alt, Medtronic Inc. (Attachments: # 1 Text of Proposed Order)(Baxter, Samuel) (Entered: 09/29/2006) |
| 10/02/2006 | 15 | ORDER granting 14 Motion to Dismiss. Parties having reached agreement on a settlement, all claims are dismissed with prejudice, with each party to bear its own costs . Signed by Judge Leonard Davis on 10/2/06. (mjc ) (Entered: 10/02/2006) |

### PACER Service Center

#### Transaction Receipt

| 10/22/2007 10:56:34 | | | |
|---|---|---|---|
| **PACER Login:** | kg0046 | **Client Code:** | 2310.016lit0 |
| **Description:** | Docket Report | **Search Criteria:** | 6:06-cv-00067-LED |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

# EXHIBIT 55

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

FEB 1 5 2006

DAVID J. MALAND, CLERK

BY
DEPUTY _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS,
## TYLER DIVISION

ECKHARD U. ALT, M.D.,                §
                                     §
            Plaintiff,               §        Civil Action No. 6:06cv67
                                     §
v.                                   §
                                     §
MEDTRONIC, INC., a Minnesota         §        Jury Trial Requested
Corporation                          §
            Defendant.               §

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff ECKHARD U. ALT, M.D. ("Dr. Alt"), for his Original Complaint for

Patent Infringement against Defendant Medtronic, Inc. ("Medtronic"), states as follows:

### INTRODUCTION

This is an action against Medtronic for patent infringement under the Patent Laws

of the United States, 35 U.S.C. §§ 101 *et seq.*, for infringing U.S. Patent No, 5,403,355 entitled

"Implantable Medical Interventional Device With Atrial Dysrhythmia Therapy For Tachycardia"

("the `355 Patent" or the "Patent In Suit") owned by Dr. Alt and which are generally directed to

cardiac rhythm management.

### PARTIES

1.      Dr. Alt is an individual residing at 4930 St. Charles Ave., New Orleans,

Louisiana.  Dr. Alt is the assignee of the `355 Patent and holds the right to recover damages for

past, present and future infringement of the `355 Patent and the right to seek injunctive relief for

infringement of the `355 Patent.

2.      On information and belief, Medtronic is a corporation duly organized and existing

under the laws of the state of Minnesota with its principal place of business in Minneapolis,

ORIGINAL COMPLAINT

Minnesota. Medtronic is engaged in the business of making, using, selling and offering to sell implantable pacemakers, defibrillators, cardiac ablation catheters, monitoring and diagnostic devices, and cardiac resynchronization devices. Certain of these devices infringe the '355 Patent. Medtronic manufactures for sale and/or sells implantable pacemakers, defibrillators, cardiac ablation catheters, monitoring and diagnostic devices, and cardiac resynchronization devices in the United States and, more particularly, in the Eastern District of Texas. Upon information and belief, Medtronic employs sales representatives in the Eastern District of Texas who solicit sales of infringing devices. On its "Traveling Website" (http://www.medtronic.com/traveling/index.html), Medtronic identifies clinics which provide support for Medtronic Cardiac Rhythm Management implanted devices including pacemakers and implantable defibrillators. There are several clinics identified as providing support for implantable cardioverter defibrillators and/or pacemakers in Texas and, in particular, in the Eastern District of Texas: The Pain Management Center, 3312 North University Drive, Nacogdoches, TX 75961; Thomas A. Lombardo, M.D., Pacemarker Analyzer System, Suite 304, 2955 Harrison, Beaumont, TX 77702; Alain Tocatjian, M.D., 600 North Highland, Sherman, TX 75090; Michael Isaac, M.D., Suite 201, 501 North Highland, Sherman, TX 75092; and Wilson N. Jones Memorial, 500 North Highland Avenue, Sherman, TX 75092. Medtronic may be served with service of process by serving a copy of the Complaint through its attorney for service of process: Sam Baxter, Esq., MCKOOL SMITH, P.C. ,300 Crescent Court, Suite 1500, Dallas, Texas 75201.

## JURISDICTION AND VENUE

3.    This is an action for patent infringement arising under the Patent Laws of the United States, Title 35, United States Code, including 35 U.S.C. §§ 271 and 281-285.

4.    This Court has subject matter jurisdiction pursuant to Title 28 U.S.C. § 1331 and §1338(a).

5.    This Court has personal jurisdiction over Medtronic.  Medtronic has conducted and does conduct business within the State of Texas.  Medtronic, directly or through intermediaries (including distributors, retailers, and others), ships, distributes, offers for sale, sells, and advertises (including the provision of an interactive website) its products in the United States, the State of Texas, and the Eastern District of Texas.  Medtronic has voluntarily and purposefully placed one or more infringing products into the stream of commerce with the expectation that they will be purchased in the Eastern District of Texas.  These infringing products have been and continue to be purchased in the Eastern District of Texas.  On its "Traveling Website" (http://www.medtronic.com/traveling/index.html), Medtronic identifies clinics which provide support for Medtronic Cardiac Rhythm Management implanted devices including implantable cardioverter defibrillators.  There are several clinics identified as providing support for implantable cardioverter defibrillators in Texas and, in particular, in the Eastern District of Texas:  The Pain Management Center, 3312 North University Drive, Nacogdoches, TX 75961; Thomas A. Lombardo, M.D., Pacemarker Analyzer System, Suite 304, 2955 Harrison, Beaumont, TX 77702; Alain Tocatjian, M.D., 600 North Highland, Sherman, TX 75090; Michael Isaac, M.D., Suite 201, 501 North Highland, Sherman, TX 75092; and Wilson N. Jones Memorial, 500 North Highland Avenue, Sherman, TX 75092.  Medtronic has committed the tort of patent infringement in the State of Texas and, more particularly, within the Eastern District of Texas.  Medtronic may receive service of process through its attorney within the State of Texas, as identified in paragraph 2.

6.    Venue is proper in this District under the provisions of Title 28 U.S.C. §§1391(c) and 1400(b), in that Medtronic has done business in this District, has committed acts of patent infringement within this District, and continues to commit acts of infringement in this District, entitling Dr. Alt to relief.

## COUNT ONE—INFRINGEMENT OF U.S. PATENT NO. 5,403,355

7.    Dr. Alt restates and realleges the allegations set forth in paragraphs 1 through 6 and incorporates them by reference.

8.    On April 4, 1995, the United States Patent and Trademark Office ("USPTO"), after full and fair examination, duly and legally issued United States Patent No. 5,403,355 entitled "Implantable Medical Interventional Device With Atrial Dysrhythmia Therapy For Tachycardia." Dr. Alt was assigned the `355 Patent, and he holds all rights, title, and interest in the `355 Patent. A true and correct copy of the `355 Patent is attached as Exhibit A.

9.    Medtronic manufactures for sale and/or sells implantable cardioverter defibrillators, including, but not limited to, the EnTrust line of defibrillators.

10.    By the manufacture and/or sale of its implantable cardioverter defibrillators, Medtronic is infringing the `355 Patent in violation of 35 U.S.C. §§ 271(a), (b), (c) and/or (f), literally and/or by the doctrine of equivalents by performing, without authority, one or more of the following acts:  (a) making, using, offering to sell, or selling within this District and elsewhere in the United States the invention in the `355 Patent; (b) importing into the United States the invention in the `355 Patent; (c) inducing infringement of at least one claim of the `355 Patent; and (d) contributing to infringement of at least one claim of the `355 Patent.

11.    Upon information and belief, Medtronic has knowledge of the `355 Patent as a result of Dr. Alt notifying Medtronic of its infringement of that patent.  Nevertheless, Medtronic has not ceased its infringing activities.  Medtronic's infringement of the `355 Patent has been and

continues to be willful and deliberate and will continue unless enjoined by this Court. To the extent that Medtronic contends that notice under 35 U.S.C. § 287 is required, Dr. Alt provided such notice to Medtronic at least as early as 2003.

12.     Medtronic has willfully infringed the `355 Patent in violation of 35 U.S.C. §§ 271(a), (b), (c) and/or (f).

13.     Medtronic's infringement of the `355 Patent has caused injury to Dr. Alt, and will continue to do so unless enjoined by this Court, thereby entitling Dr. Alt to all remedies available under the Patent Laws of the United States, including 35 U.S.C. §§ 283-285.

14.     Dr. Alt is seeking all damages arising out of Medtronic's infringement of the `355 Patent from October of 2002 to present.

## JURY DEMAND

15.     Dr. Alt demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Alt prays for the following relief:

(a)     A judgment that Medtronic has infringed the `355 Patent, directly and/or indirectly;

(b)     A judgment and order permanently enjoining Medtronic, its directors, officers, employees, agents, parents, subsidiaries, affiliates, or all persons in active concert or participation with them from further infringement, contributory infringement and/or inducing infringement of the `355 Patent;

(c)     A judgment and order requiring Medtronic to pay Dr. Alt damages under 35 U.S.C. §284, including enhanced damages pursuant to 35 U.S.C. §284, from October 2002 to present for infringement of the `355 Patent.

(d)     A judgment and order requiring Medtronic to pay pre-judgment interest, pursuant to 35 U.S.C. §284, and post-judgment interest, pursuant to 28 U.S.C. §1961, on the damages awarded to Dr. Alt;

(e)     A judgment and order finding this to be an exceptional case and requiring Medtronic to pay the costs of this action (including all disbursements) and

attorneys' fees pursuant to 35 U.S.C. §285 or as otherwise permitted by law; and

(f)    For such other costs and further relief as the Court may deem just and equitable.

Dated:  February 13, 2006                    Respectfully submitted,

David J. Healey
State Bar No. 09327980
Anita E. Kadala
State Bar No. 00786007
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
E-mail: david.healey@weil.com
E-mail: anita.kadala@weil.com

**Attorneys for Plaintiff,
ECKHARD U. ALT, MD**

**OF COUNSEL:**

Otis W. Carroll
State Bar No. 03895700
Ireland Carroll & Kelley, P.C.
6101 South Broadway, Suite 500
Tyler, Texas 75703
Telephone:  (903) 561-1600
Facsimile:  (903) 581-1071

Robert M. Parker
Robert M. Parker, P.C.
100 East Ferguson, Suite 1114
Tyler, Texas  75702
Telephone: 903-533-9288
Facsimile: 903-533-9687
Franklin Jones, Jr.
JONES & JONES, INC.
P.O. Drawer 1249
Marshall, TX 75680
Telephone: (903) 938-4395
Facsimile: (903) 938-3360

# EXHIBIT 56

US005403355A

## United States Patent [19]

### Alt

[11] **Patent Number:** **5,403,355**

[45] **Date of Patent:** **Apr. 4, 1995**

[54] **IMPLANTABLE MEDICAL INTERVENTIONAL DEVICE WITH ATRIAL DYSRHYTHMIA THERAPY FOR TACHYCARDIA**

[75] Inventor: **Eckhard Alt**, Ottobrunn, Germany

[73] Assignee: **Intermedics, Inc.**, Angleton, Tex.

[21] Appl. No.: **279,947**

[22] Filed: **Jul. 25, 1994**

### Related U.S. Application Data

[60] Division of Ser. No. 916,588, Jul. 20, 1992, which is a continuation-in-part of Ser. No. 863,092, Apr. 3, 1992, Pat. No. 5,342,404.

[51] Int. Cl.⁶ .................................... **A61N 1/368**
[52] U.S. Cl. ............................................. **607/9**
[58] Field of Search .................... 607/4, 6, 9, 19

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,998,974 | 3/1991 | Aker | 607/4 |
| 5,014,698 | 5/1991 | Cohen | 607/4 |

*Primary Examiner*—William E. Kamm
*Attorney, Agent, or Firm*—O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears

[57] **ABSTRACT**

An implantable medical interventional device for delivering electrical therapies to the heart of an implant patient to treat pathologic ventricular tachycardia. The device includes a first sensor for developing a signal indicative of the patient's ventricular ECG status, and a second sensor for developing a signal indicative of the patient's atrial ECG status. Criteria are established to distinguish physiologic tachycardia and pathologic tachycardia in the ventricles by an evaluation of the signal indicative of ventricular ECG status, and an appropriate is therapy is delivered if the evaluation indicates a pathologic tachycardia in progress. The therapy delivery is limited to an atrial response if the signal developed by the second sensor indicates atrial fibrillation or other atrial dysrhythmia, and is appropriate to that particular dysrhythmia. The evaluation is performed by comparing the signals indicative of atrial and ventricular ECG status to discriminate primary ventricular tachycardias from secondary ventricular tachycardias of primary atrial origin. The therapy is delivered in a tiered regimen and, in response to the discrimination of primary and secondary ventricular tachycardia, is adjusted accordingly. The tiered therapy regimen may include a therapy of solely atrial defibrillation. A non-ECG sensor may additionally be used to sense a physiological parameter indicative of patient activity. In that case, in response to detection of ventricular tachycardia by the first sensor, detection of atrial tachycardia by the second sensor, and indication of patient resting condition or low level activity by the non-ECG sensor, a ventricular tachycardia is treated as pathologic atrial tachycardia, and atrail therapy is applied without any therapy to the ventricle.

**16 Claims, 3 Drawing Sheets**



**U.S. Patent**          Apr. 4, 1995          Sheet 1 of 3          **5,403,355**



*FIG.1*



*FIG.2*

*FIG.3*



FIG. 4

FIG. 5



*FIG. 6*

*FIG. 7*

5,403,355

**1**

## IMPLANTABLE MEDICAL INTERVENTIONAL DEVICE WITH ATRIAL DYSRHYTHMIA THERAPY FOR TACHYCARDIA

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a division of co-pending U.S. patent application Ser. No. 07/916,588, filed Jul. 20, 1992, which is a continuation-in-part of application Ser. No. 07/863,092, filed Apr. 3, 1992, now U.S. Pat. No. 5,342,404.

### BACKGROUND OF THE INVENTION

The present invention relates generally to implantable medical devices, and more particularly to an implantable interventional device such as an antitachycardia pacemaker, a cardioverter, a defibrillator, or a device having a combination of such functions, adapted to deliver electrical impulse or shock therapies to the patient's heart upon detection of a ventricular tachycardia (VT) or ventricular fibrillation (VF). More particularly, the invention relates to improvements in apparatus and methods for detecting and distinguishing pathological tachycardias from physiological tachycardias and for establishing the type and timing of the delivery of the appropriate therapy upon detection of pathologic VT or VF.

Sinus heart rates in normal healthy adults may range upward to 160 beats per minute (bpm) during physical activity or exercise, or even when the individual is experiencing emotional stress or excitement. Rates up to even 200 bpm may be experienced during strenuous exercise. Such elevated rates occurring in these circumstances are a normal reaction by the organism and are termed physiological tachycardias. The heart rate gradually, perhaps even quickly, decreases to the normal resting rate when the factors leading to the increase d rate have ceased.

In contrast, random or spontaneous elevation of the heart rate to such levels for no apparent reason constitutes pathological tachycardia attributable to cardiovascular disease, and requires intervention with appropriate medical therapy. In general, pathological tachycardia hi the atrium is tolerated because the excitable A-V junction tissue (between the atrium and ventricle) has a longer refractory period and slower conductivity than myocardial tissue, so that the rapid atrial contractions typically fail to induce correspondingly rapid ventricular contractions, allowing cardiac output to remain relatively strong with a ventricular rhythm nearer the sinus rate.

On the other hand, pathological tachycardia in the ventricles, the main pumping chambers of the heart, is not well tolerated. The rapid contractions permit only partial filling of the chambers with oxygenated blood and result in diminished cardiac output. Moreover, ventricular tachycardia (VT) tends to accelerate spontaneously to ventricular fibrillation (VF), in which synchronous contractions of the tissue cease and the myocardial contractions become random and uncoordinated. The resulting loss of cardiac output requires immediate intervention to defibrillate, failing which death will ensue. Generally, VF occurs only after VT; only rarely is VF not precipitated by a pathological tachycardia.

Although atrial tachycardia (AT) is relatively common, patients who are symptomatic or at high risk may

**2**

be treated with drugs, antitachycardia pacemakers, or in some extreme cases, such as where the AT tends to escalate to atrial fibrillation (AF), by performing a surgical A-V block and a ventricular pacemaker implant. Antitachycardia pacemakers, which often are also prescribed for patients suffering VT, are usually adapted to overstimulate the heart by applying pulses at a programmed rapid rate to suppress the ectopic activity that leads to premature atrial or ventricular contractions. Pulses of relatively low energy content may suffice to break the tachycardia and restore normal heart rate. The term "cardioversion" usually implies delivery of higher energy electrical shocks to the heart to break the tachycardia. Unfortunately, both antitachycardia and cardioversion therapies which are used for terminating VT can contribute to acceleration into VF.

Defibrillators are employed to apply one or more high energy electrical shocks to the heart in an effort to overwhelm the uncoordinated contractions of the various sections of the myocardial tissue and reestablish organized spreading of action potentials from cell to cell, thereby to restore synchronized contractions of the ventricles. Automatic implantable defibrillators were described in the literature at least as early as 1970, in separate articles of M. Mirowski et al. and J. Schuder et al. Innovations since proposed have included automatic implantable defibrillators which perform multiple functions of antitachycardia, cardioversion and defibrillation, and where appropriate, demand bradycardia pacing. In general, the desire is to use one or more pulse sequence or low level shock therapies for breaking VT before it spontaneously progresses into VF, and, if that fails or if VF occurs without preliminary pathologic tachycardia, to resort to a high energy defibrillating shock.

Typically, the shocks are delivered from one or more output storage capacitors of sufficient capacity in the implanted device. Energy requirements generally range from as little as 0.05 joule to up to 10 joules for cardioversion, and from 5 joules to about 40 joules for defibrillation, depending on the patient, the nature of the electrical waveform applied, and the efficiency of the energy transfer through the electrodes and into the heart tissue. The capacitors must be charged to the level appropriate for the therapy when the dysfunction or dysrhythmia is detected, so that the energy required for the shock will be rapidly available far therapy. Multiphasic shocks have been found quite effective. It is customary to provide a preset delay between successive shocks, and to inhibit further shocks when return to normal rhythm is detected.

As used in this specification, the terminology "shock" or "shocks" may include any pulse-type waveform, whether single phase or multiphase, which is delivered as antitachycardia, cardioverting or defibrillating therapy to a patient's heart in an effort to break, interrupt or terminate pathologic tachycardia or fibrillation and return the pumping action of the heart to a rate in the normal range; and "interventional device" includes any antitachycardia pacemaker, cardioverter, defibrillator or other device or combination thereof (which may include the function of conventional bradycardia pacing) which is adapted to be implanted or otherwise worn by a human or animal subject for the purpose of intervening to deliver shocks to the heart in response to detection of an abnormally rapid heart rate. The waveform is not limited to any particular energy content or

5,403,355

3

range of energy content, and indeed, the therapy may include burst stimulation or other conventional techniques for applying stimulation pulses (such as for rapid pacing) to break a VT.

Proper operation of implantable antitachycardia pacemakers, cardioverters, defibrillators and similar medical devices necessitates proper timing of delivery of the therapy, including timing of charging and firing of shock-producing output capacitors. It is essential, first, that the device have the capability to distinguish physiological tachycardias from pathological tachycardias to assure that occurrence of the former will not be wrongly identified as the latter with the result that the patient is subjected to a shock when he or she is merely exercising, for example. Incapability to distinguish can mean, at the very least, that the capacitors are needlessly charged, and worse, that they are inappropriately discharged into the heart, with consequences ranging from painful shock and possible loss of consciousness to repetitive shocks.

In copending U.S. patent application Ser. No. 07/863,092 filed Apr. 3, 1992, ("the '092 application"), of which this application is a continuation-in-part, and which is incorporated herein by reference, physiological and pathological tachycardias are distinguished by resort to the use of two independent sensors, one of which detects electrocardiogram (ECG) or intrinsic electrical heart activity and the other, physical exercise by sensing activity. The latter sensor may be termed a complementary sensor, which, in the preferred embodiment of the invention disclosed in that application, is an accelerometer for detecting patient activity directly, but which instead might be an indirect sensor of physical exercise of the patient, such as blood pressure, blood oxygen content, minute ventilation, central venous temperature, pulse rate, or blood flow detector. Concurrent detection of patient cardiac activity (ECG) as well as physical activity provides improved discrimination between physiologic and pathologic tachycardias, particularly in an overlap range of heart rates from about 130 to about 180 beats per minute (bpm). This range presents especially serious problems when ECG detection alone is used and/or the patient may be experiencing either a fast physiological tachycardia or a relatively slow pathological VT.

For example, the ECG signal may indicate a VT of 150 bpm which is in the range of both pathologic and physiologic tachycardia for a particular patient, but if the activity status sensor (e.g., accelerometer) detects physical activity, the device would be inhibited from delivering antitachycardia treatment. On the other hand, the ECG may demonstrate VT or VF at a time when the activity status sensor indicates no movement of the patient, leading to the decision to trigger prompt therapy. The decision, therefore, is a reasoned one and is made automatically, and in the case of origin of a tachycardia, discriminates between physiologic and non-physiologic.

An implantable medical interventional device utilizing the complementary sensors may be programmed to respond to sensing an ECG signal indicative of possible slow VT, coupled with confirmation of physical inactivity of the patient by the other sensor, by stimulating the heart with low energy shocks to break the VT before it accelerates into VF. Alternatively, a more liberal programming philosophy may be followed in which slow tachycardia and lack of physical activity of the patient merely define an alert condition of the device in

4

which the capacitors are charged to the proper energy level, in anticipation of the possibility that a more dramatic situation may develop. If delivery of an antitachycardia or defibrillating shock is subsequently determined to be warranted, precious time will not have been lost waiting for the output storage capacitors of the device to be charged.

The use of two complementary sensors serves not only to control charging and firing of the implantable interventional device for treatment of tachycardias and fibrillation, but to better evaluate the probability of success of interventional measures. Since VT may be broken by lower energy shocks than those needed to terminate VF, a considerable energy saving is achieved which helps to reduce the size of the battery and, consequently, of the implanted device itself, or to increase its lifetime with the same battery capacity, either of which is important to the development of self-powered implanted devices.

Numerous conventional electrical waveform therapies or therapy protocols may be programmed into the interventional device for selective application to the heart upon detection of an applicable cardiac event by the complementary sensors. For example, these may include single stimulating pulses, stimulating pulse sequences, stimulating pulse trains of variable repetition frequency, one or more bursts of stimulating pulses, and single phase or multiple phase shocks of variable energy content generally greater than the energy content of the pulses in the other protocols which are utilized for treatment. In general, the therapy is applied in successively more stringent protocols until it is successful to break the VT or VF. This is termed a "tiered" therapy.

Both the degree of difficulty to defibrillate and the likelihood of failure increase with the length of time that the patient is in fibrillation. It is crucial to reduce the time interval from onset of fibrillation to delivery of the initial shock to a minimum, to reduce the energy required to defibrillate the heart and to increase the opportunity to successfully resuscitate the patient. As pointed out above, it is considerably easier to interrupt a VT, which may require delivery of only one joule of electrical energy, than to terminate VF with the potential requirement of 15 joules or more in each shock. Correspondingly, resuscitation is much more achievable with a patient who has been in fibrillation for only a few seconds than if the attack has continued for several minutes. Prompt treatment is also important for the patient experiencing either VT or VF and fighting against loss of consciousness. An excessive interval from onset to delivery of therapy, e.g., ten to thirty seconds, may cause the patient to faint, whereas earlier intervention might well have allowed the circulatory system to compensate for the fast heart rate without the loss of consciousness.

This type of dual sensing helps the implanted programmable microprocessor-based interventional device to better interpret and distinguish tachycardias than the ECG criteria which typically has been used in prior art devices, such as heart rate, morphology of the ECG, sudden onset, rate stability, etc. At least in part this is because the activity status sensor is complementary, providing additional information concerning the cardiac event under scrutiny, rather than merely part of the ECG criteria. As noted in the '092 application, improved discrimination is especially pronounced in the borderline region from 130 bpm to 180 bpm, thereby

5,403,355

5

better avoiding needless, painful and debilitating shocking of the heart.

It is a principal object of the present invention to provide improvements in techniques for recognizing abnormal tachycardias, over the prior art and even that disclosed in the '092 application, particularly in the overlap or borderline region where pathological tachycardias had been virtually indistinguishable from physiological tachycardias.

## SUMMARY OF THE INVENTION

The present invention, in one of its principal aspects, takes advantage of the detection capabilities of the complementary sensor, such as an accelerometer, to modify the rate criterion which is used for pathological tachycardia recognition. If the accelerometer indicates the patient is at rest, the criterion for deciding that a pathological tachycardia is in progress is set at a rate of 130 bpm, for example; on the other hand, if the accelerometer indicates patient activity, the tachycardia rate criterion is shifted to 170 bpm.

This is vastly different from the technique used in the prior art. The problem that exists with the prior art devices is that they invariably employ a single fixed rate which represents a compromise between the heart rate the particular patient might exhibit during exercise and the rate thought to be indicative of a pathological tachycardia. The overlap makes it very difficult to accurately determine whether the event of interest warrants intervention because some individuals may have a pathological tachycardia rate of 140 bpm, or even 130 bpm, and yet may also exhibit an exercise tachycardia rate of 140 bpm, or even 150 bpm. If the prior art rate criterion for such a patient were set at 140, the patient would receive a defibrillating shock from the implanted automatic defibrillator when he or she is merely exercising.

Although currently available cardioverters/defibrillators are adapted to operate on the principle of applying a whole bundle of distinct ECG criteria to recognize a tachycardia (pathological), including sudden rate change, rate stability, probability density function, and so forth, the principal criterion used is purely rate. If any rate above 160 bpm is considered to be pathological, these devices can fail to recognize a tachycardia for which intervention is needed where the rate in question is anywhere below 160 bpm.

With the present invention, the intervention rate is easily adjusted or shifted according to the status of patient activity or exercise, which is to say, the rate criterion for tachycardia recognition applied to the ECG signal is changed simply and effectively depending upon the output or merely the status of the complementary sensor.

The present invention modifies the criteria to recognize a pathologic tachycardia by assessing the ECG signal according to the output signal of the activity status sensor. That is, if the output signal of the activity status sensor is not present or is quite low, indicative of rest, the pathologic tachycardia recognition ECG rate criterion is preprogrammed to be correspondingly low (e.g., perhaps a heart rate of 150 bpm); but when the activity sensor output increases, indicative that the patient is undergoing exercise, the rate criterion is programmed to shift automatically to a higher value (increasing to, perhaps, 150 or even 170 bpm, depending on the particular patient). In the preferred embodiment, this threshold rate moves up or down according to the status of the output signal of the accelerometer. This

6

provides information not only about the pathological tachycardia rate but also its morphology.

As in the device of the '092 application, the implantable medical interventional device of the present invention responds to detection of cardiac activity of the patient indicative of the abnormal VT or of VF by selectively applying to the patient's heart a conventionally selected sequence of different electrical waveforms (e.g., single pulse, dual pulses, pulse trains or bursts, biphasic or triphasic shocks, etc.). Each time a new waveform is applied or repeated during the course of treatment of an ongoing VT or VF, the ECG is monitored to determine whether that treatment was successful, and, if not, the therapy is continued. Otherwise, it is terminated. A control means which is a function of the microprocessor software, or an independent subsystem of the overall electronics system package of the device, selects the appropriate electrical therapy for the sensed abnormal tachyrhythmia according to the programmed response to the recognized event. The device further includes an evaluation means operatively associated with the control means for modifying or adjusting the ECG criteria, and specifically the tachycardia recognition rate or threshold rate by which normal tachycardias are discriminated from abnormal tachycardias, according to the status of the activity signal, i.e., whether it indicates inactivity or activity, and in the latter case, the general extent or level of the activity.

The threshold rate is shifted to higher values with commencement or increases of physical activity by the patient and shifted to lower values with decreases or cessation of the physical activity. The electrical therapy may be tiered so that the shift applies to entire different zones of ECG recognition rates and to the related therapeutic consequences of a tachycardia recognized in one of the zones, such as increasingly aggressive therapy protocols applied with either continuation or acceleration of the tachycardia and the initial therapy selected for a protocol.

Therefore, it is another object of the invention to provide a simple and effective technique for identifying tachycardias arising from heart or cardiovascular disease, for distinguishing them from naturally occurring elevated heart rates attributable to stress including physical exercise by the application of an ECG rate criterion which is controlled by a non-ECG sensor output, and for shifting the ECG rate criterion in response to a material change in the non-ECG sensor output.

According to another significant aspect of the present invention, an atrial bipolar electrode is used to check the status of the atrial ECG to detect atrial tachycardia. The purpose is to avoid one of the problems associated with conventional implantable defibrillators, viz., that of inappropriate firing (i.e., discharge of the capacitors to deliver the shock(s) to the heart). This may occur, for example, where the tachycardia recognition criteria is set within a zone encompassing a ventricular rate such as 130 to 140 bpm, and the patient experiences atrial fibrillation with that ventricular rate. The complementary activity sensor used in the apparatus of the invention may not be entirely helpful in these circumstances, because it could be indicating at that time that the patient is resting or undergoing mild activity, if that is the case, with a consequent lowered tachycardia recognition rate. Hence, if the status of the atrial ECG were not being detected, the patient would receive a shock in the region of the ventricles. By use of an atrial bipolar elec-

5,403,355

7

trode for such sensing, the device of the invention avoids the delivery of such a shock.

According to another, associated feature of the invention, detection of atrial fibrillation in this way is used to trigger the delivery of low energy shocks such as in the energy range from 0.25 to 1.0 joule from the implanted device to the atrial chambers, and thereby defibrillate the atrium alone. A tiered therapy regimen may be used here as well, to provide an improved protocol for treating atrial dysrhythmias such as atrial flutter, atrial tachycardia or atrial fibrillation.

Therefore, yet another object of the invention is to avoid inappropriate firing of the implanted defibrillator into the ventricles when the patient is actually experiencing atrial fibrillation, by detecting the status of the atrial ECG.

A further object of the invention is to defibrillate the atrium alone upon such detection of atrial fibrillation, and to employ a tiered therapy regimen to treat atrial dysrhythmias.

According to still another aspect of the invention, the R-R interval—the coupling interval between beats—is detected and the ventricular ECG signals are analyzed to determine whether the tachycardia is regular or a variation in the R-R intervals. A variation in the R-R coupling interval is an indication that atrial dysrhythmia is occurring. It is desirable in such a situation to seek to terminate the atrial dysrhythmia, which will eliminate the VT because the atrial problem is primary and the VT is only secondary—rather than to attempt to terminate the VT directly. It follows that in this case it would be undesirable to modify the tachycardia recognition rate. Such modification is used specifically for detection of VT under conditions indicative of apparent exercise by the patient, which clearly is not occurring in this case. Accordingly, the modification response to the activity sensor output is disabled when a variation in the R-R interval is detected while a VT is occurring.

Hence, it is still another object of the present invention to determine whether a detected VT is primary or secondary by observing the nature of the R-R interval, and specifically to direct the implanted cardioverter/-defibrillator to apply a therapy to terminate atrial dysrhythmia rather than to apply a therapy directly toward breaking the ventricular tachycardia.

A further object of the invention is to disable the VT recognition criteria modification-producing circuitry of the tachycardia detector of an implantable defibrillator when atrial dysrhythmia is occurring, by performing the disabling function when a varying R-R interval, in contrast to a regular R-R interval, is detected in the patient's ECG.

BRIEF DESCRIPTION OF THE DRAWINGS

The above and other objects, aspects, features and attendant advantages of the present invention will become apparent from a consideration of the following detailed description of a presently preferred embodiment and method, taken in conjunction with the accompanying drawings, in which:

FIG. 1 is a graph illustrating readouts measured in g versus time from a non-ECG sensor implanted in a patient;

FIG. 2 is a perspective view of a non-ECG sensor in the form of an activity status sensor (accelerometer) comprised of a pair of mercury ball sensors in fixed orthogonal orientation as implanted in a patient;

8

FIGS. 3 is another embodiment of an accelerometer, fabricated in an integrated or hybrid electronic circuit;

FIG. 4 is a simplified diagram of an implantable medical interventional device with activity status sensor(s) located within the device housing, and, in phantom, in an alternative arrangement in which the sensor is housed in its own separate case and connected by an electrical lead to a connector on the device housing;

FIG. 5 is a graph of heart rate versus the relative to intervals of patient rest and exercise, illustrating the concepts of the present invention for shifting the ECG tachycardia recognition rate or entire zone of rates up or down under the control of the non-ECG sensor output;

FIG. 6 is a phantom view of a patient having an implanted medical interventional device adapted to provide such threshold rate or zone shifting according to the invention, together with an implanted multi-electrode lead; and

FIG. 7 is a block diagram of circuitry used for evaluation of a selected portion of the electrical cardiac activity of the patient according to another aspect of the invention.

DESCRIPTION OF THE PREFERRED
EMBODIMENT AND METHOD

The implantable medical interventional device to be described utilizes a direct sensor of electrical cardiac activity such as an ECG sensor, and an activity status sensor adapted to detect the position and movements of the patient, in the form of an accelerometer or other electromechanical converter, which may be calibrated for both static and dynamic outputs. The static output will depend upon the physical position or posture of the implant patient when inactive (e.g., at rest, or in a state of collapse). Assume that the activity status sensor is oriented vertically when implanted, and in that position produces a zero g (i.e., unit of gravity) output. The sensor produces a +1 g output in one aspect of its horizontal orientation, (i.e., one major side down), and produces a −1 g output in the opposite aspect of horizontal orientation (the other major side down).

In the example of FIG. 1, the activity status sensor provides a zero reading when the patient is standing during a first time interval, a +1 when the patient is supine during a second time interval, and a −1 when the patient is prone during a third interval. This chart is not intended to show the response of the activity status sensor to changes in position, such as in the; period between the first and second intervals, but only that different readouts or signals are produced by the sensor upon detection of different static positions of the patient.

The particular outputs may be modified by calibrating the sensor for slight deviations of orientation relative to these three positions. If the patient were lying on a side, the sensor reading would not be +1 or −1, but a non-zero value. By calibrating the electrical output of the sensor circuit after implantation, or by autocalibration of the device itself, the orientation of the sensor in any position of the patient will be known from the readout. By employing a second such activity status sensor with a 90° orientation relative to the first sensor, each sensor recognizes two of the three mutually orthogonal axes (X-Y-Z) in three dimensional space, and both together detect a full three axis orientation, to provide a combined reading uniquely identifying the patient's position. Thus, the sensor may be used to detect static

5,403,355

9

or stable (i.e., non-moving) position of the patient, and patient activity constituting dynamic movements of the patient, such as a momentary change of position or continuing movements such as walking, dancing, bicycling, and so forth.

The activity status sensor may be of the mercury ball type described in U.S. Pat. No. 4,846,195. If a single such sensor were used as an X-Y axes (two dimensional) detector, it would not uniquely identify patient position. Two such sensors with fixed orthogonal orientation will provide combined detection of all three axes (X-Y-Z) of position or direction of movement. Referring to FIG. 2, sensor 10 includes a pair of mercury ball sensors 12 and 13 coupled together at an angle of 90 degrees. This fixed orientation of the two assures that their combined output signal will properly identify different specific physical positions of the patient even if the overall sensor were to undergo a shift in its orientation after implantation in the patient's body.

It is desirable that the orientation of the sensors after implantation be such that one of them (sensor 13, in this example) is approximately horizontal and the other (here, sensor 12) approximately vertical when the patient is standing upright. In the exemplary configuration represented in FIG. 2, sensor 12 is somewhat smaller than and assembled within sensor 13 in the fixed relationship. In practice, the two position sensors may be separated, but nevertheless fixed in their orthogonal orientation. Under static motionless) conditions of either sensor of the pair, the mercury ball (not shown) is at rest and contacts specific ones among the set of electrodes (electrical contacts) 14 disposed about the side or floor of the sensor chamber. The electrodes are connected by respective electrical conductors to the output circuit of the sensor, each set of electrode locations in conductive contact identifying a particular position of the patient. As the patient changes position or engages in ongoing physical activity, one or both mercury balls will roll about within their respective chambers and make and break contact with the electrodes. The combined static locations of the mercury balls within the sensor pair, or their dynamic locations as they make and break connections between adjacent electrodes (closures and openings with time) is detected to provide information regarding the physical position, change in position, and ongoing movements of the patient.

In an alternative embodiment, the accelerometer may be piezoelectric, piezoresistive or piezocapacitive, fabricated in silicon or other semiconductor material within an integrated electronic or hybrid circuit, such as that described in U.S. Pat. No. 5,031,615. A hybrid semiconductor integrated circuit incorporates the accelerometer as a microminiature mechanoelectrical converter or transducer of high efficiency and low power consumption. This type of accelerometer 15, shown in FIG. 3, has a silicon monocrystalline substrate 15-1, an epitaxial doped layer 15-2 overlying the surface of substrate 15-1, and a polycrystalline silicon layer 15-3 sandwiched between passivating layers 15-4, 15-5 of silicon dioxide. A cavity 15-6 is formed in the substrate by etching, and portions of the silicon and passivating layers are removed by micromachining, forming a rectangular plate 15-7 connected by four arms to the corners of the cavity. The plate and its arms constitute the acceleration responsive element. An additional upper layer may be provided with an opening contiguous with the cavity to allow axial movement of plate 15-7 on its arms, and a protective layer of glass then disposed over the struc-

10

ture. An integrated circuit suitable for processing the movements of the plate in response to acceleration to provide the activity status signal may be fabricated in the silicon substrate, within the region generally indicated by that designated by 15-8, by conventional semiconductor processing techniques.

FIG. 4 is a simplified diagram of an implantable medical interventional device such as a defibrillator 25 adapted to provide both antitachycardia and defibrillation therapies. The defibrillator includes batteries 27, electronics 29 (e.g., including a microprocessor 29-1, signal processing circuitry 29-2, sense amplifiers 29-3, memories 29-4, and other conventional components) and output capacitors 30 for storing electrical charge in variable quantities according to the amount of electrical energy to be delivered for shocking the heart to provide the desired therapy. The activity sensor is located within the defibrillator in the form, for example, of an accelerometer 34 with orthogonally oriented mercury ball sensors 35, 36 substantially as described in the text pertaining to FIG. 2, except that the two may be separately affixed to maintain that orientation. Accelerometer 34 is housed within but mechanically isolated from the case 32 which houses all of the other components of the defibrillator, to avoid sensitivity to pressure on the case. Alternatively, the sensor pair may be housed in its own biocompatible hermetically sealed case 38 for implantation in the patient in a location separate from the defibrillator case, as shown in phantom in the Figure.

The lead 40 for connecting the separately housed sensor implant 38 to the electronic control circuitry of the implanted defibrillator 25 may have a proximal end connector of a multiple contact type such as that disclosed in U.S. Pat. No. 4,971,057, to facilitate the signal processing. The defibrillator case 32 includes a header 43 with electrical connectors for the lead associated with the activity status sensor implant (if in a separate implantable case) and for the lead(s) connected to the defibrillator 25 and sensing cardiac activity. An ECG sense amplifier and related processing circuitry included within electronics 29 of the defibrillator provide an ECG signal (supplied in raw form from electrode(s) implanted on, in and/or adjacent the heart) for detecting rapid heart rates and other cardiac activity.

In operation, implantable defibrillator 25 is adapted to intervene upon detection of cardiac activity of the implant patient indicative of pathological VT or of VF by sequentially applying to the heart several different preprogrammed electrical waveforms conventionally utilized as protocols for treatment to break the VT or VF, as the case may be, while monitoring the patient's cardiac activity from the ECG signal following the application of each waveform. If the tachycardia continues or is accelerating, the protocol may be to successively employ more aggressive therapies. Therapy is ceased immediately upon detection that the treatment has been successful.

The activity status sensor detects physical activity and inactivity of the patient to complement detection of the patient's cardiac activity for confirming that a detected VT is a pathological tachycardia rather than a physiological tachycardia, if that be the case. The microprocessor in the device responds to such confirmation to select an appropriate one of the preprogrammed protocols stored in memory for treatment, with application of the selected electrical waveform to the heart via the output circuit of the device and the leads. In the

5,403,355

| 11 | 12 |

example of the defibrillator, the shocks intended to defibrillate the heart are produced by charging the output capacitors of the device to the predetermined energy level, and then discharging them through the heart in the desired pulse and/or phased waveform, in a conventional manner.

The inability to fully assess the hemodynamic consequences of a tachycardia in different patients has frustrated previous attempts to provide a device universally adaptable to determine whether and when a particular antitachycardia therapy should be delivered. A particular patient may be able to tolerate an elevated heart rate of 180 bpm with a rapid decline of systolic blood pressure to 65, while another patient, because of stenosis and weak cerebral profusion, may suffer loss of consciousness and respiratory functions with a tachycardia rate of 160 bpm and systolic blood pressure of 70. Measurements of heart rate, stroke volume, cardiac output, and even blood pressure do not fully delineate cerebral status for each individual patient. Hemodynamic parameters may appear to be within a normal range or not life-threatening, but they do not provide a true indication of the cerebral function of the patient.

The problem is exacerbated by the fact that in many individuals pathological tachycardia occurs at rates within the high end of the rate range which is normally reached when the patient is engaged in strenuous exercise, such as walking at a brisk pace. Despite the fact that the patient is ordinarily able to tolerate the elevated heart rate for at least short periods of exercise, the pathological tachycardia must be broken because it is not healthy for the heart to beat continuously at a rate of, say, 140 or 150 bpm, which is typical of this range, while the patient is at rest. Further, as noted earlier, the abnormal tachycardia may accelerate into fibrillation. Therefore, it is imperative that the device should provide an appropriate interventional therapy when this situation occurs, such as stimulation with low energy shocks to break the tachycardia.

If a conventional automatic implantable cardioverter and/or defibrillator were set at a tachycardia recognition rate of 150 bpm, for example, (and, as noted above, rate alone is the principal criterion, despite these devices using other characteristics of the ECG signal such as sudden onset or sudden rate change, rate stability, and so forth, as further indicia), the implant patient who reaches a heart rate of 152 bpm during exercise will be jolted with a stimulation of the heart. Depending on the specific protocol, the inappropriately applied therapy may cause the patient great discomfort and pain, possibly even loss of consciousness. If the same patient were to experience pathological VT of 140 bpm, therapy would not be applied at that time, and even though acceleration past a rate of 150 would then trigger a device response, time is of the essence since the order of difficulty in terminating the tachycardia increases with its longevity and possible progression into ventricular fibrillation. Hence, the patient may suffer very serious consequences.

Using an output provided by a non-ECG sensor to additionally indicate whether the patient is active or inactive when the tachycardia occurs, as in the device and method of the '092 application, helps significantly to better discriminate between physiological and pathological tachycardia. By comparing the ECG signal with the activity status signal, the occurrence of a slow pathological tachycardia can be recognized by the fact that the elevated heart rate is present with little or no physical activity by the patient, as distinguished from a physiological tachycardia where coincidence of rapid heart rate and pronounced physical activity is evident from the outputs of the two types of sensors. Nevertheless, it is not a complete answer because a threshold rate, or tachycardia recognition rate, is still desirable as a basis for comparison.

In the solution provided by the present invention, this threshold rate of the ECG criteria is adjusted according to the output of the non-ECG sensor, which here, as in the '092 application, is preferably an accelerometer. By observing the processed accelerometer signal, the activity status of the patient is determined, i.e., inactivity, moderate activity, strenuous activity, even the position of the patient. This information is then used to adjust the threshold rate—the tachycardia recognition criterion of the ECG. In its simplest form, the invention changes this rate from a first lower rate to a second higher rate, or vice versa, or simply leaves the existing rate setting in place, according to the status of the output signal of the accelerometer or other non-ECG sensor. In other words, the cardioverter/defibrillator (for example) in which the invention is implemented simply shifts the ECG tachycardia recognition rate upward and downward selectively according to the status of the non-ECG sensor output.

If the accelerometer output signal indicates that the patient is at rest, an appropriate threshold rate (the first lower rate) of 150 bpm might be selected because it is unlikely (to the point of being virtually nil) that emotional stress, fever or other physiological event than exercise, which is known to be absent here because of the status of the accelerometer output signal, would produce an elevated heart rate of such magnitude. Consequently, anything above this selected (programmed) threshold rate concurrent with such accelerometer output signal is recognized as a pathological tachycardia. On the other hand, if the accelerometer output subsequently indicates that the patient is physically active, the microprocessor of the device shifts the threshold rate upward to the second higher rate, such as 150 or even 170 bpm, so the patient may continue to engage in the exercise with consequent increased heart rate, but without the possibility of being subjected to shocks from the device unless the higher rate is exceeded. Here again, this higher threshold rate is carefully selected to exceed the maximum heart rate that the particular patient in which the device is to be implanted is likely to have while undergoing strenuous exercise.

In a method for quickly and discriminately recognizing pathological tachycardia so that electrical therapy will be delivered promptly to the heart of the cardiac patient to break the tachycardia, the recognition criteria provided by the patient's ECG are modified according to the status of a non-ECG sensor output signal indicative of the nature and extent of the patient's physical activity or lack of activity. The basic criterion of heart rate threshold is shifted to higher values with commencement and any subsequent increases of physical activity, and is shifted back to lower values with decreases and ultimate cessation of physical activity.

In a somewhat more complex embodiment and method, the electrical therapy of the implanted medical interventional device is tiered so that rate zones of ECG tachycardia recognition and consequent electrical therapies are shifted up or down under the control of the output of the non-ECG sensor. Thus, for example, before patient activity commences, the therapy protocols

5,403,355

**13**

are bounded at the low end by that therapy associated with a recognized tachycardia exceeding the threshold rate for a rest output signal of the accelerometer. When activity commences, the entire rate zone or range is shifted upward to be bounded at the low end by a moderate threshold rate associated with the low activity output signal of the accelerometer. At that point, the lowest level of therapy (e.g., least aggressive therapy) for a tachycardia exceeding that moderate threshold rate is the least available therapy protocol as long as the tachycardia continues. There will be no return to the lower levels of therapy which were available in the zone having the lowest threshold rate. The same considerations apply as the activity becomes more strenuous, and a higher strenuous activity rate is set as the threshold, with the result that treatment will be limited to the still more aggressive therapies for a pathological tachycardia recognized in this zone associated with a non-ECG sensor output which indicates a magnitude indicative of strenuous activity level (exercise workload).

These concepts are illustrated in the graph of FIG. 5, relating heart rate (HR) to time ($\tau$) for a portion of the output signal 50 of accelerometer 34 over the time interval of interest. In the period of patient rest designated as region 52 of output signal 50, the microprocessor in electronics system 29 of defibrillator 25 is programmed to set the ECG tachycardia recognition rate to 130 bpm. Thus, anything above that relatively low threshold rate (low, owing to the patient's state of rest) is considered to be a tachycardia for which the electrical therapy of the device will be administered to the patient's heart. In region 53 the patient has become active at a moderate activity rate as exhibited by the magnitude of the accelerometer sensor signal, and the microprocessor has responded to this signal by shifting the threshold rate to 150 bpm in accordance with the programming for that level of the sensor signal. This means, of course, that the patient would not be subjected to shocking by the device if his heart rate were to increase to say, 132, because the device has recognized through level detection or other conventional means the existence of activity from the non-ECG sensor output signal necessitating raising the threshold rate.

Subsequently, in region 55 the patient is engaging in more strenuous activity which results in another ramping up of the threshold rate, to 170 bpm in this example. At this point, although the patient's heart rate may be unlikely to reach that level as a consequence of exercise, so too, the margin of safety makes it highly unlikely that he will be subjected to the more aggressive therapy which would be appropriate for a tachycardia rate exceeding 170 bpm, from the exercise alone. Finally, region 56 of the accelerometer output signal indicates that the patient has returned to a state of resting, and the microprocessor therefore drops the threshold rate for tachycardia recognition back to 130 bpm.

Tiering of the electrical therapy of defibrillator 25 is accomplished by shifting entire rate zones of the ECG tachycardia recognition and their related electrical therapies upwardly or downwardly based on the output of the non-ECG sensor. In the graph of FIG. 5, for example, a first rate zone is programmed to exist for the patient at rest, when the output of the non-ECG sensor is at or very near zero. In this and every other zone, the threshold rate is the programmed lower boundary rate of the zone—here, 130 bpm. Thus, in regions 52 and 56 of the time interval of interest for output signal 50, a detected ECG heart rate anywhere in the zone above

**14**

130 bpm when the output signal of accelerometer 34 reflects patient resting, is recognized as pathological tachycardia and produces a response under the control of microprocessor 29-1 to deliver a basket of therapy protocols in preprogrammed sequence for as long as the pathological tachycardia remains unbroken. ECG cardiac activity is sensed after each therapy is delivered, to assess whether the tachycardia has been broken. As patient activity commences and subsequently becomes more strenuous, the entire rate zone or range is successively shifted upward to be limited by the moderate activity threshold rate and then the higher strenuous activity threshold rate, and so on. The result is that successively more aggressive therapies become the least available therapies in their respective rate zones as the output signal of the accelerometer indicates increasing activity by the patient.

The non-ECG sensor may be any type of known sensor, such as a single accelerometer, or two accelerometers as are depicted in FIGS. 2 and 4, indicative of acceleration and hence activity of the patient; a force sensor indicative for example of movements or pedal impacts and hence activity of the patient; an impedance sensor for measuring chest impedance of the patient with ventilation; a blood flow sensor; a blood pressure sensor; a blood oxygen sensor for measuring oxygen content or saturation; a blood temperature sensor for measuring changes in central venous temperature; a respiration sensor; a minute ventilation sensor; or other sensor characterized by utilization for rate-responsive pacing, including sensors not yet developed, where the parameter being detected is indicative of or provides additional information on the exercise or activity status of the patient.

An accelerometer is preferred for the sake of simplicity, rapid detection and reliability. For example, an accelerometer can be located readily within the device case, as in the preferred embodiment of FIG. 4, whereas other types of sensors such as those mentioned above generally require much more elaborate positioning not only outside the case but in locations requiring special surgical techniques for implantation in the patient. Further, an accelerometer does not utilize or require the type of complex technology typically associated with most other sensors such as those exemplified above, nor have the problems of long term instability, of drift, of decreased sensitivity in certain stages which characterize these other sensors. Additionally, an accelerometer is capable of detecting any kind of physical activity, and if two accelerometers are disposed at 90 degrees to one another as in FIG. 2, even the position of the patient may be detected, e.g., whether he is lying on his back, lying on his stomach, standing, falling or undergoing some other sudden change in position, and so forth.

FIG. 6 illustrates defibrillator 25 implanted in a patient 60, with lead/electrode assemblies 62, 63 for epicardial patch electrode 65 and an endocardial counter-electrode 71, respectively. The patch electrode overlies an appropriate region of the epicardium and the counter-electrode is positioned in the right ventricle, for efficient delivery of the high voltage, high energy shock waveform to the heart 67. These or associated electrodes may be used to sense and monitor the patient's ECG and to deliver stimuli (pulses or higher level shocks) to the heart. Implantable defibrillation apparatus of various types is known in the art, and the specific type and location of the electrodes is not critical to an understanding of the present invention.

5,403,355

15

Transvenous lead 63 is preferably of the multi-conductor electrode type to facilitate and enable detection of signals as well as to deliver electrical stimulation at multiple locations within the patient's heart. For example, electrode tip 70 is positioned, when the lead is properly implanted, to be in direct contact with the myocardium in the right ventricle, and provide ventricular ECG status. Other relatively large sized electrode surfaces 71, 72, 73 and so forth on this lead are used for atrial and ventricular cardioversion or defibrillation and for bipolar sensing or conventional bipolar pacing according to device functions and patient requirements at any given time. For example, electrode surface 71 is a coil counter-electrode arranged to be positioned in the right ventricle for ventricular defibrillation, while electrode 73 is of similar configuration adapted to be positioned in or near the vena cava, when the lead is seated.

Floating electrode points 72 are bipolar electrodes integrated in the lead so as to be positioned in the right atrium when the lead is properly implanted. The atrial electrodes detect the electrical ECG and mechanical status of the atrium independent of the ventricular signal, so that the status of the atrial chamber is known in relation to the status of the ventricular chamber. Such ECG information in, proves the capability of the implanted device to discriminate between cardiac events in the ventricles such as sinus rate, sinus tachycardia, ventricular tachycardia with retrograde block, and others which are of primary ventricular origin, from those which are of primary atrial origin. For example, atrial dysrhythmias such as atrial tachycardia, atrial flutter or atrial fibrillation may be the primary and underlying cause for a secondary ventricular tachycardia. Accordingly, the ECG signals obtained from sensing electrodes in the atrium and the ventricle provide valuable information regarding the origin of a rhythm disorder of interest, and the type of therapy from among the therapies available from the device which are most likely to overcome the disorder and return the heart to normal sinus rhythm for the current physiological conditions.

Suitable floating electrode signal leads are known from VDD pacing principles, and are described, for example, by Brownlee in PACE, vol. 12 (March 1989), pp. 431–438, and by Heinz et al. in U.S. Pat. No. 5,078,133.

In the implanted device 25, the microprocessor evaluates the information obtained from the various sensors and applies the selected recognition criteria to distinguish between physiological and pathological tachycardia, with the interest being in the presence of ventricular tachycardia for reasons mentioned earlier herein. However, it may be that the VT is secondary, with the primary origin in the atrium. This state of affairs is not evident from the complementary sensor such as the activity sensor, which, if a pathological tachycardia is present, will simply indicates either that the patient is resting or is engaged in mild physical activity. If this state of affairs were all that is available, the device 25 capacitors would be charged and fired to deliver the appropriate cardioverting or defibrillating therapy to the ventricles. The result would be an inappropriate firing because such secondary VT is attributable to a primary AT here, and the selected therapy as well as its point of application would not suffice to break the tachycardia.

In this case, however, the microprocessor 29-1 also has the benefit of the atrial ECG status information derived from the atrial bipolar electrode for use in the

16

evaluation, independent of the ventricular ECG status. Since this information from the atrium indicates the presence of AT, the evaluation performed by the microprocessor may be programmed in those circumstances to attribute the VT to primary atrial origin. Thus, the response is substantially immediate selection by the microprocessor of a therapy regimen to terminate the atrial tachycardia or fibrillation which led to the VT. An appropriate therapy, then, where atrial fibrillation is determined by evaluation of the sense signals to be the primary cause of a secondary VT, is to deliver low energy shocks, such as in a range from 0.25 to 1.0 joule, from device 25 to the myocardium of the atrial chambers, via one of the two poles of the bipolar sensing electrode(s) 72 disposed in the right atrium and the external patch or the vena cava counter-electrode. A tiered therapy regimen may be employed here, with the predetermined therapies selected to treat atrial dysrhythmias such as atrial flutter, tachycardia or fibrillation. In any event, the selected therapy is strictly or solely a response to an atrial event, such as the application of atrial defibrillation, and to avoid applying high energy shocks to the ventricles.

Moreover, where VT is present when AF is detected, irrespective of the output signal derived from the activity sensor (or other non-ECG sensor), it may be, and typically would be desirable to disable further shifting of the tachycardia recognition criteria, at least until the AF has been terminated. The reason for this is that the modification of recognition criteria is not particularly helpful in these circumstances, and may simply produce undesirable complexities for the analysis.

With reference to FIG. 7, according to a related aspect of the invention, when a VT is detected the R-R interval, which is the coupling interval between heartbeats, is monitored by R-R interval detector 80. The purpose is to evaluate the ventricular ECG signals to determine whether the tachycardia exhibits a regular albeit rapid beat, or undergoes a variation in the R-R intervals. The output signal of the R-R detector 80, which representative of this is applied to microprocessor 29-1. If an R-R interval variation is occurring, it is an indication that an atrial dysrhythmia is present. In that event, the therapy should be applied in a manner to terminate the atrial dysrhythmia. The reason is that such a therapy will eliminate the VT because the atrial problem is primary, while the VT is only secondary. Here, this is achieved in the same manner as described above where an atrial dysrhythmia was found to be primary. The microprocessor controls the capacitors in output circuit 82 of device 25 to deliver low energy shocks in the range from about 0.25 to about 1.0 joule to the atrial chambers. As before, this is accomplished through one of the two poles 72 of the bipolar atrial sensing electrode(s) and the patch or counter-electrode. A tiered therapy regimen may be employed here also.

In contrast, an attempt to terminate such a secondary VT directly, by application of high voltage shocks through the ventricles, would prove unsuccessful in addition to causing sever trauma to the patient and a marked reduction in battery life.

When atrial dysrhythmia is found to be the primary cause of the VT, it becomes undesirable to attempt to modify the tachycardia recognition rate as was described earlier herein. Such modification of criteria is used for the specific purpose of providing more reliable detection of VT when the patient appears to be engaged in exercise. However, when an irregular R-R interval is

5,403,355

**17**

detected it is clear that exercise is not taking place. Accordingly, the modification response to the activity sensor output is disabled by the microprocessor when a variation in the R-R interval is detected while a VT is occurring.

Although certain preferred embodiments and methods have been disclosed herein, it will be apparent to those skilled in the art from a consideration of the foregoing description that variations and modifications of the described embodiments and methods may be made without departing from the true spirit and scope of the invention. Accordingly, it is intended that the invention shall be limited only to the extent required by the appended claims and the rules and principles of applicable law.

What is claimed is:

1. An implantable medical interventional device for delivering electrical therapies to the heart of an implant patient to treat pathologic ventricular tachycardia, comprising:

first sensor means adapted to generate a signal indicative of the patient's ventricular ECG status,

second sensor means adapted to generate a signal indicative of the patient's atrial ECG status,

evaluation means for establishing criteria to distinguish physiologic and pathologic tachycardias in the ventricles from an evaluation of the signal generated by said first sensor means and adapted to apply an appropriate therapy in response to an evaluation that a pathologic tachycardia is present, said evaluation means including therapy delivering means responsive to the signal generated by said second sensor means indicative of atrial fibrillation or other atrial dysrhythmias for limiting the therapy to an atrial response.

2. The device of claim 1, in which:

the evaluation means is further adapted to compare the signals indicative of atrial ECG status and ventricular ECG status to discriminate primary ventricular tachycardias from secondary ventricular tachycardias of primary atrial origin, and

the therapy delivering means is adapted to deliver electrical therapies in a tiered regimen and is responsive to said discrimination of primary and secondary ventricular tachycardia to adjust the tiered therapy regimen accordingly.

3. The device of claim 2, in which:

the tiered therapy regimen includes a therapy of solely atrial defibrillation.

4. The device of claim 1, further including:

a non-ECG sensor adapted to sense a physiological parameter indicative of patient activity.

5. The device of claim 4, in which:

the evaluation means is responsive to detection of atrial fibrillation or other atrial dysrhythmia by the second sensor means, detection of ventricular tachycardia by the first sensor means, and an indication of a resting condition or low level activity by the non-ECG sensor, to treat the ventricular tachycardia as pathologic atrial tachycardia, and to select atrial defibrillation as the therapy to be applied, without delivery of any therapy to the ventricle.

6. The method of controlling pathologic tachycardia whether in the atrium or the ventricles of the heart, including:

sensing atrial and ventricular dysrhythmias,

providing tiered electrical therapies for application to the heart to treat the sensed dysrhythmia, and

**18**

responding to a sensed ventricular dysrhythmia in the right ventricle and to a sensed atrial dysrhythmia in the right atrium while the patient is substantially at rest, by treating both the ventricular dysrhythmia and the atrial dysrhythmia with one of the tiered therapies applied solely to the atrium.

7. The method of claim 6, in which:

the tiered therapy applied solely to the atrium is defibrillation therapy applied to one of the two atrial poles used for bipolar sensing of the atrial ECG.

8. The method of claim 7, wherein:

evaluation of the ECG signal includes using signal information indicative of both the ventricular ECG status and the atrial ECG status.

9. The method of claim 8, wherein:

one of the therapies among the tiered electrical therapies which may be selected is solely atrial defibrillation without a concurrent therapy applied to the ventricles.

10. An implantable medical interventional device for delivering electrical therapies to the heart of an implant patient to treat pathologic ventricular tachycardia, comprising:

first sensor means adapted to be positioned in the patient's right ventricle to sense ventricular electrical activity,

second sensor means adapted to be positioned in the patient's right atrium to sense atrial electrical activity, and

defibrillation electrode means adapted to be positioned in the patient's right ventricle to electrically stimulate excitable myocardial tissue thereof;

evaluation means establishing criteria to distinguish ventricular tachycardia of physiologic origin and of pathologic origin, and responsive to said first and second sensor means for determining whether a pathologic ventricular tachycardia is primary, originating from ventricular dysfunction, or secondary, originating from atrial dysfunction; and

control means responsive to said evaluation means for selecting an electrical therapy for delivery to the patient's heart;

all of said first and second sensor means and said defibrillation electrode means being disposed on the same electrode structure.

11. The device of claim 10, including:

another defibrillation electrode means adapted to be positioned in the patient's right atrium to electrically stimulate excitable myocardial tissue thereof, on said same electrode structure.

12. The device of claim 11, wherein:

said another defibrillation electrode means is part of said second sensor means.

13. A method of controlling both atrial and ventricular pathologic dysrhythmias, including:

sensing atrial and ventricular dysrhythmias utilizing respective recognition criteria,

normally modifying the recognition criteria for ventricular dysrhythmias if it is determined that the patient is undergoing exercise and removing the modification when the patient returns to a state of rest,

providing tiered electrical therapies for application to the heart to treat the sensed dysrhythmia,

responding to a sensed dysrhythmia in the right ventricle and to a sensed atrial dysrhythmia in the right atrium as indicative that the atrial dysrhythmia is primary, by treating both the ventricular dysrhyth-

5,403,355

**19**

mia and the atrial dysrhythmia with one of the tiered therapies applied solely to the atrium, while avoiding modification of the recognition criteria.

14. The method of claim 13, in which:

the step of applying a tiered therapy solely to the atrium is performed by applying a cardioversion therapy applied to an atrial electrode which is also used for sensing the atrial ECG.

**20**

15. The method of claim 13, wherein:

the dysrhythmia in the right ventricle is sensed by detecting the R-R interval of the patient's electrical cardiac activity.

16. The method of claim 15, wherein:

determination that the ventricular dysrhythmia is arising from atrial dysrhythmia is made upon sensing an irregular R-R interval.

\* \* \* \* \*

# EXHIBIT 57



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title
**NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.**

**Total Assignments: 6**

**Patent #:** 5403355    **Issue Dt:** 04/04/1995    **Application #:** 08279947    **Filing Dt:** 07/25/1994
**Inventor:** ECKHARD ALT
**Title:** IMPLANTABLE MEDICAL INTERVENTIONAL DEVICE WITH ATRIAL DYSRHYTHMIA THERAPY FOR TACHYCARDIA

**Assignment: 1**

**Reel/Frame:** 007099/0343    **Recorded:** 07/25/1994    **Pages:** 2
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** ALT, ECKHARD    **Exec Dt:** 06/23/1994
**Assignee:** INTERMEDICS, INC.
                  4000 TECHNOLOGY DRIVE
                  ANGLETON,, TEXAS 77515
**Correspondent:** DONALD R. GREENE
                  O'CONNOR CAVANAGH
                  ONE EAST CAMELBACK ROAD
                  SUITE 1100
                  PHOENIX, AZ 85012-1656

**Assignment: 2**

**Reel/Frame:** 014699/0789    **Recorded:** 11/19/2003    **Pages:** 3
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** INTERMEDICS, INC.    **Exec Dt:** 11/10/2003
**Assignee:** ADVANCED MEDICAL DEVICES, S.A.
                  16A BOULEVARD DE LA FOIRE
                  BP 524, L2015, LUXEMBOURG
**Correspondent:** WEIL GOTSCHAL & MANGES
                  ANITA E. KADALA
                  700 LOUISIANA, SUITE 1600
                  HOUSTON, TX 77002-2784

**Assignment: 3**

**Reel/Frame:** 015722/0220    **Recorded:** 08/25/2004    **Pages:** 3
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** ADVANCED MEDICAL DEVICES, S.A.    **Exec Dt:** 08/19/2004
**Assignee:** DR. ECKHARD U. ALT
                  4930 ST. CHARLES AVENUE
                  NEW ORLEANS, LOUISIANA 70115
**Correspondent:** WEIL, GOTSHAL & MANGES LLP
                  ANITA E. KADALA
                  700 LOUISIANA
                  STE. 1600
                  HOUSTON, TX 77002-2784

**Assignment: 4**

**Reel/Frame:** 018296/0826    **Recorded:** 09/26/2006    **Pages:** 5

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** ALT, ECKHARD U., M.D.                                              **Exec Dt:** 09/15/2006

**Assignee:** MEDTRONIC, INC.
710 MEDTRONIC PARKWAY NE
WORLD HEADQUARTERS
MINNEAPOLIS, MINNESOTA 55432

**Correspondent:** JOHN S. PARZYCH
200 SOUTH SIXTH STREET
IP GROUP - SUITE 4000
MINNEAPOLIS, MN 55402

## Assignment: 5

**Reel/Frame:** 018296/0929          **Recorded:** 09/26/2006                    **Pages:** 5

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** ADVANCED MEDICAL DEVICES, S.A.                                    **Exec Dt:** 09/15/2006

**Assignee:** MEDTRONIC, INC.
710 MEDTRONIC PARKWAY NE
WORLD HEADQUARTERS
MINNEAPOLIS, MINNESOTA 55432

**Correspondent:** JOHN S. PARZYCH
200 SOUTH SIXTH STREET
IP GROUP - SUITE 4000
MINNEAPOLIS, MN 55402

## Assignment: 6

**Reel/Frame:** 018296/0976          **Recorded:** 09/26/2006                    **Pages:** 5

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** SCICOTEC GMBH                                                      **Exec Dt:** 09/15/2006

**Assignee:** MEDTRONIC, INC.
710 MEDTRONIC PARKWAY NE
WORLD HEADQUARTERS
MINNEAPOLIS, MINNESOTA 55432

**Correspondent:** JOHN S. PARZYCH
200 SOUTH SIXTH STREET
IP GROUP - SUITE 4000
MINNEAPOLIS, MN 55402

Search Results as of: 10/22/2007 01:23 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1
Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&frame=&pat=5403355&pub=&...          10/22/2007

# EXHIBIT 58



**United States Patent and Trademark Office**                                    **PATENTS**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Patents > Search Colections > MPEP > § 3.54 Effect of recording. - Appendix R    PATENT RULES

Go to **MPEP - Table of Contents**

**browse before**

# § 3.54 Effect of recording. - Appendix R    PATENT RULES

### § 3.54 Effect of recording.

The recording of a document pursuant to **§ 3.11** is not a determination by the Office of the validity of the document or the effect that document has on the title to an application, a patent, or a registration. When necessary, the Office will determine what effect a document has, including whether a party has the authority to take an action in a matter pending before the Office.

[Added, 57 FR 29634, July 6, 1992, effective Sept. 4, 1992]

**browse after**

| KEY: =online business system  =fees  =forms  =help  =laws/regulations  =definition (glossary) |
| --- |

*The Inventors Assistance Center is available to help you on patent matters. Send questions about USPTO programs and services to the USPTO Contact Center (UCC). You can suggest USPTO webpages or material you would like featured in this section by E-mail to the webmaster@uspto.gov. While we cannot promise to accommodate all requests, your suggestions will be considered and may lead to other improvements on the website.*

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Last Modified: 11/21/2006 15:09:26

Go to **MPEP - Table of Contents**

# EXHIBIT 59



**United States Patent and Trademark Office**                                    **PATENTS**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Patents > Search Collections > MPEP > 307 Issue to Assignee [R-3] - 300 Ownership and Assignment

Go to **MPEP - Table of Contents**

browse before

# 307 Issue to Assignee [R-3] - 300 Ownership and Assignment

## 307 Issue to Assignee [R-3]

### 35 U.S.C. 152 Issue of patent to assignee.

Patents may be granted to the assignee of the inventor of record in the Patent and Trademark Office, upon the application made and the specification sworn to by the inventor, except as otherwise provided in this title.

---

**>

### 37 CFR 3.81 Issue of patent to assignee.

(a) *With payment of the issue fee*: An application may issue in the name of the assignee consistent with the application's assignment where a request for such issuance is submitted with payment of the issue fee, provided the assignment has been previously recorded in the Office. If the assignment has not been previously recorded, the request must state that the document has been filed for recordation as set forth in § **3.11**.

(b) *After payment of the issue fee*: Any request for issuance of an application in the name of the assignee submitted after the date of payment of the issue fee, and any request for a patent to be corrected to state the name of the assignee, must state that the assignment was submitted for recordation as set forth in § **3.11** before issuance of the patent, and must include a request for a certificate of correction under § **1.323** of this chapter (accompanied by the fee set forth in § **1.20**(a)) and the processing fee set forth in § **1.17** (i) of this chapter.

(c) *Partial assignees*. (1) If one or more assignee, together with one or more inventor, holds the entire right, title, and interest in the application, the patent may issue in the names of the assignee and the inventor.

(2) If multiple assignees hold the entire right, title, and interest to the exclusion of all the inventors, the patent may issue in the names of the multiple assignees.<

---

Normally, for a patent to issue to an assignee, a request for issuance of the application in the name* of the assignee* must be filed in the United States Patent and Trademark Office (Office) at a date not later than the day on which the issue fee is paid. **>Such a request must indicate that the assignment has been previously recorded in the Office. If the assignment has not been previously recorded in the Office, the request must state that the document has been filed for recordation as set forth in 37 CFR **3.11**. See 37 CFR **3.81**(a).

If a request for issuance to an assignee pursuant to 37 CFR **3.81**(b) is submitted after the day on which the issue fee is paid, the request under 37 CFR **3.81**(b) must include a request for a certificate of correction under 37 CFR **1.323** (accompanied by the fee set forth in 37 CFR **1.20**(a)) and the processing fee set forth in 37 CFR **1.17**(i). The request under 37 CFR **3.81** (b) must state that the assignment was submitted for recordation as set forth in 37 CFR **3.11** before issuance of the patent. The Office will issue a certificate of correction to reflect that the patent issued to the assignee provided the requirements of 37 CFR **3.81**(b) and 37 CFR **1.323** are complied with.<

Only the first appearing name of an assignee will be printed on the patent where multiple names for the same party are identified on the **>Fee(s)< Transmittal form, PTOL-85B. Such multiple names may occur when both a legal name and an "also known as" or "doing business as" name is also included. This printing practice will not, however, affect the existing practice of recording assignments with the Office in the Assignment Division. The assignee entry on form PTOL-85B should still be completed to indicate the assignment data as recorded in the Office. For example, the assignment filed in the Office and, therefore, the PTOL-85B assignee entry might read "Smith Company doing business as (d.b.a.) Jones Company." The assignee entry on the printed patent will read "Smith Company."

Irrespective of whether the assignee participates in the prosecution of the application, the patent issues to the assignee if so indicated on the **>Fee(s)< Transmittal form PTOL-85B. Unless an assignee's name and address are identified in item 3 of the **>Fee(s)< Transmittal form PTOL-85B, the patent will issue to the applicant. Assignment data printed on the patent will be based solely on the information so supplied. >Assignment information printed on a patent is not updated after a patent is issued, and may not be reflective of the assignment recorded in the Office subsequent to the issuance of the patent. Detailed assignment information can be found by performing an assignment search on the USPTO Internet website, and by inspecting the recorded assignment documents.<

A request for a certificate of correction under **37 CFR 1.323** (see **MPEP § 1481** and **§ 1485**) arising from incomplete or erroneous assignee's name furnished >, or a missing assignee's name,< in item 3 of PTOL-85B will not be granted unless a **>request under 37 CFR **3.81**(b) has been granted and the assignment was submitted for recordation as set forth in 37 CFR **3.11** before the patent issued. Any such request under 37 CFR **3.81**(b)< should be directed to the Office of Petitions and should include:

(A) the *>processing< fee required by **37 CFR 1.17**(*>i<);

(B) a request **>for issuance of the application in the name of the assignee, or a request that a patent be corrected to state the name of the assignee;<

(C) a statement that the **>assignment was submitted for recordation as set forth in 37 CFR **3.11** before the issuance of the patent;< and

(D) a **>request for a certificate of correction under 37 CFR **1.323** accompanied by the fee set forth in 37 CFR **1.20**(a).<

**browse after**

---

| KEY: 🐭=online business system  💲=fees  📑=forms  🕙=help  ⚖️=laws/regulations  📖=definition (glossary) |
| --- |

*The **Inventors Assistance Center** is available to help you on patent matters. Send questions about USPTO programs and services to the **USPTO Contact Center (UCC)**. You can suggest USPTO webpages or material you would like featured on this section by E-mail to the **webmaster@uspto.gov**. While we cannot promise to accommodate all requests, your suggestions will be considered and may lead to other improvements on the website.*

---

Last Modified: 11/03/2006 15:28:55

Go to **MPEP - Table of Contents**

# EXHIBIT 60

# EXHIBIT FILED UNDER SEAL

Exhibit 60 - copy of "ANNEX 1" to the Statement by Eisenlohr, LL.M.

# EXHIBIT 61

# EXHIBIT FILED UNDER SEAL

Exhibit 61 – German translation

# EXHIBIT 62

# EXHIBIT FILED
# UNDER SEAL

Exhibit 62 - copy of "ANNEX 3" to the Statement by Eisehlohr, LL.M.

# EXHIBIT 63

# EXHIBIT FILED
# UNDER SEAL

Exhibit 63 - copy of "ANNEX 6" to the Statement by Eisenlohr, LL.M.

# EXHIBIT 64

# EXHIBIT FILED
# UNDER SEAL

Exhibit 64 - true and correct copy of "ANNEX 7" to the Statement by Eisenlohr, LL.M.

# EXHIBIT 65

# EXHIBIT FILED
# UNDER SEAL

Exhibit 65 - true and correct copy of "ANNEX 9" to the Statement by Eisenlohr, LL.M.

# EXHIBIT 66

# EXHIBIT FILED UNDER SEAL

Exhibit 66 – German translation – Annex 10

# EXHIBIT 67

# EXHIBIT FILED UNDER SEAL

Exhibit 67 - copy of "ANNEX 11" to the Statement by Eisenlohr, LL.M.